**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; and TEXAS ASSOCIATION OF BUSINESS, <br><br> *Plaintiffs,* <br><br> v. <br><br> INTERNAL REVENUE SERVICE; UNITED STATES DEPARTMENT OF THE TREASURY; JOHN A. KOSKINEN, in his official capacity as Commissioner of Internal Revenue; and JACOB J. LEW, in his official capacity as United States Secretary of the Treasury, <br><br> *Defendants.* | Civil Action No. 1:16-cv-944 |

## COMPLAINT

Plaintiffs Chamber of Commerce of the United States of America and Texas Association of Business allege, by and through their attorneys, on knowledge as to Plaintiffs and on information and belief as to all other matters, as follows:

1. On April 4, 2016, the Internal Revenue Service and the Department of the Treasury issued a "temporary" rule that took effect immediately without a prior opportunity for notice and comment in order to stop otherwise lawful cross-border mergers of private companies that federal Executive Branch officers apparently do not want to occur. *See Inversions and Related Transactions*, 81 Fed. Reg. 20,858, 20,865–66 (Apr. 8, 2016) (codified at 26 C.F.R. § 1.7874-8T). Although it might seem esoteric, this action is a clear case of federal Executive Branch officers and agencies bypassing Congress and short-circuiting legislative debate over a hotly contested issue by unilaterally imposing the Administration's preferred policy result in violation of clear statutory limits. The Executive Branch has purported to rewrite the Internal

Revenue Code, and to do so in disregard of the rulemaking requirements of the Administrative Procedure Act ("APA").  If the Defendants' rule is permitted to stand, it is not just mergers that will suffer—it is the rule of law, and the certainty and stability required for effective commerce, markets, and economic growth, that are truly threatened by Defendants' unauthorized and unlawful action.

2.      For over a decade, corporate taxpayers in the United States have engaged in transactions in reliance on a detailed statutory framework governing the tax consequences of so-called corporate "inversions."  After Congress declined to adopt the Executive Branch's proposed amendment to this framework in 2014, Defendants—the Internal Revenue Service, the Treasury Department, and senior Executive Branch officials—decided to rewrite these clear statutory rules.

3.      Because the United States is unique among developed nations both in imposing a high corporate income tax rate and in taxing the profits that U.S. corporations earn through their foreign subsidiaries, U.S. corporations with subsidiaries abroad face higher taxes on their foreign operations than they would if incorporated elsewhere, thus putting them at a competitive disadvantage.  This disparity creates significant incentives to incorporate outside the United States in order to shield foreign subsidiaries from burdensome U.S. taxation and thereby remain competitive in a global economy.  Corporate "inversions" are a way to accomplish this goal.

4.      In a typical corporate inversion, a U.S. corporation with foreign subsidiaries engages in a transaction with a foreign corporation whereby the U.S. corporation becomes a subsidiary of a new foreign parent, which is typically incorporated in a lower-tax jurisdiction. Because the inversion allows the U.S. corporation's new parent to face less burdensome taxes on its worldwide profits, it is able to invest additional funds in U.S. facilities and American employees.

5.      Recognizing those benefits, Congress in 2004 added a provision to the Internal Revenue Code—Section 7874—that disqualifies inversions for tax purposes only if the foreign company's shareholders do not retain a meaningful stake in the new foreign parent corporation. In other words, Congress shut down the practice of inverting through empty transactions, but maintained the permissibility of inversions that involve genuine corporate mergers or acquisitions.  Section 7874 sets forth an elaborate, specific framework for distinguishing between the two.

6.      Since 2004, members of Congress have advanced a variety of legislative proposals to regulate inversions more aggressively.  None has been enacted into law.

7.      In 2014, President Obama urged Congress to amend Section 7874 to make it more difficult for U.S. corporations to engage in inversions.  As Executive Branch officials recognized at the time, the President could not change this law unilaterally.  Although the Internal Revenue Code gave the Executive Branch power to target inversions that sought to avoid the statutory framework, it could not eliminate transactions that genuinely complied with the Code.  As the Treasury Secretary, Jacob J. Lew, admitted: "We have looked at the tax code.  There are a lot of obscure provisions that we do not believe we have the authority to address this inversion question through administrative action.  If we did, we would be doing more.  That's why legislation is needed. . . .  There are limits to what we can do without legislative action."

