CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

ADAM D. STRAIT (Mass. BBO No. 670484)
MICHELLE C. JOHNS (Texas SBN 24010135)
PAUL T. BUTLER (MD Bar No. 9406230037))
Trial Attorneys
U.S. Department of Justice, Tax Division
P.O. Box 683
Washington, D.C. 20044-0683
Telephone: (202) 307-2135
Fax: (202) 307-2135
adam.d.strait@usdoj.gov

*Of counsel:*
RICHARD L. DURBIN
United States Attorney
Western District of Texas

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, and TEXAS ASSOCIATION OF BUSINESS, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES INTERNAL REVENUE SERVICE, *et al.,* <br><br> *Defendants.* | No. 1:16-cv-944-LY <br><br> **Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction** |

# TABLE OF CONTENTS

I.   Background: Inversions, I.R.C. § 7874, and the Rule. ........................... 2

   A.   Overview of U.S. Taxation of International Corporations and the Effect of Inversions. ....................................................................... 2

   B.   Section 7874 Limits the Benefits of Tax-Driven Inversions by Using a Proxy Test for Tax Motivation. ....................................... 5

   C.   The Treasury Department Creates the Rule to Block One Method of Avoiding the Reach of I.R.C. § 7874. ........................... 8

II.  The Plaintiffs Lack Associational Standing to Maintain this Suit Because They Have Not Shown Any Individual Member Has Standing. ........................................................................ 11

   A.   The Plaintiffs' Claim Regarding Precluded Inversions Is Not Sufficiently Concrete and Imminent to Justify Prospective Relief. ..................................................................................... 13

   B.   Conjectural "Precluded" Mergers Are Not Traceable to the Rule, and the Failure of the Proposed Pfizer-Allergan Transaction Is Not Redressable by Prospective Relief. ....................................... 16

   C.   The Plaintiffs Have Not Alleged Facts Showing a Substantial Risk of Future Harm from the Rule. ............................................ 17

III. The Anti-Injunction Act Bars Plaintiffs' Suit. ...................................... 22

   A.   The Plaintiffs' Requested Relief Falls Within the Anti-Injunction Act. ............................................................................. 24

   B.   Neither Judicial Exception to the Anti-Injunction Act Applies. ............... 26

IV.  Conclusion ..................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Alexander v. "Americans United" Inc.,* 416 U.S. 752 (1974)........................... 24, 25, 30

*Bellinger v. Cagle*, 685 F. Supp. 142, 143 (N.D. Tex. 1987) ...................................... 30

*Bob Jones University v. Simon*, 416 U.S. 725 (1974) .............................. 23, 24, 25, 27

*Campbell v. Guetersloh*, 287 F.2d 878 (5th Cir. 1961) ............................................... 23

*Chamber of Commerce v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ....................... 1, 16, 32

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................... 15

*Clapper v. Amnesty Int'l USA*, 568 U.S. ___, 133 S. Ct. 1138 (Feb. 26, 2013) ...................................................................................................................... 17

*Clinton v. City of New York*, 524 U.S. 417 (1998)................................................. 18, 19

*Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) ........................................ 23, 25

*Cool Fuel, Inc. v. Connett*, 685 F.2d 309 (9th Cir. 1982) ........................................... 30

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ......................................................... 2

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................. 13

*Direct Marketing v. Brohl*, 575 U.S. ___, 135 S.Ct. 1124 (Mar. 3, 2015) .................. 25

*Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1 (1962).......................... 27, 28, 30

*Flora v. United States*, 362 U.S. 145 (1960)............................................................... 27

*Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012) ..................................................................................................... 12

*Hotze v. Burwell*, 784 F.3d 984 (5th Cir. 2015) ......................................................... 22

*Hunsucker v. Phinney*, 497 F.2d 29 (5th Cir. 1974) ................................................... 30

*Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)...................... 11

*Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1 (D.C. Cir. 1979)....................... 23

*Lewis v. Knutson*, 699 F.2d 230 (5th Cir. 1983) .......................................................... 2

*Linn v. Chivatero*, 714 F.2d 1278 (5th Cir. 1983)....................................................... 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................ 11, 14, 15, 16, 19

*Maze v. Internal Revenue Service*, 2016 WL 4007075 (D.D.C. 2016), *appeal docketed*, No. 16-5265 (D.C. Cir.).............................................................. 25

*McCabe v. Alexander*, 526 F.2d 963 (5th Cir. 1976) .................................... 22

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) ................................ 30

*NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010) ................................. 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. ___, 132 S. Ct. 2566 (June 28, 2012) ........................................................................................................ 22

*Public Citizen v. Bomer*, 274 F.3d 212 (5th Cir. 2001) ............................... 12

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ................. 11

*Smith v. Booth*, 823 F.2d 94 (5th Cir. 1987) ............................................... 22

*South Carolina v. Regan*, 465 U.S. 367 (1984) ..................................... 26, 27

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ...................... 15, 20

*Susan B. Anthony List v. Driehaus*, 573 U.S. ___, 134 S.Ct. 2334 (June 16, 2014) ........................................................................................................... 12

*Warth v. Seldin*, 422 U.S. 490 (1975).......................................................... 12

*We the People Found., Inc. v. United States*, 485 F.3d 140 (D.C. Cir. 2007) ............. 22

## **Statutes**

28 U.S.C. § 1341.............................................................................................. 25

28 U.S.C. § 2201.............................................................................................. 22

5 U.S.C. § 702.................................................................................................. 22

5 U.S.C. § 706.................................................................................................. 24

I.R.C. § 11.......................................................................................................... 3

I.R.C. § 61.......................................................................................................... 3

I.R.C. § 6511................................................................................................... 27

I.R.C. § 6532................................................................................................... 27

I.R.C. § 7421 (the Anti-Injunction Act, or AIA)....................... 2, 22, 23, 25

I.R.C. § 7422................................................................................................... 27

I.R.C. § 7701..................................................................................................... 2

I.R.C. § 7805 ................................................................................. 28, 29

I.R.C. § 7874 .................................................................................. passim

I.R.C. § 881 ......................................................................................... 3

I.R.C. § 882 ......................................................................................... 3

I.R.C. § 951 ......................................................................................... 3

I.R.C. § 952 ......................................................................................... 3

I.R.C. § 954 ......................................................................................... 3

## **Regulations**

T.D. 9761, 81 Fed. Reg. 20,858 (Apr. 8, 2016) ....................................... 9, 29

Treas. Reg. § 1.7874-1 .......................................................................... 8

Treas. Reg. § 1.7874-4T ......................................................................... 9

Treas. Reg. § 1.7874-8T .............................................................. 9, 10, 14, 21

## **Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................... 2, 30

## **8**

H.R. Conf. Rep. 108-755 (2004) ............................................................... 8