8.      When Congress failed to do the President's bidding, however, the Defendants took unilateral action.  In response to a proposed merger between two companies that fully complied with the existing law on inversions, the Defendants issued, without notice or opportunity for comment, a regulation tailored to destroy that deal—and to foreclose similar transactions in the future—despite a complete absence of statutory authority to do so.  That

regulation, announced on April 4, 2016, is known as the "multiple domestic entity acquisition rule" ("the Multiple Acquisition Rule").  *Inversions and Related Transactions*, 81 Fed. Reg. at 20,865–66; *see* 26 C.F.R. § 1.7874-8T.  As intended, the Multiple Acquisition Rule caused the two corporations to abandon their proposed merger.

9.     The Multiple Acquisition Rule has harmed members of Plaintiffs, who are business organizations committed to defending the business community and the free enterprise system in Texas and throughout the Nation from unlawful regulations, particularly those that limit business opportunities and inhibit the ability of American companies to remain competitive in the global economy.

10.     Accordingly, Plaintiffs ask this Court to set aside the Multiple Acquisition Rule as unlawful under the APA, 5 U.S.C. § 706.

## PARTIES

11.     Plaintiff Chamber of Commerce of the United States of America ("Chamber") is a non-profit organization created in and existing under the laws of the District of Columbia.  The Chamber is the world's largest federation of businesses and associations, directly representing 300,000 members, and indirectly representing the interests of more than three million U.S. businesses and professional organizations of every size, in every industry sector, and from every region of the country.  Of particular relevance here, the Chamber routinely advocates on matters of federal tax law and policy and on matters of administrative law and procedure, including by the filing of lawsuits challenging federal regulatory actions.  In bringing this action, the Chamber seeks to vindicate the interests of its members, tens of thousands of whom are based in Texas, who have been and continue to be injured by the Multiple Acquisition Rule, and to advance its goal of challenging unlawful regulations that harm business interests and job growth.  The Chamber's individual members are not indispensable to the proper resolution of the case.

12.     Plaintiff Texas Association of Business ("TAB") is the state chamber of commerce for Texas, advocating for policies favorable to businesses on behalf of Texas employers and businesses of all sizes and representing more than 4,000 business members as well as their more than 600,000 employees at the state and federal levels.  In bringing this lawsuit, TAB seeks to vindicate the interests of its members, who have been and continue to be injured by the Multiple Acquisition Rule, as well as to advance its goal of minimizing unlawful regulatory burdens faced by Texas employers.  TAB's individual members are not indispensable to the proper resolution of the case.

13.     Defendant Internal Revenue Service ("IRS") is an executive agency of the United States within the meaning of the APA.

14.     Defendant United States Department of the Treasury ("Treasury") is an executive agency of the United States within the meaning of the APA.

15.     Defendant John A. Koskinen is the Commissioner of Internal Revenue.  He is sued in his official capacity.

16.     Defendant Jacob J. Lew is the Secretary of the United States Department of the Treasury.  He is sued in his official capacity.

## JURISDICTION AND VENUE

17.     Because this action arises under the APA, 5 U.S.C. § 706, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l), because Defendants are officers and agencies of the United States and Plaintiff TAB resides in this District.

# BACKGROUND

## A.   The Existing Statutory and Regulatory Framework Addressing Inversions

19.     The rise of inversions is a symptom of the uncompetitive nature of U.S. corporate tax law.  Most developed nations do not tax their corporations on all income earned through foreign subsidiaries, and the handful of other nations that do tax worldwide income apply a much lower rate than the United States does.  To remain competitive as a global company, a U.S.-based multinational corporation therefore can indefinitely defer the taxes they owe on profits of foreign subsidiaries by declining to repatriate those profits, or engage in an inversion.  Inversions thus allow multinational corporations to bring more money earned abroad into the United States, leading to the creation of new American facilities and more American jobs, as well as increased profits for U.S. shareholders.  For example, in connection with its 2015 inversion, Medtronic agreed to create more jobs in Minnesota and to invest more profits earned abroad in the United States.  Inversions are nonetheless controversial because they reduce the potential amount of federal income tax for foreign companies with a U.S. presence.[1]

20.     Around the year 2000, a number of prominent U.S.-based multinational corporations inverted to tax havens such as Bermuda by creating shell corporations there to serve as parent corporations.  In these "mailbox inversions," the multinationals rented a mailbox in a foreign tax haven but did not maintain any staff, offices, employees, or business activities there, and continued to run all operations from the United States.  Members of Congress denounced

---

[1] *See* Joe Carlson, *Medtronic Says It Has Added 300-Plus Jobs to Minnesota*, Star Trib. (Sept. 3, 2015), http://www.startribune.com/larger-medtronic-beats-earnings-forecasts/324060161/; Diana Furchtgott-Roth, *Tax Inversions Help, Not Hurt, the Economy*, Econ. 21 (Aug. 8, 2014), http://economics21.org/html/tax-inversions-help-not-hurt-economy-1067.html.