H.R. Rep. 108-548(I) (2004) ................................................................... 5

S. Rep. No. 108-192 (2003) .......................................................... 3, 5, 7, 29

Staff of the Joint Committee on Taxation, General Explanation of Tax
    Legislation Enacted in the 108th Congress (JCS-5-05) (May 31, 2005)
    (JCT Explanation) ...................................................................... 4, 5, 7

The Plaintiffs ask the Court to invalidate a reasonable regulation limiting the tax benefits on corporate inversions. Inversions occur when a U.S. firm shifts its tax residence offshore. Often the aim is to avoid paying U.S. tax. Inversions erode the U.S. tax base by reducing the total amount of corporate income subject to U.S. taxes. Inversions also undermine the perception that the tax code is fair, because they permit a multinational corporation to change its tax rate in a way that small businesses and individuals cannot. In some situations, a company might change its tax residency but carry on business as usual in the United States. Particularly concerned about those inversions, Congress enacted Section 7874 of the Internal Revenue Code. Section 7874 serves as a Congressionally-designed proxy test for whether an inversion should be respected; subjected to a corporate-level toll charge for inverting; or disregarded. Congress also gave the Secretary of the Treasury broad authority to create regulations to ensure that the proxy test catches the transactions it should. The Plaintiffs challenge one of those regulations, the multiple domestic entity acquisition rule ("the Rule"). The Rule is designed to prevent a snowball effect in which the same foreign parent assists U.S. company after U.S. company to invert, the inverting U.S. company growing larger each time.

For two reasons, this suit falls outside of this Court's subject-matter jurisdiction. First, the Plaintiffs lack standing. They argue that the Rule "precludes" inversions, but that is wrong—it only changes the tax consequences for some mergers. They do not identify any future inversion that the Rule blocks, nor a substantial risk of economic harm from the Rule. As a result, they have failed to

allege an injury in fact that justifies prospective relief. Second, the suit is barred by the Anti-Injunction Act, I.R.C. § 7421 (AIA). In some circumstances, the Rule affects whether and how § 7874 imposes adverse tax consequences on merging companies. By seeking to set aside the Rule, the Plaintiffs seek to prevent the IRS from assessing corporate income tax in situations where the Rule applies. That is precisely the relief the AIA prohibits. Therefore, and for the reasons below, the United States respectfully moves to dismiss the case. Fed. R. Civ. P. 12(b)(1).

In deciding this Motion to Dismiss, the Court assumes all plausible allegations in the Complaint are true. *Crane v. Johnson*, 783 F.3d 244, 250 (5th Cir. 2015). The Plaintiffs are the parties invoking federal jurisdiction. They bear the burden to show that jurisdiction exists—including that they have standing. *See id.* Because the United States is raising a facial jurisdictional challenge, the Court should examine only the allegations in the Complaint in determining whether jurisdiction exists. *See Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983).

## I. Background: Inversions, I.R.C. § 7874, and the Rule.

The United States' jurisdictional arguments turn on the injuries the Plaintiffs allege and the relief they seek. Some background on U.S. taxation of multinational companies, inversions, and the function of § 7874 and the Rule is necessary to place in context the Plaintiffs' alleged injuries and claimed relief.

### A. Overview of U.S. Taxation of International Corporations and the Effect of Inversions.

Under federal tax law, whether a company is foreign or domestic depends on its place of incorporation. *See* I.R.C. § 7701(a)(4), (a)(5). The United States taxes

domestic corporations on their worldwide income.  *See* I.R.C. §§ 11, 61.  Foreign

corporations are taxed only on U.S.-source income and income that is "effectively

connected" to a U.S.-based trade or business.  *See* I.R.C. §§ 881, 882.  If a U.S.

parent corporation operates abroad through foreign subsidiaries, the U.S. parent

generally does not owe current federal income tax on its subsidiaries' foreign-source

income.  Instead, the tax is deferred until the foreign earnings are repatriated—for

instance, through a dividend.

Those deferrals are limited by other statutes.  In the context of inversions,

one important set of limitations is the controlled foreign corporation rules in

Subpart F of the Internal Revenue Code, §§ 951-964.  If a foreign subsidiary

receives certain types of income, such as passive income like royalties or dividends,

Subpart F may deem the income to be repatriated, requiring the U.S. corporate

parent to pay current tax on it.  *See* I.R.C. §§ 951 (a), 952(a)(2), 954(c)(1)(A).  Other

countries structure their income tax laws differently.  They may have a lower

marginal tax rate, or test tax residency in a different way, or more broadly exempt

foreign income from taxation.

Because of the differences between U.S. and foreign income tax regimes, a

U.S. multinational corporation might see an advantage in restructuring or merging

with a foreign acquiring corporation so that the corporate parent of the resulting

multinational group is a foreign tax resident.  That is an "inversion."  *See* S. Rep.

No. 108-192 (2003), at 142; Staff of the Joint Comm. on Taxation, General

Explanation of Tax Legislation Enacted in the 108th Congress (JCS-5-05) (May 31, 2005) (JCT Explanation), at 342.

By itself, an inversion might provide little tax benefit. The U.S. company must still file a U.S. corporate income tax return and pay U.S. income taxes, including any tax due under Subpart F on the income of its foreign subsidiaries. But post-inversion transactions can slash the U.S. company's taxes. After an inversion, the U.S. company typically transfers its foreign subsidiaries to its new foreign parent. That removes the subsidiaries' income from U.S. taxing jurisdiction, including the anti-deferral rules of Subpart F:



Other post-inversion transactions can also reduce the U.S. corporation's tax bill. For instance, in an "earnings stripping" transaction, the inverted U.S. company might make (and then deduct) interest or royalty payments to the new foreign

parent, located in a low- or no-tax jurisdiction.  Because the interest or royalty income is being paid to a foreign company and deducted in the United States, the transaction effectively shifts income from the U.S. tax base to a foreign country's.

In 2004, Congress expressed concern that inversions permit U.S. companies "to conduct business in the same manner as they did prior to the inversion, but with the result that the inverted entity avoids U.S. tax on foreign operations and may engage in earnings-stripping techniques to avoid U.S. tax on domestic operations." S. Rep. No. 108-192, at 142; JCT Explanation at 343.  As a result, it passed I.R.C. § 7874 to "remove the incentives for entering into inversion transactions."  H.R. Rep. 108-548(I) (2004), at 244.  *See also* JCT Explanation at 343.

### B. Section 7874 Limits the Benefits of Tax-Driven Inversions by Using a Proxy Test for Tax Motivation.

Generally speaking, § 7874 is triggered if, pursuant to a plan or a series of related transactions, three conditions are met:

1)  A foreign corporation acquires substantially all of the assets of a U.S. target corporation.  § 7874(a)(2)(B)(i).