these transactions as "shams" that "rob[] the rest of the tax-paying public," and began to explore legislative solutions.[2]

21.     In 2004, Congress ultimately settled on a law that "applies special tax rules to corporations that undertake certain defined inversion transactions."  H.R. Rep. No. 108-755, at 569 (2004).   It enacted Section 7874 of the Internal Revenue Code, which sets forth a comprehensive, detailed scheme to govern inversions.  Under Section 7874, a foreign corporation that acquires substantially all of the property of a U.S. corporation "pursuant to a plan" will fall into one of three categories for federal tax purposes:  *First*, if the shareholders of the U.S. corporation receive less than 60% of the foreign parent corporation's stock in exchange for their stock in the U.S. corporation, the foreign corporation will be treated as a "foreign corporation" and thus not subject to U.S. taxes on income earned outside of the United States.  *Second*, if the shareholders of the U.S. corporation receive at least 60% but less than 80% of the foreign corporation's stock in exchange for their stock in the U.S. corporation, the foreign corporation will be deemed a "surrogate foreign corporation" and denied certain tax benefits associated with its U.S. subsidiary.  *Third*, if the shareholders of the U.S. corporation receive 80% or more of the foreign corporation's stock in exchange for their stock in the U.S. corporation, then the foreign corporation will be treated as a "domestic corporation" that may be taxed on its and its subsidiaries' worldwide income, even though it is incorporated outside of the United States.  26 U.S.C. § 7874(a)–(b).  Essentially, the inversion in this latter scenario is disregarded.

---

[2] John D. McKinnon, *Senators Plan Curbs on Relocating to Bermuda, Other Tax Havens*, Wall St. J. (Mar. 22, 2002), http://www.wsj.com/articles/SB1016753449115132240; *see also* David Cay Johnston, *U.S. Corporations Are Using Bermuda To Slash Tax Bills*, N.Y. Times (Feb. 18, 2002), http://www.nytimes.com/2002/02/18/business/us-corporations-are-using-bermuda-to-slash-tax-bills.html?pagewanted=all.   *See generally* Michael S. Kirsch, *The Congressional Response to Corporate Expatriations: The Tension Between Symbols and Substance in the Taxation of Multinational Corporations*, 24 Va. Tax Rev. 475 (2005).

22.     This detailed framework balances the costs of inversions (the reduction in the U.S. tax base) with the benefits of these transactions (the increased repatriation of money earned abroad) by permitting inversions so long as foreign shareholders have a significant stake in the new foreign parent corporation.   If those shareholders own more than 40% of the foreign corporation, the transacting parties may reap all of the tax advantages associated with an inversion.   If those shareholders own more than 20% of the foreign corporation, they will receive certain tax benefits because those transactions "may have sufficient non-tax effect and purpose to be respected," but will be denied others because those transactions "warrant heightened scrutiny and other restrictions."  S. Rep. No. 108-192, at 142 (2003).  And if the foreign shareholders own 20% or less of the "foreign" corporation, then the transaction will be "disregarded for U.S. tax purposes," as their relatively small stake shows the transaction has "little or no non-tax effect or purpose."  *Id.*   In short, Congress struck a balance:  It allowed the United States to secure the benefits of real inversions while rejecting empty transactions.

23.     Beyond establishing these clear, bright-line percentage-of-ownership thresholds, Section 7874 gave Treasury limited authority to stop corporations from avoiding those thresholds. Section 7874(g) authorizes "such regulations as are necessary to carry out this section, including regulations providing for such adjustments to the application of this section as are necessary to prevent the avoidance of the purposes of this section."   Relatedly, the statute itself, in Section 7874(c)(4), requires that transactions be "disregarded if such transfers are part of a plan a principal purpose of which is to avoid the purposes of this section."  Finally, Section 7874(c)(6) authorizes the Secretary, with respect to determining "whether a corporation is a surrogate foreign corporation," to issue "appropriate" regulations to "treat stock as non-stock" or to "treat . . . other

. . . interests as stock" (or to take similar measures) to preclude a corporation from artificially satisfying the statutory percentages by dressing up one type of financial instrument as another.