2)  After the acquisition, the shareholders of the acquired U.S. target own at least 60% of the foreign acquirer by reason of their ownership of the U.S. target (for example, following a share exchange).  § 7874(a)(2)(B)(ii).

3)  After the acquisition, the new group of affiliated companies "does not have substantial business activities in the foreign [residence] country . . . when compared to the total business activities" of the group.  § 7874(a)(2)(B)(iii).

If all three conditions are met, the foreign acquirer is deemed a "surrogate foreign corporation." § 7874(a)(2)(B). The statute then imposes adverse tax consequences, the nature of which depends on the proportion of the foreign acquirer owned by the former shareholders of the U.S. target.

If § 7874 applies and the former shareholders of the U.S. target own at least 80% of the foreign acquirer, § 7874(b) deems the foreign acquirer to be a domestic corporation for all federal tax purposes. That eliminates the tax benefits of the inversion. And if the former shareholders of the U.S. target own at least 60% but less than 80% of the foreign acquirer, § 7874 respects the transaction, but the inverted U.S. target must pay tax on any "inversion gain" for ten years. *See* § 7874(a)(1), (a)(2), (d)(1), (e)(1). Inversion gain includes any income resulting from the transfer or license of property to a foreign related entity. *See* § 7874(d)(2). The U.S. target corporation cannot reduce the tax on inversion gain by applying most types of tax credits or through net operating losses. *See* § 7874(a)(1), (e)(1). In the example transaction diagrammed above, when the U.S. target transfers its foreign subsidiary to the new foreign parent company in the "Post-Inversion Transactions" phase, any gain it recognizes would be inversion gain.

Much depends, then, on the percentage of the foreign acquirer owned by the former shareholders of the acquired U.S. target after the inversion—the "ownership percentage." Calculating the ownership percentage is complicated. Section 7874 tests whether the U.S. target's former shareholders hold "at least 60 percent [or 80 percent] of the stock (by vote or value)." § 7874(a)(2)(B)(ii). Congress did not

explain further how to define "stock (by vote or value)" for the ownership percentage calculation. It did, however, specifically exclude some stock from the calculation— stock in the foreign acquirer held by affiliates, for example. *See* § 7874(c)(2)(A).

The statute's emphasis on the ownership percentage is appropriate: the legislative history shows that Congress intended the ownership percentage to be part of a proxy test for whether the inversion had "sufficient non-tax effect and purpose to be respected." S. Rep. No. 108-192, at 142; JCT Explanation at 343. In Congress's view, if the new affiliated group of companies does not have substantial business activities in its parent's place of residence, the ownership percentage determines whether adverse tax consequences apply, and which type. Inversions where the U.S. target's shareholders own more than 80% of the foreign acquirer "have little or no non-tax effect or purpose and should be disregarded for U.S. tax purposes." *See* S. Rep. No. 108-192, at 142. Those where the ownership percentage is more than 60% but less than 80% are respected, "but warrant that any applicable corporate-level 'toll charges' for establishing the inverted structure not be offset by tax attributes such as net operating losses or foreign tax credits." *See id.*

To ensure that the proxy test would carry out the statute's purpose, Congress gave the Secretary broad power to modify what stock is used in the ownership percentage calculation. *See* § 7874(c)(6) (granting authority to create regulations "to treat stock as not stock"); § 7874(g) (granting authority to issue regulations "providing for such adjustments to the application of this section as are necessary to carry out this section, including regulations providing for such adjustments to the

application of this section as are necessary to prevent the avoidance of the purposes

of this section"). Some of Treasury's regulations ensure that § 7874 does not apply

where the statute's policy concerns are not implicated. *See* Treas. Reg. § 1.7874-1

(rules to exclude internal group restructurings from statute); *see also* H.R. Conf.

Rep. 108-755 (2004), at 569-70 (explaining that a U.S. parent's conversion of a

domestic subsidiary into a foreign one should not come within the statute). Other

regulations prevent manipulation of the proxy test to avoid § 7874. One is the Rule.

### C. The Treasury Department Creates the Rule to Block One Method of Avoiding the Reach of I.R.C. § 7874.

As explained above, § 7874 is keyed to the ownership percentage—the

proportion of the foreign acquirer that the U.S. target's former shareholder own

after the inversion. One way of manipulating the ownership percentage is to "stuff"

the foreign acquirer with assets in exchange for the foreign acquirer's stock. That

increases the value of the foreign acquirer compared to the U.S. target. Inversions

are typically stock-for-stock exchanges, *see* H.R. Conf. Rep. 108-755 (2004), at 568,

in which the shareholders in the U.S. target company trade their shares in the

target for new shares in the foreign acquirer. For the exchange to occur at market

price, the stock issued to the U.S. target shareholders and the stock tendered to the

foreign acquirer must be of equal value. Because of the "stuffing," shareholders in

the U.S. target receive fair market value for their stock, but a smaller proportion of

the foreign acquirer—the same amount of pie, but a smaller slice of a larger whole.

Stuffing transactions can ensure that the ownership percentage stays below

60% or 80%, preventing Congress's proxy test for tax motivation from working

correctly.  Several Treasury Regulations address this technique by disregarding, for purposes of calculating the ownership percentage, stock connected with the stuffing transaction.  One example: stock issued in exchange for passive assets in a transaction related to the inversion.  *See* Treas. Reg. § 1.7874-4T(b), (c)(1)(i), (i)(7).

The Rule addresses another kind of stuffing.  When it issued the Rule, the Treasury Department explained its concern that a single foreign acquirer could participate in multiple inversions in a relatively short time, each time escaping § 7874's scope by choosing a small enough U.S. target company to keep the ownership percentage under 60%.  T.D. 9761, 81 Fed. Reg. 20,858, 20,865 (Apr. 8, 2016).  With each inversion, the foreign acquirer grows larger.  Therefore, each inversion provides a platform to acquire a larger U.S. target without triggering § 7874.  As the Wall Street Journal put it, the Johnson Controls, Inc.-Tyco International PLC merger "highlights the self-perpetuating nature of inversions, as American companies that move their legal homes abroad create opportunities for others to follow."  Liz Hoffman & Richard Rubin, "Johnson Controls-Tyco Deal Adds to U.S. Tax Exodus," *The Wall Street Journal* (Jan. 26, 2016), at B2.

The Rule aims to interrupt chains of inverting U.S. companies by changing the ownership percentage calculation.  It does so by disregarding stock that the foreign acquirer issued in connection with an inversion in the past 36 months—the "excluded amount."  *See* Treas. Reg. § 1.7874-8T(a), (b), (c)(1), (g)(3).  The excluded amount is generally equal to the number of shares issued to the U.S. target

shareholders in the previous inversion multiplied by the fair market value of a single share of stock on the date of the current inversion. § 1.7874-8T(c)(1), (c)(2).