24.     Under these provisions, Treasury has issued regulations targeting transactions carried out pursuant to a plan intended to avoid Section 7874's basic framework through artificial schemes.  For instance, in an effort to curb a type of "transaction intended to avoid section 7874," Treasury in 2009 issued a regulation clarifying that if a foreign corporation acquires substantially all of the property of two or more U.S. corporations "as part of the same plan," the ownership stake of the shareholders of those companies will be combined to compute the Section 7874 percentage.  *Guidance Under Section 7874 Regarding Surrogate Foreign Corporations*, 74 Fed. Reg. 27,920, 27,922 (June 12, 2009); *see* 26 C.F.R. § 1.7874-2(e).  Likewise, in January 2014, Treasury issued a regulation providing that if the foreign corporation acquiring a U.S. corporation issues stock either (1) in exchange for passive assets, or (2) in exchange for other property "with a principal purpose of avoiding the purposes of section 7874," that stock would be disregarded for purposes of determining the ownership percentages.  *Guidance for Determining Stock Ownership*, 79 Fed. Reg. 3,094, 3,102 (Jan. 17, 2014); *see* 26 C.F.R. § 1.7874-4T(i)(7).

**B.   The Administration's Failed Attempts To Amend the Law Concerning Inversions**

25.     Following Section 7874's enactment, members of Congress repeatedly proposed legislation aimed at further deterring inversions that were otherwise permitted under that section. Since 2005, there have been nearly 50 such bills introduced.  *See, e.g.*, S. 2667, 114th Cong. (2d Sess. 2016); H.R. 3959, 109th Cong. (1st Sess. 2005).  None has been enacted into law.

26.     In March 2014, the Administration included a provision in its proposed budget for Fiscal Year 2015 that would amend Section 7874's framework by, among other things,

eliminating the 60% threshold and reducing the 80% threshold to 50%.[3]   That amendment would, in effect, have completely disregarded all inversions except those that result in a foreign parent that is majority-owned by the shareholders of the foreign corporation.   The President then gave a speech in July 2014 criticizing U.S. corporations that had engaged in inversions that were valid and permissible under Section 7874 and the relevant regulations at the time.   Although he acknowledged that such conduct was "legal," he declared, "I don't care if it's legal—it's wrong." He urged Congress to adopt his proposal.[4]

27.     Congress did not enact this proposed amendment.

**C.     The Consideration of Administrative Responses To Inversions**

28.     Executive Branch officials initially conceded that they lacked authority to reject inversions that complied with Section 7874's percentage thresholds.  For example, in a July 2014 letter sent to Senator Grassley, Treasury's Assistant Secretary for Legislative Affairs Alastair Fitzpayne admitted that "[b]ecause of the way [recent] inversion transactions are structured"—*i.e.*, involving a U.S. corporation combining with a smaller, but still substantial, foreign corporation—"section 7874 does not apply to them, and they cannot be addressed comprehensively in regulations."[5]

29.     Similarly, when asked on July 16, 2014, "why can't the IRS start some sort of rule making" to address inversions, Secretary Lew responded: "We have looked at the tax code.

---

[3] *See* U.S. Dep't of the Treasury, *General Explanations of the Administration's Fiscal Year 2015 Revenue Proposals* 64–65 (2014),   https://www.treasury.gov/resource-center/tax-policy/Documents/General-Explanations-FY2015.pdf.

[4] White House, Office of the Press Secretary, *Remarks by the President on the Economy—Los Angeles, CA* (July 24, 2014), https://www.whitehouse.gov/the-press-office/2014/07/24/remarks-president-economy-los-angeles-ca.

[5] Juliann Francis, *Treasury Studying Corporate Inversions 10 Years After Congress Asked for a Report*, 12 Corp. L. & Accountability Rep. 817, 818 (July 18, 2014) (BNA).

There are a lot of obscure provisions that we do not believe we have the authority to address this inversion question through administrative action.  If we did, we would be doing more.  That's why legislation is needed.  That's why we proposed it in our budget.  . . .  There are limits to what we can do without legislative action."[6]

30.     Nonetheless, less than a month later, on August 5, 2014, Treasury issued a statement that it was "reviewing a broad range of authorities for possible administrative actions that could limit the ability of companies to engage in inversions."  The same day, Secretary Lew separately announced that officials were assembling a list of options to "change the economics of inversions," because "[i]f we have to wait for what is the likely period of time before business tax reform can be enacted," then "we're all going to regret the number of inversions that have occurred in the interim."[7]  A day later, the President remarked that when it came to administrative actions on inversions, "[w]e're reviewing all of our options" and "we want to move quickly—as quickly as possible."[8]

31.     On September 22, 2014, and November 19, 2015, Treasury issued two notices announcing its intention to promulgate regulations designed to address "transactions that are structured to avoid the purposes of section[] 7874."  *Additional Rules Regarding Inversions & Related Transactions*, 2015–49 I.R.B. 775 (Nov. 19, 2015); *Rules Regarding Inversions &*

---

[6] *CNBC Exclusive: CNBC's Jim Cramer Interviews Treasury Secretary Jack Lew from CNBC Institutional Investor Delivering Alpha Conference in NYC Today*, CNBC (July 16, 2014), http://www.cnbc.com/2014/07/16/cnbc-exclusive-cnbcs-jim-cramer-interviews-treasury-secretar y-jack-lew-from-cnbc-institutional-investor-delivering-alpha-conference-in-nyc-today.html.