Consider the following series of inversions. (The diagram assumes, as does the following discussion, a simple fact pattern with stock-for-stock transactions, no changes to the acquiring corporation's share value or capital structure, and so on.)



Without the Rule, each of those acquisitions would fall outside of § 7874 because in each case, the ownership percentage would be about 55%, calculated by value. For Acquisition #3, for instance, the ownership percentage would be $\frac{\$55}{\$55+\$45} = 55\%$.

With the Rule, by contrast, the stock issued by the Foreign Acquirer with respect to an inversion within the 36-month lookback period is disregarded in the calculation. That prevents the Foreign Acquirer from diluting the ownership percentage by stuffing itself with assets—the assets in question being U.S. companies. For Acquisition #3, the Rule disregards the stock issued in connection with Acquisition #2, which was worth $24.80. Therefore, under the Rule, the ownership percentage

is $\frac{\$55}{\$55 + \$45 - \$24.80} \approx 73\%$.  Section 7874 would apply to Acquisition #3, reducing its tax

benefits.  Acquisition #1, by contrast, falls outside of the 36-month lookback.

## II.    The Plaintiffs Lack Associational Standing to Maintain this Suit Because They Have Not Shown Any Individual Member Has Standing.

The Plaintiffs ask the Court to set aside the Rule.  (*See* Compl. at 21.)  The

Plaintiffs do not claim that the Rule injures them.  Instead, they invoke an alleged

injury to their members.  (*See id.* ¶¶ 11, 12.)  The Plaintiffs can seek relief on their

members' behalf, but doing so does not relax the fundamental requirement of

standing.  Each Plaintiff must still show that one of "its members would otherwise

have standing to sue in [its] own right."  *Hunt v. Wash. State Apple Advertising*

*Comm'n*, 432 U.S. 333, 343 (1977).[1]  The Complaint fails to clear that hurdle.

To establish standing at the pleading stage, a plaintiff must allege "an injury

in fact" that is both "concrete and particularized" and "actual or imminent, not

conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992).  The injury must also be "fairly traceable" to the defendant's action, "and not

the result of the independent action of some third party not before the court."  *Id.*

(brackets and ellipses omitted).  Finally, it must be "likely" as opposed to merely

"speculative" that the concrete and particularized injury will be redressed by a

favorable decision.  *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38-43

(1976).  While general factual allegations of injury can suffice at the pleading stage,

---

[1] *Hunt* also requires a plaintiff association to show that the interests it seeks to protect are germane to its purpose and that neither the claim asserted nor the relief requested requires the participation of individual members.  432 U.S. at 343.

the Plaintiffs must still plead an injury to a member that gives rise to standing. *See Public Citizen v. Bomer*, 274 F.3d 212, 218-19 & n.5 (5th Cir. 2001).

Because the Plaintiffs seek prospective relief, they must show that one of their members has an ongoing, present injury or an "actual and imminent" threat of future injury. *See Warth v. Seldin*, 422 U.S. 490, 516 (1975); *see also Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012). A claim of future injury meets the injury-in-fact test if the injury "is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. ___, 134 S.Ct. 2334, 2341 (June 16, 2014).

The Complaint postulates two types of harm the Plaintiffs' members allegedly suffer as a result of the Rule. First, the Plaintiffs complain that the Rule "precludes" certain inversions. Without identifying a particular transaction that would be subject to the Rule, that claim is not concrete enough to support standing. It also overstates the impact of the Rule. The Rule does not block inversions. The shareholders of the companies could vote to complete the hypothetical deal regardless of the Rule. And the conjectural future transaction could fail for reasons other than the Rule. As a result, the failure of unspecified future inversions cannot be traced to the Rule. The Complaint does identify a single specific transaction allegedly affected by the Rule: the now-abandoned Pfizer Inc.-Allergan plc merger. That transaction's failure, even assuming it can be traced to the Rule, is past harm, and does not constitute the present or future injury that would justify prospective

relief.  Similarly, the Plaintiffs have failed to show that the relief they seek, setting

aside the Rule, would redress any harm to the proposed Pfizer-Allergan merger.

Second, the Plaintiffs claim that the Rule deprives their members of business

opportunities.  The purported impact on some conjectural future opportunity is

insufficient to confer standing.  Instead, the Plaintiffs must show that at least one

of their members has a concrete plan to engage in a transaction such that the Rule

inflicted a substantial risk of economic harm.  Aside from the now-abandoned

Pfizer-Allergan transaction, the Complaint does not identify a single member's

concrete plan to engage in a transaction affected by the Rule.  Nor does it allege

facts demonstrating that the Rule is sufficiently likely to apply to any of the

Plaintiffs' members to create a substantial risk of economic harm.[2]

### A. *The Plaintiffs' Claim Regarding Precluded Inversions Is Not Sufficiently Concrete and Imminent to Justify Prospective Relief.*

The Plaintiffs claim that the Rule "precludes [their members] from engaging

in transactions similar to the Pfizer-Allergan merger."  (Compl. ¶ 46; *see also id.*

¶ 55.)  That allegation does not detail a harm sufficiently concrete or imminent to

create standing to maintain a suit for pre-enforcement relief.

---

[2] The Complaint also alleges, in passing, that Plaintiffs' members are "chilled" from undertaking *other* unspecified inversions that are *not* affected by the Rule because they "fear" yet-to-be-released regulations.  (*See* Compl. ¶ 46.)  That subjective fear cannot create standing.  An asserted injury based on speculation about future official action is too conjectural and too distant to qualify as an injury in fact. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344-45 (2006).  Nor would the purported "chill" be redressed by setting aside the Rule.

The Complaint fails to allege that any particular transaction "similar" to Pfizer-Allergan is under consideration. Thus, the future "precluded" inversion is mere conjecture. At most, the Plaintiffs have alleged that at some indeterminate point in the future, an unspecified member might want to move offshore by merging with some unidentified foreign acquirer that previously merged with an inverting U.S. company. That vague speculation is not enough to create standing. The transaction is hypothetical, so it is impossible to say whether the Rule would apply. For instance, the previous inversion might have been completed before the 36-month lookback period, so the Rule would not apply. *See* § 1.7874-8T(g)(4)(i). If the Rule did apply, it is impossible to tell whether it would affect the tax consequences: the ownership percentage might still fall below 60% regardless of the Rule. If the Rule would affect the merger's tax consequences, the shareholders could approve it anyway because of its non-tax benefits.