[7] Richard Rubin & Kathleen Hunter, *Treasury Exploring Limits on Inversions Without Congress*, Bloomberg (Aug. 5, 2014), http://www.bloomberg.com/news/articles/2014-08-05/treasury-said-exploring-inversion-limits-without-congress.

[8] White House, Office of the Press Secretary, *Remarks by the President at Press Conference After U.S.-Africa Leaders Summit* (Aug. 6, 2014), https://www.whitehouse.gov/the-press-office/2014/08/06/remarks-president-press-conference-after-us-africa-leaders-summit.

*Related Transactions*, 2014–42 I.R.B. 712 (Sept. 22, 2014).  The Multiple Acquisition Rule was not one of the regulations proposed to address transactions "structured to avoid the purposes of section [] 7874."

**D.   The Proposed Merger Between Pfizer and Allergan**

32.     On November 22, 2015, Allergan plc ("Allergan"), a pharmaceutical company incorporated in Ireland, and Pfizer Inc. ("Pfizer"), a pharmaceutical company incorporated in the United States and headquartered in New York, announced their plan to merge into a new corporation named Pfizer plc.  Following this $160 billion transaction, the new company would be incorporated in Ireland with corporate headquarters in New York.

33.     If the contemplated merger between Allergan and Pfizer had been consummated, Allergan shareholders would have owned roughly 44% of the stock of the new corporation. Because Pfizer shareholders conversely would have owned less than 60% of Pfizer plc, that new corporation would have been treated as a foreign corporation under Section 7874 and thus not subject to U.S. taxes on income earned outside of the United States.  In other words, Section 7874 would not have disregarded this proposed inversion.

34.     Wholly apart from the federal tax benefits, the proposed merger was desirable for a variety of reasons.  For instance, the proposed merger would have allowed Allergan to use Pfizer's global presence to expand its products to new markets, as well to combine portfolios of complementary pharmaceuticals in areas such as dermatology and neuroscience.  The merger also would have let Pfizer access Allergan's successful portfolio of pharmaceuticals, such as the anti-wrinkle treatment BOTOX®.

**E.   Treasury Issues the Multiple Acquisition Rule in Response to the Pfizer-Allergan Merger**

35.     On April 4, 2016, Treasury and the IRS issued a series of new regulations designed to target inversions.  Although some of these rules had been proposed in the previous

Treasury notices issued in September 2014 and November 2015, the regulations also contained "new rules that address issues that were not discussed in either notice." *Inversions and Related Transactions*, 81 Fed. Reg. at 20,858.  One such new regulation was the Multiple Acquisition Rule.  *Id.*; *see* 26 C.F.R. § 1.7874-8T.

36.     For purposes of computing the ownership percentage under Section 7874, the Multiple Acquisition Rule disregards any stock issued by a foreign corporation in prior acquisitions of U.S. corporations occurring during the three years before the signing date of a pending acquisition.  This Rule applies even if those previous acquisitions were not part of a plan to avoid the framework of Section 7874.  *Inversions and Related Transactions*, 81 Fed. Reg. at 20,865–66.  As the Rule's preamble explains, "the Treasury Department and the IRS do not believe that the application of section 7874 in these circumstances should depend on whether there was a demonstrable plan to undertake the subsequent domestic entity acquisition at the time of the prior entity acquisitions."  *Id.* at 20,865; *see also id.* (explaining that Multiple Acquisition Rule was needed to get at "circumstances where section 7874 would otherwise have applied if the acquisitions had been made . . . pursuant to a plan").  In other words, the Rule pretends that previous, bona fide acquisitions do not exist in order to change the tax treatment that would unambiguously apply to a later, unrelated transaction under Section 7874.

37.     Treasury cited Section 7874(g) and Section 7874(c)(6) as authority for the Multiple Acquisition Rule, but offered no reasoned explanation for how these provisions authorized it to disregard transactions that were not part of a plan intended to circumvent the clear numerical thresholds of Section 7874.  *Id.*  Nor did Treasury acknowledge that it was changing its position from the one taken in its earlier regulations issued in June 2009 and January 2014, *see id.*

at 20,865–66, both of which would not have disregarded such transactions unless they were part of a plan to avoid Section 7874's purposes, *see* 26 C.F.R. §§ 1.7874-2(e), -4T(i)(7).