Indeed, the Plaintiffs' allegations are even less concrete and less particularized than assertions that the Supreme Court has held do not give rise to standing. In *Lujan*, the Supreme Court considered a challenge to a regulation excepting agency action in foreign countries from the Endangered Species Act's consultation requirement. Two of the plaintiff's members professed a general intent to travel abroad to specific countries to view specific endangered species. 504 U.S. at 563-64. The Court held that the affidavits did not demonstrate the plaintiff's standing because "profession of an 'intent' . . . is simply not enough. Such 'some day' intentions—without any description of concrete plans, or indeed even any

specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564. Here, the Plaintiffs do not even allege the same degree of general intent, stating only that their members are precluded. Nor do the allegations show the same degree of concreteness, given that they do not specify the merger partners, whereas the *Lujan* members stated a specific country and endangered species. Under *Lujan*, the Plaintiffs lack standing to claim that the Rule prevents inversions. *See also Summers v. Earth Island Institute*, 555 U.S. 488, 495-96 (2009) (rejecting claim of standing based on possibility that member would visit area about to be affected by project subject to allegedly unlawful regulations).

The Plaintiffs' reliance on the failed Pfizer-Allergan merger does not create standing either. The Plaintiffs claim that the drug companies had non-tax reasons for merging (*id.* ¶ 34), but nevertheless allege that Pfizer and Allergan "abandoned" the transaction because "the regulations" eliminated the tax benefits associated with the deal (*see id.* ¶¶ 39, 44). The Complaint does not suggest that the merger is still under consideration.

Standing is not created by every injury. It must be an injury in fact that justifies the specific type of relief sought. *See Summers*, 555 U.S. at 493. The Pfizer-Allergan merger "does not suffice" to create standing because it "relates to past injury rather than the imminent future injury that is sought to be enjoined." *Id.* at 495. *See also, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("[P]ast exposure to [allegedly] illegal conduct does not in itself show a present case

or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." (internal quotation marks, brackets, and ellipsis omitted).) Because the Plaintiffs seek prospective relief, the Court looks to the present and future injuries they allege, not the past ones. Without any allegation that the Rule is presently affecting Pfizer or Allergan, the failure of that merger adds nothing to the Plaintiffs' standing.

### B. Conjectural "Precluded" Mergers Are Not Traceable to the Rule, and the Failure of the Proposed Pfizer-Allergan Transaction Is Not Redressable by Prospective Relief.

In addition to the injury-in-fact requirement, the Plaintiffs must allege facts demonstrating that the injury is fairly traceable to the defendant's conduct. They must also allege facts from which it can reasonably be inferred that setting aside the Rule is likely to redress the injury. *Lujan*, 504 U.S. at 560-61. With respect to the "precluded merger" injury, they have failed to do either one.

First, with respect to the hypothetical, future "precluded" mergers by their members at large, the Plaintiffs have failed to allege facts demonstrating that the conjectural future failure is due to the Rule. They carry the burden of showing that third parties' choices have been or will be made in such manner as to produce causation and permit redressability of injury. *See Chamber of Commerce v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011) (rejecting standing because injury to plaintiff's members hinged on actions taken by third parties).

Inversions, described in greatly simplified form above, are complex transactions. They depend on many factors other than tax considerations: market

conditions, available capital, acceptable pricing premiums, and business synergies, to name a few.  After weighing those factors, the shareholders of the companies could approve the merger despite the Rule—or reject it even in the Rule's absence.  Given the complexity of the transactions, it is impossible to say with any degree of certainty that an unspecified future merger that does not occur failed because of the Rule.  The Rule therefore cannot cause the harm the Plaintiffs allege—it is the decision of shareholders or boards not to engage in the inversion that "precludes" the transaction from completing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. ___, 133 S. Ct. 1138, 1150 (Feb. 26, 2013) ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

Second, any alleged harm the Rule may have caused to the only merger the Plaintiffs specifically identify, Pfizer-Allergan, would not be redressed by setting the Rule aside.  The Plaintiffs do not allege that the transaction may be revived, and many of the non-tax factors affecting the transaction might have changed in the interim.  The complexity of a $160 billion merger (Compl. ¶ 32) means that its "likely" completion in the absence of the Rule cannot be inferred.

### C. The Plaintiffs Have Not Alleged Facts Showing a Substantial Risk of Future Harm from the Rule.

The Plaintiffs' allegations of harm go beyond contending that the Rule blocks inversions.  They also contend that the Rule "severely curtail[s]" their members' "opportunities for successful corporate transactions," by which they apparently mean corporate inversions by means of combining with serial acquirers.  (Compl.

¶ 46.)  Likewise, the Plaintiffs assert that Pfizer and Allergan suffer the loss of

opportunities to merge with unspecified potential partners and to "actively explore"

inversions, and, in Allergan's case, the loss of opportunity to "actively pursue" U.S.

companies looking to invert.  (*See id.* ¶ 47.)  None of those allegations show a

sufficiently concrete and substantial risk of economic harm to give rise to standing.

In some circumstances, courts have found that a diminished business

opportunity can demonstrate an injury in fact: it can show that the defendant's

action "inflicted a sufficient likelihood of economic injury."  *Clinton v. City of New

York*, 524 U.S. 417, 432-33 (1998).  But not every diminished opportunity is an

injury in fact.  Rather, a sufficient likelihood of injury requires a concrete plan to

take advantage of the lost opportunity.  *See id.* at 432.  For instance, in *City of New

York*, the Court found that standing existed where the plaintiff "had concrete plans

to utilize" the tax benefit that the President cancelled with the line item veto; the

plaintiff was "actively searching for" opportunities in the event that the cancellation

was reversed; and there were "ample processing facilities" that the plaintiff might

be able to purchase with the assistance of the tax benefit.  *Id.  Cf. NAACP v. City of

Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (rejecting standing because evidence showed

only that some members might be less able to afford housing as a result of revised

land-use ordinances, rather than specifically "when and how the revised ordinances

may deprive a . . . member of the opportunity to acquire a new residence").

The Plaintiffs have failed to allege that any of their members has a concrete

future plan to participate in an inversion affected by the Rule.  Indeed, with the

exception of the failed Pfizer-Allergan proposed merger, they do not even claim that any member has considered or is considering such an inversion. (*See* Compl. ¶ 46.) Just as the Plaintiffs' allegations do not make out an injury in fact with respect to preclusion of a specific merger, they do not make out an injury in fact with respect to a diminished business opportunity. Without "concrete plans," *see City of New York*, 524 U.S. at 432, the Plaintiffs have not alleged facts showing that the Rule is likely to deprive any of their members of a business opportunity. *See also Lujan*, 504 U.S. at 564 (deprivation of future opportunity to observe endangered species, without "any description of concrete plans," was not an "actual or imminent" injury).