38.     Treasury further decreed, with no explanation, that it has "been determined that section 553(b) of the Administrative Procedure Act"—which requires agencies to notify regulated parties of a proposed substantive rule so that they have a chance to comment before it goes into effect—"does not apply to th[is] regulation[]."  *Inversions and Related Transactions*, 81 Fed. Reg. 20,588, 20,588 (Apr. 8, 2016).  It did so even though its prior claims to immunity from the APA have been repeatedly rebuked by the judiciary.  The Multiple Acquisition Rule also took effect immediately, although APA section 553(d) forbids such action absent "good cause."  *See Inversions and Related Transactions*, 81 Fed. Reg. at 20,904.

39.     The Multiple Acquisition Rule had the purpose and effect of eliminating the tax benefits associated with the announced Pfizer-Allergan merger.  Specifically, the Rule targeted the fact that the current corporate composition of Allergan was the product of several acquisitions of U.S. corporations by a foreign corporation over the past three years.  To start, in October 2013, Actavis, Inc., a U.S. pharmaceutical company, had entered into a deal with Warner Chilcott plc, an Irish pharmaceutical company.  As part of that transaction, a new corporation, Actavis plc, had been incorporated in Ireland.  Actavis plc then had acquired both Warner Chilcott plc and Actavis, Inc.  In connection with the latter acquisition, Actavis plc had issued approximately 134 million shares of its stock in exchange for Actavis, Inc. stock.  Then, in June 2014, Actavis plc had acquired Forest Laboratories, Inc. ("Forest Labs"), a U.S. pharmaceutical company, and had issued approximately 99 million shares of stock to the owners of Forest Labs in exchange for Forest Labs stock.  Finally, in March 2015, Actavis plc had acquired Allergan, Inc., a U.S.

pharmaceutical corporation, and had issued approximately 128 million shares of stock to the owners of Allergan, Inc. in exchange for Allergan, Inc. stock.

40.     Treasury did not doubt that each of the foregoing transactions was consistent with Section 7874.  Nonetheless, under the Multiple Acquisition Rule, Treasury purported to ignore the approximately 361 million shares of stock issued by Allergan in connection with these earlier transactions for purposes of computing the Section 7874 ownership percentage, even though these transactions had nothing to do with the subsequent Allergan-Pfizer merger and even though they did not involve the use of other financial instruments masquerading as stock to artificially satisfy the statute.

41.     Thus, even though Allergan shareholders would in reality have owned 44% of the new corporation following the Allergan-Pfizer merger, the Multiple Acquisition Rule would have treated those shareholders as owning under 20%.  Because Pfizer shareholders conversely would have been treated as owning over 80% of the new corporation, that entity would have been treated as a domestic corporation under Section 7874, and thus would have been subject to federal income tax on its and its subsidiaries' worldwide income.

42.     To ensure that Allergan and Pfizer could not abandon this merger and then enter into a new deal once the Multiple Acquisition Rule's three-year window would no longer apply to Allergan's prior domestic acquisitions, the regulations specified that the three-year window would look back from any "substantially similar acquisition" that had previously been terminated "with a principal purpose of avoiding section 7874."  *Inversions and Related Transactions*, 81 Fed. Reg. at 20,866; *accord* 26 C.F.R. § 1.7874-8T(g)(6).

43.     It was widely understood that Treasury had crafted the Multiple Acquisition Rule to prevent the consummation of the Pfizer-Allergan merger.  For example, Representative Sander

Levin, a supporter of Treasury's action, acknowledged that the Multiple Acquisition Rule "in many ways was targeting Pfizer-Allergan," and that "what the Treasury did was take the history of the inversions by Allergan" and then gerrymander a regulation to support rejection of the Pfizer inversion.[9]

**F.   The Effects of the Multiple Acquisition Rule**

44.    On April 5, 2016, the day after these new regulations were issued, Pfizer and Allergan announced that they had abandoned their planned merger because of the regulations.

45.    The same day, the President gave a speech in which he proclaimed that "this is something that I've been pushing for a long time."   The President acknowledged that the inversions targeted by the Defendants were "legal," but concluded that their legality was "exactly the problem," as "[i]t's not that they're breaking the laws, it's that the laws are so poorly designed."   He then declared that the new regulations "will make it more difficult and less lucrative for companies to exploit this particular corporate inversions loophole."[10]

46.    Members of both Chamber and TAB have been and continue to be injured by the Multiple Acquisition Rule.   In addition to chilling Plaintiffs' members from considering other inversions that are currently permissible under Section 7874 for fear of similar targeting, the Rule itself precludes them from engaging in transactions similar to the Pfizer-Allergan merger.   Due to the Multiple Acquisition Rule, foreign corporations that acquired U.S. corporations in the past are disabled from successfully merging with other U.S. corporations in the future.   Conversely, U.S.-based multinationals that were considering mergers with foreign corporations now face a far

---

[9] *See* Ronald Orol, *Treasury Department Was 'Targeting' Pfizer-Allergan Deal*, MSN (Apr. 26, 2016), http://www.msn.com/en-us/money/other/treasury-department-was-targeting-pfizer-allergan-deal/ar-BBsiwrp.