The Plaintiffs claim that Allergan and Pfizer each labor under a "regulatory disability" that restricts their respective pools of "potential merger partners." (Compl. ¶ 47.) They likewise argue that "*but for* the" Rule, Pfizer and Allergan "*would* actively explore merger opportunities." (*Id.* (emphases added).) While Pfizer and Allergan remain free under the Rule to "explore" and "pursue" whatever merger opportunities they desire, they apparently are not doing so. That undermines the Plaintiffs' claim for standing. There is no allegation that Pfizer or Allergan has a concrete plan to engage in the type of transaction affected by the Rule, so they cannot argue that they are harmed by a diminished pool of counterparties. *Cf. City of New York*, 524 U.S. at 432 (noting, as fact supporting standing, that plaintiff was "actively searching for other . . . facilities for possible future purchase if" it prevailed). Instead, the Plaintiffs' claims amount to the following allegation: Pfizer or Allergan *hopes* to participate in a merger that *might*

fall within the Rule's ambit, but their chances of doing so are diminished by the Rule, so they are not seeking out the opportunities. That is simply too attenuated to give rise to standing. A purported free-floating desire to engage in behavior that might be impacted by a regulation does not confer standing, as the Supreme Court's decision in *Summers* illustrates.

In *Summers*, 555 U.S. 488, the plaintiffs sought to enjoin Forest Service regulations that exempted certain small projects from the usual notice, comment, and appeal process that the agency used for more significant land-management actions. *Id.* at 490-91. The plaintiffs relied on the affidavit of one of their members to establish standing. The affidavit "assert[ed] that he has visited many National Forests and plans to visit several unnamed National Forests in the future." *Id.* at 495. The Supreme Court rejected the plaintiffs' standing claim. In order to accept the affidavit as establishing standing, the Court explained, it would have needed to assume that the member would come across an affected tract; that the tract was about to be developed in a way that would harm the member's recreational interest; and that the member would have commented but for the regulation. *Id.* at 496.

The Plaintiffs' allegations regarding Pfizer and Allergan's intentions are similarly distant from a concrete, imminent injury. Pfizer or Allergan might be injured by the Rule at some indeterminate point in the future—*if* it decides to pursue a merger, and *if* it identifies a potential merger partner, and *if* market conditions are right for the merger, and *if* the potential partner would be interested, and *if* merging with the potential partner would trigger the Rule, and *if* the

partner's relative size were such that the Rule would change the merger's treatment under § 7874.  That contingent future injury is neither concrete nor imminent enough to constitute the injury in fact that Supreme Court precedent requires.

Finally, the Plaintiffs claim that the Rule prevents Allergan from "actively pursu[ing] merger opportunities."  (Compl. ¶ 47.)  They fail to identify a single "opportunit[y]" Allergan would pursue or to identify the time frame in which Allergan would sign the merger contract.  (*See id.*)  Those are crucial omissions.  Generally speaking, the Rule only takes into account certain inversions that happened in the 36 months before the signing date of the merger the Rule is testing.  Treas. Reg. § 1.7874-8T(g)(4)(i).  Depending on the timing of the transaction and the size of Allergan's target, if indeed it ever finds one, it is possible that the Rule would not be triggered at all.  Allergan plc (or its predecessor Actavis) has acted as the foreign acquirer in several inversions in the past three years or so.  The first was the October 2013 merger between Actavis, Inc., and Warner Chilcott plc.  (*See* Compl. ¶ 39.)  That merger already falls outside the 36-month lookback period.  The June 2014 Actavis-Forest Laboratories, Inc. merger and the March 2015 Actavis-Allergan, Inc., merger will likewise age out of the Rule in less than 9 and 18 months, respectively.  (*See id.*)  Unless Allergan plans to acquire a U.S. corporation of sufficient size in exchange for stock in the next 18 months, its next merger may not be affected by the Rule.

To have standing, the Plaintiffs must allege a concrete, particularized, imminent present injury.  What they have alleged is a mere possibility that a

member might be injured at some indeterminate point in the future. Whether the member's injury is framed as preclusion of a merger or as a diminished business opportunity, the Plaintiffs have failed to show that the member has the concrete plan the case law requires. They lack standing, so the Court lacks jurisdiction.

## III. The Anti-Injunction Act Bars Plaintiffs' Suit.

The Anti-Injunction Act (AIA), I.R.C. § 7421(a), broadly bars injunctive relief with respect to federal taxes: "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." The statute "protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. ___, 132 S. Ct. 2566, 2582 (June 28, 2012). There are some statutory exceptions, *see* § 7421(a), but the Administrative Procedure Act (APA) is not one of them. *See Smith v. Booth*, 823 F.2d 94, 97 (5th Cir. 1987) (holding that waiver of sovereign immunity under 5 U.S.C. § 702 does not override AIA); *We the People Found., Inc. v. United States*, 485 F.3d 140, 142-43 (D.C. Cir. 2007); *see also* 5 U.S.C. § 702 ("Nothing herein . . . affects other limitations on judicial review . . . ."). A suit seeking injunctive relief in violation of the AIA is subject to dismissal for lack of subject-matter jurisdiction. *See Hotze v. Burwell*, 784 F.3d 984, 996 (5th Cir. 2015).[3]

---

[3] The result is the same if a plaintiff frames its claim as one for declaratory relief. The Declaratory Judgment Act, 28 U.S.C. § 2201, excepts cases "with respect to Federal taxes" from its reach. Where the AIA applies, no declaratory relief is available. *McCabe v. Alexander*, 526 F.2d 963, 965 (5th Cir. 1976) (per curiam).

To effectuate the purpose of the Anti-Injunction Act, courts have interpreted it "broadly," applying it "not only to the assessment and collection of taxes, but to activities which are intended to or may culminate in the assessment or collection of taxes as well." *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983) (internal quotation marks omitted). Accordingly, courts have applied the AIA to dismiss a broad range of legal actions. *See, e.g.*, *Campbell v. Guetersloh*, 287 F.2d 878 (5th Cir. 1961) (AIA precludes injunction restraining the IRS from using particular methodologies to calculate tax deficiencies); *Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 4 (D.C. Cir. 1979) (AIA precludes suit to enjoin enforcement of Revenue Ruling). To decide whether the AIA applies, courts conduct "a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection." *Cohen v. United States*, 650 F.3d 717, 727 (D.C. Cir. 2011).

What matters is whether the suit has "the purpose of restraining the assessment" of tax. § 7421(a). Therefore, the Supreme Court has held that the AIA applies even in cases that do not directly involve the assessment of taxes. In *Bob Jones University v. Simon*, 416 U.S. 725 (1974), the school sued to enjoin the IRS from revoking its tax-exempt status over its racially discriminatory admissions policy. It argued that the suit was not to restrain assessment or collection of a tax, merely about the withdrawal of its tax-exempt status. In rejecting that argument, the Supreme Court noted the school's allegation that "it would be subject to 'substantial' federal income tax liability" upon revocation, which the Court noted

left "little doubt that a primary purpose of this lawsuit is to prevent the Service from assessing and collecting income taxes from petitioner." *Id.* at 738.