[10] White House, Office of the Press Secretary, *Remarks by the President on the Economy* (Apr. 5, 2016), https://www.whitehouse.gov/the-press-office/2016/04/05/remarks-president-economy-0.

smaller pool of potential transaction partners.  In both respects, the opportunities for successful corporate transactions have been severely curtailed by the Multiple Acquisition Rule.

47.    For example, Allergan and Pfizer were injured by the Multiple Acquisition Rule's disruption of their merger plans.  In light of Allergan's prior acquisitions, the Multiple Acquisition Rule subjects the company to a regulatory disability that significantly limits and burdens, if not completely eliminates, its prospective opportunities to merge with U.S. corporations.  Likewise, the Multiple Acquisition Rule subjects Pfizer to a regulatory disability on its transaction capabilities by limiting its potential merger partners.  But for this Rule, Allergan would actively explore merger opportunities with large U.S. pharmaceutical companies, and Pfizer would actively explore merger opportunities with foreign pharmaceutical companies that have recently acquired U.S. corporations or may acquire such corporations; and if the Rule were set aside, then Allergan would actively pursue merger opportunities otherwise burdened by the Rule.  Pfizer is a member of both the Chamber and TAB, and Allergan is a member of both the Chamber and the Greater Waco Chamber of Commerce, which in turn is a member of TAB.

## COUNT ONE:
### UNAUTHORIZED AGENCY ACTION IN VIOLATION OF THE APA

48.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

49.    The APA forbids agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

50.    Section 7874 does not give Treasury authority to determine whether a corporation is a foreign, domestic, or surrogate foreign corporation for federal tax purposes.  Rather, the statute itself speaks to these precise questions by specifying that the characterization of the corporation turns on bright-line ownership percentages—namely, 60% and 80%.  Those statutory percentages determine the tax status of the inverted company's new parent corporation.  Treasury

17

has no delegated authority to substitute its judgment for whether a corporation should be treated as foreign or domestic, or otherwise to alter or ignore the statutorily prescribed percentages—by, for example, reducing 80% to 50%, as the President had proposed to Congress.

51.     Treasury's only authority to affect the statutory percentages is the limited power, when calculating the percentages, to disregard certain transactions (or aspects of transactions) if, and only if, they are part of a plan designed to avoid the purposes of Section 7874.  Absent such a purpose-avoiding plan, Treasury cannot revise the statutorily prescribed percentage-of-ownership calculations.  When a statute is clear, an agency may not use rulemaking to bypass the statutory scheme in order to purportedly better serve the administrator's views of the statute's underlying purposes.  Basic separation-of-powers principles forbid and condemn this "self-help" approach by the Executive Branch to update the law.

52.     The Multiple Acquisition Rule disregards an entire series of transactions without regard to whether they are part of a plan or designed to avoid Section 7874's purposes.  It therefore exceeds Treasury's statutory authority and must be set aside.

53.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

54.     Plaintiffs have "no other adequate remedy in a court."  5 U.S.C. § 704.

55.     Defendants' action in promulgating the Multiple Acquisition Rule has harmed and will continue to harm Plaintiffs and their members by foreclosing merger opportunities.

**COUNT TWO:**
**ARBITRARY AND CAPRICIOUS RULEMAKING IN VIOLATION OF THE APA**

56.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

57.     The APA forbids agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

58.     This provision of the APA requires federal agencies to give adequate reasons for their decisions and regulations.  If an agency fails to provide a reasoned explanation for its action, that action is arbitrary and capricious and must be set aside.

59.     Moreover, if an agency changes its position, the APA requires the agency to acknowledge the change as well the serious reliance interests created by its prior position, provide good justifications for the new policy, and explain why it may disregard the circumstances underlying and created by its earlier policy.

60.     Treasury's conduct in promulgating the Multiple Acquisition Rule was arbitrary, capricious, unsupported by a reasoned basis, and contrary to law.  Treasury did not provide adequate reasons for why it was issuing the Multiple Acquisition Rule.  It explained neither why the targeted transactions were contrary to Section 7874 or that Section's purposes, nor why it could disregard them in the absence of any plan to avoid the statutory framework.  Nor did it offer a reasoned explanation for why it was changing its policy of regulating only those transactions that were part of a plan to avoid Section 7874's framework or why it was now disregarding transactions that would have been permissible under its prior regulations.  Indeed, Treasury did not even acknowledge that it was changing its position in promulgating the Multiple Acquisition Rule, let alone consider the serious reliance interests created by its earlier pronouncements.