Similarly, in *Alexander v. "Americans United" Inc.,* 416 U.S. 752 (1974), the IRS switched the nonprofit's tax-exempt status from I.R.C. § 501(c)(3) to (c)(4) because it spent too large a proportion of its resources lobbying. The change made it liable for unemployment taxes and ineligible for tax-deductible contributions. 416 U.S. at 754-55. The Supreme Court rejected the nonprofit's argument that the case's effect on assessment or collection of taxes was "at best a collateral effect." *Id.* at 760 (internal quotation marks omitted). The Court reasoned:

> Under any reasonable construction of the statutory term 'purpose,' the objective of this suit was to restrain the assessment and collection of taxes from respondent's contributors. The obvious purpose of respondent's action was to restore advance assurance that donations to it would qualify as charitable deductions under § 170 that would reduce the level of taxes of its donors. Indeed, respondent would not be interested in obtaining the declaratory and injunctive relief requested if that relief did not effectively restrain the taxation of its contributors.

*Id.* at 760-61.

Under *Bob Jones University* and *"Americans United"*, as well as the text of the AIA, this Court should look to whether the purpose of the Plaintiffs' suit is to restrain the assessment of tax. Plainly, it is. And because no statutory or judicial exception to the AIA applies, the Court should dismiss this case.

### A. The Plaintiffs' Requested Relief Falls Within the Anti-Injunction Act.

The Plaintiffs ask this Court to set aside the Rule as unlawful under the APA, 5 U.S.C. § 706 (Compl. ¶ 10.) The relief the Plaintiffs seek is exactly the type

of "preenforcement interference" that the Anti-Injunction Act prohibits. *Bob Jones Univ.*, 416 U.S. at 736.[4] *See also Cohen*, 650 F.3d at 727 (looking to the "implication the remedy may have on assessment and collection"). The Plaintiffs' complaint falls within the strictures of the Anti-Injunction Act.

The clear purpose and effect of the Plaintiffs' suit is to restrain assessment of corporate income tax. As explained in detail above (*see* Part I.B), I.R.C. § 7874 imposes adverse tax consequences if the former shareholders in the U.S. target corporation own at least 60% of the new foreign parent by reason of their ownership in the U.S. target (and other requirements are met). The Rule provides additional instructions on how to calculate that ownership percentage, potentially bringing some mergers within the scope of § 7874 that otherwise would not have been subject to it. Setting aside the Rule would unquestionably restrain the assessment of corporate income tax in the situations to which the Rule applies. Indeed, restraining such assessments is the very purpose of the suit. (*See, e.g.*, Compl. ¶ 36

---

[4] The Court's recent decision in *Direct Marketing v. Brohl*, 575 U.S. ___, 135 S.Ct. 1124 (Mar. 3, 2015), is perfectly consistent with *Bob Jones University* and *"Americans United"*. *Direct Marketing* involved a challenge to a reporting requirement, not an indirect challenge to income or employment taxes. And unlike the two earlier cases, *Direct Marketing* concerned the Tax Injunction Act, 28 U.S.C. § 1341. That statute lacks the "for the purpose of" language that the Supreme Court found significant in *Bob Jones University* and *"Americans United"*. *Compare* I.R.C. § 7421(a) *with* 28 U.S.C. § 1341; *see Bob Jones Univ.*, 416 U.S. at 738-41 (looking generally to purpose of suit); *"Americans United"*, 416 U.S. at 760-61 (same). *See also Maze v. Internal Revenue Service*, 2016 WL 4007075, at *12 (D.D.C. 2016), *appeal docketed*, No. 16-5265 (D.C. Cir.) (distinguishing *Direct Marketing* on grounds that "restrain" takes a broader meaning in I.R.C. § 7421(a) than in 28 U.S.C. § 1341). In any event, the Plaintiffs' requested relief clearly falls within the AIA's scope, regardless of any differences between § 7421(a) and § 1341.

(complaining that the Rule "change[s] the tax treatment"); *id.* ¶ 41 (alleging that under the Rule, a merged Pfizer-Allergan "would have been treated as a domestic corporation under Section 7874, and thus would have been subject to federal income tax . . . .").)  The Plaintiffs' suit falls within the scope of the Anti-Injunction Act.

### B. Neither Judicial Exception to the Anti-Injunction Act Applies.

The Supreme Court has recognized two narrow exceptions to the Anti-Injunction Act.  Neither applies here.  One exception is outlined in *South Carolina v. Regan*, 465 U.S. 367, 373 (1984).  "Congress intended the Act to bar a suit only in situations in which Congress had provided the aggrieved party with an alternative avenue by which to contest the legality of a particular tax."  *Id.*  The "aggrieved party" the Supreme Court had in mind was a taxpayer, not an organization like the Plaintiffs.  Indeed, the *South Carolina* Court suggested that an organization could not invoke the exception it set out.  "Because taxpayers have alternative remedies, it would elevate form over substance to treat . . . organizations [of taxpayers] as if they did not possess alternative remedies.  Accordingly, such organizations could not successfully argue that the [Anti-Injunction] Act does not apply because they are without alternative remedies."  *Id.* at 381 n.19.

Here, the Plaintiffs allege in their complaint that they have no adequate or available administrative remedy and no adequate remedy in court.  (Compl. ¶¶ 53, 54.)  As *South Carolina* suggested, the *Plaintiffs* may not because the Rule does not affect the associations' tax liabilities, but their *members* do: they can obtain relief by filing a refund suit.  If the Rule applies and causes the new foreign parent to have to

file a U.S. corporate income tax return, the foreign parent can do so, then file a claim for refund with the IRS.  I.R.C. § 6511(a).  If the claim is denied or not acted upon, the foreign parent can file a refund suit in federal district court or the Court of Federal Claims.  I.R.C. §§ 6532(a), 7422(a).  Likewise, a U.S. company required to pay tax on inversion gain can file a claim for refund, then a refund suit, so it too has an opportunity to litigate.  In either event, the taxpayer can raise, if it wishes, challenges to the Rule as part of its suit.  *Cf. South Carolina*, 465 U.S. at 378-381 (emphasizing that South Carolina would "incur no tax liability" and had no remedy in which to challenge constitutionality of tax on bearer bonds).  A refund suit—"pay first and litigate later"—is one of the few Congressionally-approved ways of challenging a tax.  *See Flora v. United States*, 362 U.S. 145, 164 & n.29 (1960) (explaining scope of tax exception to Declaratory Judgment Act).  Plaintiffs may claim it is onerous for their members to file a refund suit, but "[u]nder the language of the Act, the degree of harm [caused by the challenged action] is not a factor." *Bob Jones Univ.*, 416 U.S. at 745.