61.     The Rule was not a good-faith interpretation of the statute or effort to establish general regulatory guidance, but a gerrymandered effort to specifically target a particular transaction.  It therefore constituted an arbitrary and capricious abuse of discretion.

62.     The Multiple Acquisition Rule must therefore be set aside.

63.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

64.     Plaintiffs have "no other adequate remedy in a court." 5 U.S.C. § 704.

65.     Defendants' action in promulgating the Multiple Acquisition Rule has harmed and will continue to harm Plaintiffs and their members by foreclosing merger opportunities.

### COUNT THREE:
### FAILURE TO PROVIDE NOTICE AND AN OPPORTUNITY FOR COMMENT IN VIOLATION OF THE APA

66.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

67.     The APA forbids agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

68.     Before a substantive rule such as the Multiple Acquisition Rule may take effect, the APA requires the agency to issue a notice of proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved" in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)(3) & (c).

69.     The promulgation of the Multiple Acquisition Rule violated this notice-and-comment requirement.   As the preamble to April 4, 2016 regulations concede, the Multiple Acquisition Rule, which took effect on that date, is a "new rule[] that address[es] issues that were not discussed in either the [September 2014 or November 2015] notice." *Inversions and Related Transactions*, 81 Fed. Reg. at 20,858; *see id.* at 20,904.

70.     Treasury simply declared that it has "been determined that section 553(b) of the Administrative Procedure Act . . . does not apply to th[is] regulation[]." *Inversions and Related Transactions*, 81 Fed. Reg. at 20,588.  It did not and could not explain why the APA could be disregarded here.  Although the APA's notice-and-comment requirement does not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable,

unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), Treasury made no such good-cause finding here, much less provide the requisite statement of reasons for such a finding. Nor could it possibly have done so, as the purpose for promulgating this Rule without an opportunity for notice and comment was a plainly improper one:  to prevent the consummation of the imminent Pfizer-Allergan merger.  (For the same reason, Treasury did not and could not offer any "good cause" for making the Rule effective immediately, rather than 30 days after publication, as required by 5 U.S.C. § 553(d).)

71.    The fact that Treasury labeled the Multiple Acquisition Rule a "temporary" regulation does not excuse its violation of the APA.  Although Section 7805(e) of the Internal Revenue Code requires Treasury to issue any temporary regulation as a proposed regulation and to finalize that temporary regulation within three years of its promulgation, those limitations on Treasury's authority do not authorize dispensing with the APA's notice-and-comment requirement.

72.    Treasury's failure to provide notice or opportunity for comment also renders the Multiple Acquisition Rule substantively defective, because that expedited process precludes reasoned decisionmaking that accounts for, and responds to, comments on proposed rules.

73.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

74.    Plaintiffs have "no other adequate remedy in a court."  5 U.S.C. § 704.

75.    Defendants' action in promulgating the Multiple Acquisition Rule has harmed and will continue to harm Plaintiffs and their members by foreclosing merger opportunities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment setting aside the Multiple Acquisition Rule under 5 U.S.C. § 706(2).

Respectfully submitted,

Dated: August 4, 2016

/s/ Laura Jane Durfee

LILY FU CLAFFEE*
  D.C. Bar No. 450502
  LClaffee@USChamber.com
KATE COMERFORD TODD*
  D.C. Bar No. 477745
  KTodd@USChamber.com
STEVEN P. LEHOTSKY*
  D.C. Bar No. 992725
  SLehotsky@USChamber.com
WARREN POSTMAN*
  D.C. Bar No. 995083
  WPostman@USChamber.com
**U.S. CHAMBER LITIGATION CENTER**
1615 H Street NW
Washington, DC 20062
Telephone: (202) 463-5337
Facsimile: (202) 463-5346

MICHAEL A. CARVIN*
  D.C. Bar No. 366784
  macarvin@jonesday.com
RAYMOND J. WIACEK*
  D.C. Bar No. 925966
  rjwiacek@jonesday.com
ANDREW M. EISENBERG*
  D.C. Bar No. 445346
  ameisenberg@jonesday.com
JACOB M. ROTH*
  D.C. Bar No. 995090
  yroth@jonesday.com
BRINTON LUCAS*
  D.C. Bar No. 1015185
  blucas@jonesday.com
**JONES DAY**
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
**JONES DAY**
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

*Applications for admission *pro hac vice* pending