The other judicial exception applies only "if it is clear that under no circumstances could the Government ultimately prevail . . . and . . . equity jurisdiction otherwise exists." *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962).  The Plaintiffs cannot meet either part of the *Williams Packing* test.  First, they are not certain to succeed on the merits.  In considering the merits at this stage, the Court should afford the United States' position "the most liberal view of the law and the facts" and permit the exception to the AIA only if the United States'

position is "without foundation." *Id.* The United States will lay out its merits arguments in detail in response to the Plaintiffs' concurrently-filed motion for summary judgment. (*See* Order (Dkt. 30).) But it is clear that the United States has a strong position on the merits.

In Count One of the Complaint, the Plaintiffs contend that the Rule exceeds the Secretary's statutory authority because Congress delegated authority to disregard transactions "if, and only if, they are part of a plan designed to avoid the purposes of Section 7874." (Compl. ¶ 51.) In fact, Congress delegated broad authority to "prescribe such regulations as may be appropriate to determine whether a corporation is a surrogate foreign corporation," including "to treat stock as not stock." § 7874(c)(6). Congress also gave the Secretary authority to "provide such regulations as are necessary to carry out this section, including regulations providing for such adjustments to the application of this section as are necessary to prevent the avoidance of the purposes of this section." § 7874(g). Those specific grants of authority add to the Secretary's general authority in I.R.C. § 7805. The Secretary's authority is not limited to addressing transactions designed to circumvent the statute, which Congress *already* determined should be disregarded. *See* § 7874(c)(4); *see also* § 7874(c)(3).

In Count Two, the Plaintiffs assert that the Treasury Department did not explain "why the targeted transactions were contrary to Section 7874 or that Section's purposes" or why it was "changing its position" on serial inversions. (Compl. ¶ 60.) They also argue that the Rule specifically targeted the Pfizer-

Allergan merger.  (*See id.* ¶ 61.)  The Rule targets a practice, not a transaction.  Its preamble explains that it, like other stock exclusion regulations, is intended to ensure that § 7874 applies to transactions in which the U.S. parent is replaced with a foreign parent, but the U.S. company "'continue[s] to conduct business in the same manner as [it] did prior to the inversion.'"  81 Fed. Reg. at 20,865 (quoting S. Rep. No. 108-192, at 142).  The Rule addresses the specific concern that a foreign acquirer could avoid the section's application by stuffing itself with other U.S. companies.  *See id.*  And because the Treasury Department had not previously issued any published guidance or policy statement directly addressing that situation, there was no "change in position" that the preamble had to justify.

Finally, in Count Three, the Plaintiffs claim that the Rule is procedurally invalid because the Treasury Department failed to follow notice-and-comment procedures.  The Rule is both a temporary regulation and a proposed regulation issued for notice and comment.  That is consistent with the law.  I.R.C. § 7805(e) recognizes the Treasury Department's authority to issue temporary regulations. The statute requires the Secretary to simultaneously issue a temporary regulation as a proposed regulation, § 7805(e)(1), and causes temporary regulations to sunset after three years, § 7805(e)(2).  Section 7805 thus explicitly authorizes temporary regulations with an immediately binding effect.

Because the Rule was issued pursuant to broad grants of authority, it is reasonable, and the applicable procedural requirements were followed, the Plaintiffs cannot meet the first part of the *Williams Packing* test.  Nor can they

meet the second, the existence of equity jurisdiction. Equity is not available if the plaintiff has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. *E.g., Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992). Here, as explained above, the Plaintiffs have failed to allege a concrete, imminent injury. Nor is the injury irreparable. The Rule does not forbid companies from merging. It merely brings certain mergers within the scope of § 7874. And the Plaintiffs have an adequate legal remedy to challenge those consequences: a refund suit. Companies can proceed with their inversion, pay the tax due under the Rule and § 7874, and sue for a refund of any amount they believe they overpaid. That is a sufficient remedy to foreclose application of *Williams Packing*. *See "Americans United"*, 416 U.S. at 761-62 (explaining that refund suit permitted taxpayer to seek final adjudication of claims); *Hunsucker v. Phinney*, 497 F.2d 29, 34-35 (5th Cir. 1974) (holding that refund suit was an adequate remedy at law, despite plaintiff's contention that he would have to incriminate himself to prevail in refund suit); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 314 (9th Cir. 1982) (holding that "payment of the tax followed by a suit for refund constitutes an adequate remedy at law"); *Bellinger v. Cagle*, 685 F. Supp. 142, 143 (N.D. Tex. 1987) (finding refund suit adequate remedy at law to prevent application of *Williams Packing* exception).

Accordingly, because the AIA bars the Plaintiffs' requested relief and no judicial exception applies, the Court lacks subject-matter jurisdiction.

## IV.  Conclusion

For the foregoing reasons, the Court should dismiss this suit for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

Respectfully submitted,

CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

Date: October 11, 2016     /s/ Michelle C. Johns
ADAM D. STRAIT (Mass. BBO No. 670484)
PAUL T. BUTLER (MD Bar No. 9406230037)
Trial Attorneys
U.S. Department of Justice, Tax Division
P.O. Box 683
Washington, D.C. 20044-0683
Telephone: (202) 307-2135
Fax: (202) 307-2135
adam.d.strait@usdoj.gov
paul.t.butler@usdoj.gov

Michelle C. Johns
Texas State Bar No. 24010135
Department of Justice, Tax Division
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9762
(214) 880-9741 (FAX)
Michelle.c.johns@usdoj.gov

*Of counsel:*
RICHARD L. DURBIN
United States Attorney
Western District of Texas

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2016, I filed the foregoing with the Court in this case through the Court's CM/ECF system. I further certify that as a result of filing the document with the Court, pursuant to Local Rule CV-5(b), I served a copy of it on the following:

Laura Durfee (ldurfee@jonesday.com)

Michael A. Carvin (macarvin@jonesday.com)

Andrew M. Eisenberg (ameisenberg@jonesday.com)

Gerald Brinton Lucas (blucas@jonesday.com)

Jacob M. Roth (yroth@jonesday.com)

Raymond J. Wiacek (rjwiacek@jonesday.com)

*Attorneys for the Plaintiffs*

Kathryn Comerford Todd (ktodd@uschamber.com)

Lily Fu Claffee (lclaffee@uschamber.com)

Steven P. Lehotsky (slehotsky@uschamber.com)

Warren Postman (wpostman@uschamber.com)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Date: October 11, 2016              /s/ Michelle C. Johns
                                    MICHELLE C. JOHNS
                                    Trial Attorney
                                    U.S. Department of Justice, Tax Division