**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; and
TEXAS ASSOCIATION OF BUSINESS,

    *Plaintiffs*,

 v.

INTERNAL REVENUE SERVICE; *et al.*,

    *Defendants*.

Civil Action No. 1:16-cv-00944-LY

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

STATUTORY, REGULATORY, AND FACTUAL BACKGROUND ..................................... 1

    A.    Congress Enacts An Intricate Framework Governing Corporate Inversions ........ 2

    B.    The Administration Seeks To Change The Law Governing Inversions ............... 6

    C.    Treasury Acts To Prevent The Proposed Pfizer-Allergan Merger ........................ 8

    D.    The Multiple Acquisition Rule Curtails Merger Opportunities .......................... 11

ARGUMENT ..................................................................................................... 11

I.    TREASURY EXCEEDED ITS STATUTORY AUTHORITY ..................................... 12

    A.    Treasury Has Authority Only To Disregard Transactions Done For The Purpose Of Artificially Satisfying The Statutory Ownership Test ..................... 13

    B.    The Multiple Acquisition Rule Impermissibly Disregards Bona Fide Transactions Not Designed To Avoid Section 7874's Purposes ........................ 15

II.    TREASURY ENGAGED IN ARBITRARY AND CAPRICIOUS RULEMAKING .............................................................................................. 24

III.    TREASURY FAILED TO PROVIDE NOTICE OR A CHANCE TO COMMENT .................................................................................................. 27

    A.    Treasury Flouted The APA's Notice-And-Comment Requirements .................. 27

    B.    There Is No Excuse For Treasury's Disregard Of The APA Here ..................... 28

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Backcountry Against Dumps v. EPA,*
100 F.3d 147 (D.C. Cir. 1996) ............................................................... 19

*Botany Worsted Mills v. United States,*
278 U.S. 282 (1929) ................................................................................ 19

*Burks v. United States,*
633 F.3d 347 (5th Cir. 2011) .................................................................. 28

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ........................................................................... 14, 22

*Christopher v. SmithKline Beecham Corp.,*
132 S. Ct. 2156 (2012) ............................................................................ 25

*City of Arlington v. FCC,*
133 S. Ct. 1863 (2013) ............................................................................ 12

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.,*
367 U.S. 316 (1961) ................................................................................ 14

*Cohen v. United States,*
650 F.3d 717 (D.C. Cir. 2011) (*en banc*) ............................................... 29

*Encino Motorcars, LLC v. Navarro,*
136 S. Ct. 2117 (2016) .................................................................. 24, 25, 26

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ................................................................................ 25

*Hays v. Sebelius,*
589 F.3d 1279 (D.C. Cir. 2009) ............................................................. 13

*In re Needham,*
354 F.3d 340 (5th Cir. 2003) .................................................................. 22

*Intermountain Ins. Serv. of Vail Liab. Co. v. Comm'r,*
134 T.C. 211 (2010) ................................................................................ 29

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ................................................................................ 19

*Mayo Found. for Med. Educ. & Research v. United States,*
562 U.S. 44 (2011) .................................................................................. 29

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994)................................................................24

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)..........................................................17

*Mistretta v. United States*,
    488 U.S. 361 (1989)..............................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)................................................................27

*Ogden v. Saunders*,
    25 U.S. (12 Wheat.) 213 (1827)............................................27

*Panama Ref. Co. v. Ryan*,
    293 U.S. 388 (1935)..............................................................22

*Perez v. Mortgage Bankers Ass'n*,
    135 S. Ct. 1199 (2015)..........................................................28

*Pilgrim's Pride Corp. v. Comm'r*,
    779 F.3d 311 (5th Cir. 2015) ...........................................12, 22

*Rodriguez v. United States*,
    480 U.S. 522 (1987) (*per curiam*) .......................................24

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)..........................................................20, 21

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
    245 F.3d 434 (5th Cir. 2001) ................................................21

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) .......................................19, 23, 30

*U.S. Steel Corp. v. EPA*,
    595 F.2d 207 (5th Cir. 1979) ................................................28

*United Mine Workers of Am. v. Dole*,
    870 F.2d 662 (D.C. Cir. 1989)..............................................27

*United States v. Home Concrete & Supply, LLC*,
    132 S. Ct. 1836 (2012)..........................................................21

*Util. Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014)......................................................12, 13

*W. Va. Univ. Hosps., Inc. v. Casey*,
    499 U.S. 83 (1991)...........................................................23, 24

*Whitman v. Am. Trucking Assn's,*
    531 U.S. 457 (2001)..................................................................................19, 22

**STATUTES**

5 U.S.C. § 553.............................................................................10, 27, 28, 29

5 U.S.C. § 559.........................................................................................................29

5 U.S.C. § 706.............................................................................11, 12, 24, 27

I.R.C. § 7805............................................................................................................29, 30

I.R.C. § 7874.................................................................................................... *passim*

Administrative Procedure Act, 5 U.S.C. § 551 *et seq*............................... *passim*

**OTHER AUTHORITIES**

26 C.F.R. § 1.7874-2...............................................................................................10, 25

26 C.F.R. § 1.7874-8T ..................................................................................... *passim*

*CNBC Exclusive: CNBC's Jim Kramer Interviews Treasury Secretary Jack Lew*
    *from CNBC Institutional Investor Delivering Alpha Conference in NYC*
    *Today*, CNBC (July 16, 2014) ...........................................................................7

FR Doc. 2016-07300 (Apr. 4, 2016)..................................................................10

H.R. 3959, 109th Cong. (2005)..........................................................................6

H.R. Rep. No. 108-755 (2004)...........................................................................21

Kristen Hallam et al., *Pfizer Confirms Termination of Proposed $160 Billion*
    *Allergan Merger*, Bloomberg (Apr. 6, 2016)..................................................11

*Hearing Before the Subcomm. on Select Revenue Measures of the H. Comm. on*
    *Ways & Means*, 107th Cong. 51 (2002).............................................................4, 5

Michael S. Kirsch, *The Congressional Response to Corporate Expatriations: The*
    *Tension Between Symbols and Substance in the Taxation of Multinational*
    *Corporations*, 24 Va. Tax Rev. 475 (2005) .....................................................2

John D. McKinnon, *Senators Plan Curbs on Relocating to Bermuda, Other Tax*
    *Havens*, Wall St. J. (Mar. 22, 2002).................................................................2

Ronald Orol, *Treasury Department Was 'Targeting' Pfizer-Allergan Deal*, MSN
    (Apr. 26, 2016).................................................................................................9

Prop. Treas. Reg. § 1.7874-8, 81 Fed. Reg. 20,588 (Apr. 8, 2016) ...................10, 28

Richard Rubin & Kathleen Hunter, *Treasury Exploring Limits on Inversions*
    *Without Congress*, Bloomberg (Aug. 5, 2014) .................................................7

S. 604, 100th Cong. (1987)....................................................................30

S. 1774, 100th Cong. (1987)..................................................................30

S. 2667, 114th Cong. (2016)....................................................................6

S. Rep. No. 79-752 (1945).....................................................................28

S. Rep. No. 100-309 (1988)....................................................................30

S. Rep. No. 108-192 (2003)................................................................4, 24

Irving Salem et al., *ABA Section of Taxation Report of the Task Force on Judicial Deference*, 57 Tax Law. 717 (2004) .......................................10

T.D. 9265, 71 Fed. Reg. 32,437 (June 6, 2006)..................................15, 21

T.D. 9453, 74 Fed. Reg. 27,920 (June 9, 2009)......................................25

T.D. 9761, 81 Fed. Reg. 20,858 (Apr. 8, 2016).............................. *passim*

U.S. Dep't of Treasury, *General Explanations of the Administration's Fiscal Year 2015 Revenue Proposals* (2014) ................................................7

Jefferson P. VanderWolk, *Inversions Under Section 7874 of the Internal Revenue Code: Flawed Legislation, Flawed Guidance*, 30 Nw. J. Int'l L. & Bus. 699 (2010).................................................................................20

White House, Office of the Press Secretary, *Remarks by the President at Press Conference After U.S.-Africa Leaders Summit* (Aug. 6, 2014) ...........................7, 8

White House, Office of the Press Secretary, *Remarks by the President on the Economy* (Apr. 5, 2016)................................................................11

White House, Office of the Press Secretary, *Remarks by the President on the Economy—Los Angeles, CA* (July 24, 2014) .......................................7

# INTRODUCTION

For over a decade, American businesses have entered into deals in reliance on a detailed, yet predictable, statutory framework governing the tax consequences of corporate "inversions"—cross-border transactions whereby a U.S.-based multinational corporation becomes a subsidiary of a foreign parent in a lower-tax jurisdiction. In 2014, the Administration proposed altering this framework. But after Congress declined to act on this proposal—and after Administration officials conceded that they lacked authority to change the law on their own—the Administration decided to take matters into its own hands, unilaterally rewriting the statute under the guise of rulemaking. In response to a proposed merger that unambiguously complied with the statutory framework as well as existing regulations governing inversions, the U.S. Department of the Treasury ("Treasury")—along with its bureau, the Internal Revenue Service ("IRS")—issued, without notice or opportunity for comment, an immediately applicable regulation tailored to destroy that deal (and foreclose similar deals in the future) despite a lack of authority to do so.

This regulation, known as the "multiple domestic entity acquisition rule" ("Multiple Acquisition Rule" or "Rule"), is unlawful for three independent reasons. T.D. 9761, 81 Fed. Reg. 20,858, 20,865–66 (Apr. 8, 2016); *see* 26 C.F.R. § 1.7874-8T. To begin, the Rule exceeds Treasury's statutory authority. In addition, it was the product of an arbitrary and capricious change in agency policy. Finally, it was imposed without the notice and opportunity to respond required by law. Each of these flaws renders the Rule invalid and requires that it be set aside under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. ("APA").

# STATUTORY, REGULATORY, AND FACTUAL BACKGROUND

The United States is unique among developed nations in that it taxes its corporations both at a high rate and on income earned worldwide. As a result, U.S.-based multinational corporations are at a disadvantage to those incorporated elsewhere. These businesses have two

strategies available if they wish to regain an even playing field in the global economy. The first is to conduct their foreign operations through foreign subsidiaries and invest the income from those operations outside the United States. This option allows them to indefinitely defer U.S. taxes on that foreign income by keeping it outside the country. However, this approach also prevents that foreign income from being sent to, and invested in, the United States, thus hampering capital investment, job creation, and economic development in States like Texas. The second is to "invert"—become a subsidiary of a foreign parent corporation, typically in a country that taxes corporations at a lower rate and only on their domestic income. The corporate group resulting from an inversion will still do business in the United States and pay U.S. taxes on its U.S. income, but it can also invest income earned abroad in our country without suffering additional U.S. taxes. The investment of such income in the United States will lead to the creation of new American facilities and jobs.

### A.    Congress Enacts An Intricate Framework Governing Corporate Inversions.

Around the year 2000, a number of U.S.-based multinationals inverted to tax havens such as Bermuda by creating "shell" corporations there to serve as their foreign parents. In these "mailbox inversions," the corporations rented a mailbox in a foreign tax haven but did not maintain offices, employees, or business activities there and, instead, continued to run all their operations from the United States. *See* Michael S. Kirsch, *The Congressional Response to Corporate Expatriations: The Tension Between Symbols and Substance in the Taxation of Multinational Corporations*, 24 Va. Tax Rev. 475, 478 n.3 (2005). Members of Congress denounced these transactions as "shams" and began to explore legislative solutions.[1]

---

[1] John D. McKinnon, *Senators Plan Curbs on Relocating to Bermuda, Other Tax Havens*, Wall St. J. (Mar. 22, 2002), http://www.wsj.com/articles/SB1016753449115132240.

In 2004, Congress settled on a law that imposes additional tax burdens on certain inversions in which the relative foreign corporation ownership of the combined entity (the foreign parent acquiring the U.S. corporation) is too small—Section 7874 of the Internal Revenue Code. Under Section 7874, the combined entity will trigger the application of a statutory ownership test if it acquires substantially all of the properties of a U.S. corporation "pursuant to a plan (or a series of related transactions)," and, after the acquisition, "the expanded affiliated group"—the combined entity and its relevant affiliates—lacks "substantial business activities" in the combined entity's country of incorporation relative to the group's total operations. I.R.C. § 7874(a)(2)(B)(i), (iii).

If this ownership test is triggered, the combined entity will fall into one of three categories for federal tax purposes based on stock ownership after the acquisition. *First*, if the shareholders of the acquired U.S. corporation receive less than 60% of the combined entity's stock in exchange for their stock in the U.S. corporation, the combined entity will be respected as a genuine "foreign corporation." *Id.* § 7874(a)(2)(B)(ii). *Second*, if those shareholders receive at least 60% but less than 80% of such stock, the combined entity will be deemed to be a "surrogate foreign corporation." *Id.* A "surrogate foreign corporation" is largely treated like any other foreign corporation, except that for the 10 years after the inversion, the taxable income of its acquired U.S. corporation cannot fall below a certain minimum level.[2] *Third*, if those shareholders receive 80% or more of such stock, the combined entity, although incorporated outside the United States, will be treated as a "domestic corporation" that may be taxed on its worldwide income. *Id.* § 7874(b).

---

[2] Specifically, the taxable income of the acquired U.S. corporation cannot be less than its "inversion gain"—the gain recognized on transfers of stock or other assets to foreign affiliates as well as certain royalty income from those sources. I.R.C. § 7874(a)(1)–(2)(A), (d)(2).

In short, this ownership test ties the tax effects of the inversion to the percentage ownership in the combined entity held by U.S. corporation shareholders relative to foreign corporation shareholders. In doing so, the test balances the costs of inversions (the reduction in the U.S. tax base) with their benefits (the increased investment of money earned abroad in the United States) by refraining from imposing tax burdens on such transactions so long as the foreign corporation shareholders continue to have a significant stake in the combined entity. If those shareholders own more than 40% of the combined entity after the transaction, the transacting parties will not face any penalty under Section 7874, as their relatively large stake shows that the transaction has "sufficient non-tax effect and purpose to be respected." *See* S. Rep. No. 108-192, at 142 (2003). By contrast, if those shareholders own 20% or less, the transaction will be "disregarded for U.S. tax purposes," as their relatively small stake shows the deal has "little or no non-tax effect or purpose." *Id.* And if those shareholders own more than 20% but no more than 40%, the transaction will be neither fully respected nor fully disregarded for U.S. tax purposes, but will trigger some additional tax burdens, as such deals "may have sufficient non-tax effect and purpose to be respected, but warrant heightened scrutiny and other restrictions to ensure that the U.S. tax base is not eroded through related-party transactions." *Id.* In other words, Congress struck a balance: Using specific numerical thresholds, it allowed companies to secure the tax benefits of transactions between near equals, limited the tax benefits of transactions between a large U.S. corporation and a somewhat smaller foreign corporation, and eliminated the tax benefits of transactions between a large U.S. corporation and a much smaller foreign one (because such deals were not viewed as genuine business transactions).

In drafting Section 7874, Congress realized that companies could "easily circumvent" this statutory ownership test through known and obvious schemes. *See Hearing Before the*

*Subcomm. on Select Revenue Measures of the H. Comm. on Ways & Means*, 107th Cong. 51 (2002) (hereinafter *Hearing*) (statement of Rep. McCrery, Chairman, Subcomm. on Select Revenue Measures). Section 7874 thus anticipates the ways in which the ownership test could be manipulated to satisfy the statute and gives Treasury authority to disregard these stratagems.

*First*, the true domestic and foreign ownership stakes could be manipulated by counting the ownership percentage of entities closely affiliated with the transacting parties, rather than the percentages of the transacting parties themselves. The statute prohibits this avoidance mechanism by mandating that stock held by a member of the "expanded affiliated group"—the combined entity and all of its relevant affiliates—"shall not be taken into account in determining ownership under [the ownership test]." I.R.C. § 7874(c)(2)(A). It then authorizes Treasury to disregard similar efforts to misportray the transacting parties' ownership percentages through stratagems involving "the use of related persons, pass-through or other noncorporate entities" or "transactions designed to have persons cease to be (or not become) members of expanded affiliated groups or related persons." *Id.* § 7874(g).

*Second*, the statute prohibits corporations from gaming the ownership percentage through actions "related to the acquisition" or otherwise done with the purpose of artificially satisfying the ownership test. Thus, the statute forbids counting the stock of the combined entity "sold in a public offering related to the acquisition." *Id.* § 7874(c)(2)(B). This rule bars the combined entity from issuing stock to the public in order to inflate its own size and reduce the percentage of its outstanding stock that is received by the shareholders of the acquired U.S. corporation. *See Hearing*, *supra*, at 51 (noting that if a combined entity "issued IPO stock as part of the inversion transaction," it could "dilute the shares of stock of the [U.S. corporation] shareholders below 80 percent"). More broadly, the statute also mandates that the "transfer of properties . . . shall be

disregarded if such transfers are part of a plan a principal purpose of which is to avoid the purposes of this section." I.R.C. § 7874(c)(4).

*Finally*, and most obviously, the ownership test could be manipulated by calling what is economically stock by another name (or by treating debt or other non-stock instruments as stock). For example, if stock held by U.S. shareholders were designated as debt, the relative stock ownership of the U.S. shareholders would decrease and the relative stock ownership of the foreign shareholders would increase. Section 7874(c)(6) thus empowers Treasury to look behind the form of an instrument to assess whether it is, in substance, stock that should be counted in "determin[ing]" whether the entity is a "surrogate foreign corporation." *Id.* § 7874(c)(6). Specifically, Treasury may issue rules that are "appropriate" to prevent such false designations, "including regulations" both "to treat warrants, options, contracts to acquire stock, convertible debt interests, and other similar interests as stock," and "to treat stock as not stock." *Id.*

Thus, in addition to providing bright-line, anti-avoidance rules, Congress granted certain specific powers to Treasury to stop corporations from employing stratagems designed to avoid the ownership test. Nowhere, however, did Congress give Treasury authority to disregard stock ownership that arises from unrelated, bona fide transactions.

**B.      The Administration Seeks To Change The Law Governing Inversions.**

Although Section 7874 put an end to "mailbox inversions," some felt it did not go far enough. Since 2005, members of Congress have introduced nearly 50 bills aimed at deterring inversions further. *See, e.g.*, S. 2667, 114th Cong. (2016); H.R. 3959, 109th Cong. (2005). None has been enacted into law. In March 2014, the Obama Administration entered the debate by including a provision in its proposed budget for Fiscal Year 2015 that would have amended the ownership test by, among other things, eliminating the 60% threshold and reducing the 80%

threshold to 50%.[3]  The President then gave a speech in July 2014 criticizing U.S. corporations that had engaged in inversions permitted under Section 7874.  Although he acknowledged that such conduct was "legal," he declared, "I don't care if it's legal—it's wrong," and urged Congress to adopt his proposal.[4]  Congress did not do so.

After legislative efforts stalled, the Administration considered unilateral solutions. Earlier, members of the Administration had conceded that they lacked the authority to challenge inversions that fell outside Section 7874's statutory rules.  For example, in July 2014, Secretary Lew explained that "[w]e have looked at the tax code" and "do not believe we have the authority to address this inversion question through administrative action.  If we did, we would be doing more.  That's why legislation is needed."[5]  But by August 2014, the Administration had changed its position.  On August 5, Secretary Lew announced that officials were assembling options to "change the economics of inversions," because "[i]f we have to wait" until "tax reform can be enacted," then "we're all going to regret the number of inversions that have occurred in the interim."[6]  A day later, the President noted that when it came to executive action on inversions, "[w]e're reviewing all of our options," and "we want to move quickly—as quickly as possible."[7]

---

[3] *See* U.S. Dep't of the Treasury, *General Explanations of the Administration's Fiscal Year 2015 Revenue Proposals* 64–65 (2014), https://www.treasury.gov/resource-center/tax-policy/Docum ents/General-Explanations-FY2015.pdf.

[4] White House, Office of the Press Secretary, *Remarks by the President on the Economy—Los Angeles, CA* (July 24, 2014), https://www.whitehouse.gov/the-press-office/2014/07/24/remarks-president-economy-los-angeles-ca.

[5] *CNBC Exclusive: CNBC's Jim Cramer Interviews Treasury Secretary Jack Lew from CNBC Institutional Investor Delivering Alpha Conference in NYC Today*, CNBC (July 16, 2014), http://www.cnbc.com/2014/07/16/cnbc-exclusive-cnbcs-jim-cramer-interviews-treasury-secretar y-jack-lew-from-cnbc-institutional-investor-delivering-alpha-conference-in-nyc-today.html.

[6] Richard Rubin & Kathleen Hunter, *Treasury Exploring Limits on Inversions Without Congress*, Bloomberg (Aug. 5, 2014), http://www.bloomberg.com/news/articles/2014-08-05/treasury-said-exploring-inversion-limits-without-congress.

[7] White House, Office of the Press Secretary, *Remarks by the President at Press Conference*

**C.    Treasury Acts To Prevent The Proposed Pfizer-Allergan Merger.**

On November 22, 2015, Allergan plc, a pharmaceutical company incorporated in Ireland, and Pfizer Inc., a pharmaceutical company incorporated in the United States, announced their plan to merge into a new company incorporated in Ireland.  The proposed merger would have let the two companies combine their portfolios of complementary products and expand them to new markets.  If the deal had taken place, Allergan's shareholders would have owned roughly 44% of the combined entity's stock.  Because Pfizer shareholders conversely would have received less than 60% of the combined entity's stock, that entity would have been respected as a foreign corporation under Section 7874 and thus not subject to U.S. tax on earnings from outside the United States.  *See* Compl. ¶¶ 32–34.

Less than five months later, during the period between the signing and closing of this deal, Treasury announced a package of new regulations, including one known as the Multiple Acquisition Rule.  81 Fed. Reg. at 20,865–66.  This Rule provides that, when calculating the ownership percentages under Section 7874, the IRS will exclude from the denominator any stock issued by a foreign corporation in acquisitions of U.S. entities within the three years before the acquisition of another U.S. entity.  26 C.F.R. § 1.7874-8T(b), (g).  As its preamble makes clear, the Rule applies even if there was no "plan to undertake the subsequent domestic entity acquisition at the time of the prior entity acquisitions."  81 Fed. Reg. at 20,865.  In other words, the Rule disregards stock issued in prior U.S. acquisitions even if those transactions were legitimate business deals that had nothing to do with a later transaction.

The Multiple Acquisition Rule had the purpose and effect of causing the announced Pfizer-Allergan merger to trigger significant tax burdens under Section 7874.  Representative

---

*After U.S.-Africa Leaders Summit* (Aug. 6, 2014), https://www.whitehouse.gov/the-press-office/2014/08/06/remarks-president-press-conference-after-us-africa-leaders-summit.

Sander Levin, a prominent supporter of the Rule, explained that it "was targeting Pfizer-Allergan," and that "what the Treasury did was take the history of . . . Allergan prior to the Pfizer deal" and construct a regulation on the basis of that history to ensure that the deal would cause Section 7874 to apply, even though it otherwise would not have.[8]   Specifically, Treasury used the fact that Allergan was in part the product of three prior acquisitions of U.S. corporations by a foreign corporation.  Treasury did not dispute that these earlier acquisitions, dating back to 2013, were bona fide business transactions that were not part of a plan to avoid the purposes of Section 7874.  Yet the Rule would nonetheless have excluded roughly 361 million shares of stock issued in these prior, unrelated transactions from the calculation of the ownership percentage of the Allergan-Pfizer deal.  Thus, even though Allergan shareholders would in reality have owned 44% of the combined entity following the merger, the Rule would have treated those shareholders as owning under 20%.  Because Pfizer shareholders conversely would have been treated as owning over 80% of the combined entity, that entity would have been treated as a "domestic" corporation under Section 7874, and thus subject to U.S. taxes on its and its subsidiaries' worldwide income.  *See* Compl. ¶¶ 39–41.  And to ensure that Pfizer and Allergan could not enter into a new merger once the three-year window had ceased to apply, the Rule specified that the window would look back from a "substantially similar acquisition . . . terminated with a principal purpose of avoiding section 7874."  26 C.F.R. § 1.7874-8T(g)(6).

Treasury issued this Rule "under section 7874(c)(6) and (g)," but offered no explanation for why those two provisions allowed it to disregard *genuine* stock issued in transactions that were *not* part of a plan to avoid the purposes of Section 7874.  81 Fed. Reg. at 20,865.  Nor did it

---

[8] Ronald Orol, *Treasury Department Was 'Targeting' Pfizer-Allergan Deal*, MSN (Apr. 26, 2016), http://www.msn.com/en-us/money/other/treasury-department-was-targeting-pfizer-allergan-deal/ar-BBsiwrp.

acknowledge that the Rule departed from an existing Treasury regulation providing that stock issued in a prior acquisition of a U.S. corporation would be treated like any other type of foreign corporation stock under the ownership test, so long as it had not been issued "pursuant to a plan" that included the current acquisition. *See* 26 C.F.R. § 1.7874-2(e).

Treasury conceded that although it had previously issued two notices concerning proposed regulations targeting "certain transactions structured to avoid the purposes of section 7874," the Multiple Acquisition Rule was one of several "new rules that address issues that were not discussed in either notice." 81 Fed. Reg. at 20,858. Treasury nonetheless made the Rule immediately applicable to "acquisitions completed on or after April 4, 2016"—the Rule's announcement date. *Id.* at 20,858, 20,904; *see* FR Doc. 2016-07300, at 31–37, 176–83 (Apr. 4, 2016). Treasury also classified this Rule as a "temporary" regulation set to expire on April 4, 2019, and issued a notice of proposed rulemaking for an identical regulation. 26 C.F.R. § 1.7874-8T(j); Prop. Treas. Reg. § 1.7874-8, 81 Fed. Reg. 20,588, 20,591 (Apr. 8, 2016). (Treasury regulations issued as "temporary"—as opposed to "proposed"—have the force and effect of law and are effectively treated as final regulations for three years. *See, e.g.*, Irving Salem et al., *ABA Section of Taxation Report of the Task Force on Judicial Deference*, 57 Tax Law. 717, 735 (2004).) In doing so, Treasury decreed, without any explanation, that it had "determined that section 553(b) of the Administrative Procedure Act"—which requires agencies to notify regulated parties of a proposed substantive rule so that they have opportunity to comment *before* it goes into effect—"does not apply." 81 Fed. Reg. at 20,588.

The day after the Rule's announcement, the President proclaimed that Treasury's action was "something that I've been pushing for a long time." He admitted that the inversions targeted

by Treasury's action were "legal," but argued that their legitimacy was "exactly the problem": "It's not that they're breaking the laws, it's that the laws are so poorly designed."[9]

### D. The Multiple Acquisition Rule Curtails Merger Opportunities.

Within two days of Treasury's announcement, Pfizer and Allergan abandoned their planned merger. Both explained that Treasury's action was responsible for destroying the deal.[10]

On August 4, 2016, Plaintiffs, business organizations whose members are harmed by the Multiple Acquisition Rule, filed a Complaint seeking an order setting aside the Rule under the APA. In addition to preventing the consummation of the Pfizer-Allergan merger, the Rule stops Plaintiffs' members from engaging in similar transactions, and thus injures them by limiting, if not eliminating, their potential merger opportunities. *See* Compl. ¶¶ 44–47. Because the Rule's validity turns on purely legal questions, Plaintiffs are moving for summary judgment now in order to promptly vindicate the rights of their members and the broader business community.

## ARGUMENT

In issuing the Multiple Acquisition Rule, Treasury flouted three separate requirements of the APA: it exceeded its statutory authority, it engaged in an arbitrary and capricious departure from its prior position, and it failed to provide affected parties with notice and an opportunity to respond. Each of these violations independently renders the Rule an unlawful agency action that must be set aside. *See* 5 U.S.C. § 706(2)(A), (C), (D).

---

[9] White House, Office of the Press Secretary, *Remarks by the President on the Economy* (Apr. 5, 2016), https://www.whitehouse.gov/the-press-office/2016/04/05/remarks-president-economy-0.

[10] Kristen Hallam et al., *Pfizer Confirms Termination of Proposed $160 Billion Allergan Merger*, Bloomberg (Apr. 6, 2016), http://www.bloomberg.com/news/articles/2016-04-06/pfizer-allergan -end-160-billion-merger-amid-new-tax-rules.

# I.    TREASURY EXCEEDED ITS STATUTORY AUTHORITY.

Under the APA, an agency regulation must be set aside if it is "in excess of statutory jurisdiction, authority, or limitations," or "otherwise not in accordance with law." *Id.* § 706(2)(A), (C). Courts therefore must "tak[e] seriously, and appl[y] rigorously, in all cases, statutory limits on agencies' authority." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013). Those limits include structural ones, as "an agency interpretation that is 'inconsistent with the design and structure of the statute as a whole'" necessarily exceeds "'the bounds of its statutory authority.'" *Util. Air Regulatory Grp. v. EPA* (*UARG*), 134 S. Ct. 2427, 2439, 2442 (2014). Most obviously, an agency cannot take a position that "would render superfluous" the relevant statutory text. *Pilgrim's Pride Corp. v. Comm'r*, 779 F.3d 311, 316 (5th Cir. 2015). That, however, is exactly what Treasury did in issuing the Multiple Acquisition Rule.

In Section 7874, Congress created a numerical test that ties a corporation's tax status to the percentage of its stock owned by the foreign corporation shareholders. Treasury, to be sure, has a role to play in the application of that test. But that role is circumscribed by the text and structure of the statute, which Treasury cannot rewrite or replace to advance what it views as desirable tax policy. Simply put, Treasury may not disregard stock if it was issued for reasons independent of satisfying Section 7874's percentage ownership test; rather, Treasury may disregard stock only if it was issued for the purpose of artificially satisfying that test, by falsely portraying the real ownership stakes or otherwise. The Multiple Acquisition Rule exceeds that delegated authority because it disregards stock issued in transactions that *Treasury admits* have no such purpose. *See* 81 Fed. Reg. at 20,865. By changing the tax consequences of bona fide transactions that legitimately comply with Section 7874's numerical ownership test, the Rule departs from the statute's structure and renders superfluous its text.

**A.** **Treasury Has Authority Only To Disregard Transactions Done For The Purpose Of Artificially Satisfying The Statutory Ownership Test.**

In Section 7874, Congress created a bright-line ownership test governing the tax consequences of acquisitions of domestic corporations by foreign ones: A combined entity will be treated as a "surrogate foreign" or "domestic" corporation—and thereby face less favorable tax treatment than a foreign corporation under Section 7874—only if its post-acquisition ownership by the shareholders of the acquired U.S. corporation crosses one of two statutory thresholds (at least 60% or 80% domestic ownership, respectively). I.R.C. § 7874(a)–(b). As Section 7874 repeatedly makes clear, Treasury may alter application of this numerical test *only* when the transacting parties seek to avoid the statute's purposes by manipulating the relevant ownership percentages through artificial schemes.

**1.** To start, Treasury obviously has no power to amend the ownership test, by, for example, reducing 60% to 55%, because such authority would render the statutory test itself irrelevant. After all, "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate," and "[i]t is hard to imagine a statutory term less ambiguous than the precise numerical thresholds" used in the ownership test. *See UARG*, 134 S. Ct. at 2445–46.

Just as Treasury has no authority to alter the statutory percentage thresholds, it has no power to alter the numerator and denominator that establish the statutory percentage. There is no difference between altering the percentage and altering the components that establish the percentage. Thus, for example, Treasury could not issue a rule excluding half of every foreign corporation's stock from the denominator of the ownership fraction, as such a regulation would have the same effect as a revision to the percentage thresholds themselves. *Cf., e.g.*, *Hays v. Sebelius*, 589 F.3d 1279, 1282 (D.C. Cir. 2009) (agency may not "fundamentally alter the reimbursement scheme" by redefining the inputs of a numerical reimbursement formula). In

short, Treasury lacks "the power to do indirectly what it cannot do directly." *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961).

Thus, Treasury has no authority to rewrite, either directly or indirectly, the numerical thresholds set forth by Congress in Section 7874. It is the *statute,* not the *agency,* that determines the ownership percentages necessary to establish a corporation's status as truly "foreign," "surrogate foreign," or "domestic." Since "Congress has directly spoken to the precise question" of the requisite foreign ownership stake, it has inherently not delegated to Treasury any discretion on the degree of ownership needed to achieve this status; the precise statutory language "is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Thus, so long as a corporation genuinely qualifies as a foreign corporation under the statutory ownership test, Treasury may not substitute its judgment for Congress's by reclassifying such an entity as a domestic corporation or a surrogate foreign one. The agency has no such power to render Section 7874's ownership test superfluous.

**2.** Although Congress' establishment of precise numerical thresholds by itself shows that Treasury has no general authority to adjust the stock ownership percentages of transacting companies, that conclusion is further confirmed by the limited nature of what *is* delegated to the agency. All of the statutory delegations grant only the circumscribed authority to deny "foreign" corporation status to entities that have artificially satisfied the statutory thresholds, not those that do so independently of any purpose related to Section 7874. *See supra* pp. 4–6.

The reason Treasury is authorized to disregard purposive manipulations is to preclude corporate lawyers from intentionally manipulating the relevant ownership percentages to avoid Section 7874's tax consequences. For example, a combined entity could avoid triggering the statutory thresholds by giving *options or warrants* to the shareholders of the acquired U.S.

corporation that could then be easily converted into combined entity *stock* after the inversion. *See* T.D. 9265, 71 Fed. Reg. 32,437, 32,447 (June 6, 2006). Such stratagems would comply with the literal letter of the ownership test, but nevertheless avoid the purpose of that test—namely, to guarantee a sufficiently sizeable genuine foreign ownership in the combined entity to justify accepting it as "foreign."

However, these carefully delineated delegations authorizing Treasury to disregard artificial schemes intended to avoid the ownership test do not grant it authority to disregard genuine transactions done for independent business reasons. To the contrary, the fact that Treasury is given specific authority to disregard transactions designed to avoid the purposes of Section 7874 further confirms that it has no authority to disregard transactions without such a purpose. Indeed, if Congress intended to grant Treasury the general authority to disregard even bona fide transactions, there would have been no reason to give it the lesser, specific authority to disregard purpose-avoiding transactions.

In short, the Multiple Acquisition Rule's disregard of *all* transactions within a specified time period *regardless* of whether they are part of plan intended to avoid the ownership test exceeds Treasury's limited authority to disregard transactions designed to avoid 7874's purposes. A detailed review of Treasury's delegated authority, as set forth below, makes this clear.

### B. The Multiple Acquisition Rule Impermissibly Disregards Bona Fide Transactions Not Designed To Avoid Section 7874's Purposes.

Because Treasury has no general authority under Section 7874 to indiscriminately disregard stock issued by an acquiring corporation, the Multiple Acquisition Rule can only be justified if it is authorized under one of the specific statutory provisions allowing the agency to recharacterize the ownership percentages. The Rule cannot be based on any of these provisions, however, because it sweeps far beyond all of them. It disregards, for purposes of the statutory

ownership test, *all* stock issued by *any* foreign corporation in *any* prior (non-*de minimis*) acquisition of a U.S. corporation occurring within a three-year window. 26 C.F.R. § 1.7874-8T(b), (g). It makes no difference whether the earlier acquisition was a bona fide transaction done without any eye toward a later merger or, instead, was part of a scheme intended to circumvent the statute by inflating the foreign corporation's size. The Rule's preamble is quite explicit on this point, stating that Treasury does "not believe that the application of section 7874 in these circumstances should depend on whether there was a demonstrable plan to undertake the subsequent domestic entity acquisition at the time of the prior entity acquisitions," and that the Rule was adopted to get at "circumstances where section 7874 would otherwise have applied if the acquisitions had been made . . . pursuant to a plan." 81 Fed. Reg. at 20,865. But while *Treasury* does not believe an avoidance plan is required here, *Congress* did. The authority delegated to Treasury clearly establishes that the agency has no ability to disregard stock genuinely issued in long-closed, independent transactions, and the agency did not even try to explain how it may so radically change the statute's express percentage thresholds.

1. Section 7874(g) provides no support. This provision authorizes only "such regulations as are necessary to carry out this section, including regulations providing for such adjustments to the application of this section as are necessary to prevent the *avoidance of the purposes of this section*." I.R.C. § 7874(g) (emphasis added). That is, this provision is targeted at avoidance schemes such as "the use of related persons, pass-through or other noncorporate entities" or "transactions designed to have persons cease to be (or not become) members of expanded affiliated groups or related persons." *Id.* Needless to say, an acquisition that *genuinely satisfies* Section 7874's percentage thresholds cannot "*avoid*[]" that Section's "purposes," as such an action complies with both the letter and spirit of the statute. *A fortiori*, it cannot be

"necessary" to disregard such a legitimate acquisition "to prevent the avoidance of the purposes of this section." *Id.*; *see Michigan v. EPA*, 135 S. Ct. 2699, 2707–08 (2015) (using "context" to interpret the statutory phrase "appropriate and necessary").

Unsurprisingly, Treasury does not even attempt to explain how an acquisition that legitimately satisfies the statutory ownership test "avoid[s]" the statute's "purposes." Instead, it merely offers the *ipse dixit* that "it is not consistent with the purposes of section 7874 to permit a foreign acquiring corporation to reduce the ownership fraction for a domestic entity acquisition by including stock issued in connection with other recent domestic entity acquisitions." 81 Fed. Reg. at 20,865. That simply assumes the conclusion. Treasury does not even attempt to explain how the *timing* of the prior acquisitions undermines Section 7874's purposes. The acquisition of two U.S. corporations by a foreign corporation within *three* years of each other is just as "consistent with the purposes of section 7874" as the exact same pair of acquisitions done for the exact same reasons, but occurring *four* years earlier. Thus, the timing of acquisitions cannot distinguish transactions that avoid the purposes of Section 7874 from those that do not. Rather, the only reasoned basis for distinguishing between transactions is whether they were motivated by different purposes—i.e., whether they were done to avoid or alter the application of Section 7874. Prior transactions not undertaken pursuant to such a purpose—independent deals done for business reasons—cannot be disregarded whether completed two, three, or four years ago.

To be sure, the fact that prior acquisitions occurred more recently may be *relevant* to the inquiry into the existence of a plan, since more recent acquisitions may be more likely to be "related to the acquisition" at issue or part of an overarching purpose-avoiding "plan." I.R.C. § 7874(c)(2)(B), (c)(4). But the dispositive question must be whether the prior acquisitions are, in fact, part of such a "related" "plan" (or otherwise part of a purpose-avoiding scheme). If not,

Treasury has no authority to disregard stock ownership issued in legitimate, independently motivated acquisitions—regardless of how recent or ancient they are.

Here, however, Treasury issued a blanket rule condemning all within-three-year acquisitions, expressly stating that such acquisitions would be disregarded *regardless* of whether they were part of a plan or purpose-avoiding scheme. *See* 81 Fed. Reg. at 20,865. It presumably did so because it recognized that only such a blunderbuss regulation forbidding acquisitions unrelated to a plan would invalidate the Pfizer-Allergan merger that this purportedly general rule was obviously designed to stop.

**2.** In short, Section 7874(g) provides no authority for Treasury to disregard stock based on *when* it is issued, but only on *why* or *to whom* it is issued. This basic limitation is also conclusively established by Section 7874(c)(4), which specifically vests Treasury with authority to "disregard," *inter alia*, stock transfers connected to the acquisition of U.S. corporations, but only if "such transfers are part of a plan a principal purpose of which is to avoid the purposes of . . . section [7874]." I.R.C. § 7874(c)(4). Standing alone, this specific authorization to disregard stock issued as part of a purpose-avoiding plan demonstrates that the Rule's disregard of stock received in transactions without such a plan or purpose clearly exceeds Treasury's authority.

Section 7874(c)(4) plainly states that "[t]he transfer of properties"—including the transfer of stock in connection with the acquisition of a U.S. corporation—"shall be disregarded if such transfers are part of a plan a principal purpose of which is to avoid the purposes of this section." *Id.* The fact that Treasury did not even *cite* this most directly relevant provision as authority for the Multiple Acquisition Rule vividly demonstrates both that the Rule facially exceeds the authority granted under that section and that it cannot be justified or interpreted as a broad-based effort to disregard stock issued in purpose-avoiding plans.

It is a longstanding maxim of administrative law that "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929); *accord Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007). That is because "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). So "[w]hen Congress has directly addressed the extent of authority delegated to an administrative agency, neither the agency nor the courts are free to assume that Congress intended the [agency] to act in situations left unspoken." *Texas*, 497 F.3d at 502; *see also, e.g.*, *Backcountry Against Dumps v. EPA*, 100 F.3d 147, 151 (D.C. Cir. 1996) ("[B]ecause Indian tribes are explicitly defined as municipalities, and because only states may submit solid waste management plans for EPA approval, the agency's position that it may approve plans submitted by Indian tribes is inconsistent with the statute's plain language.").

Thus, by instructing Treasury in Section 7874(c)(4) to disregard stock transferred in the acquisition of a U.S. corporation *if* it was transferred as "part of a plan a principal purpose of which is to avoid the purposes of this section," I.R.C. § 7874(c)(4), Congress simultaneously told the agency that it could *not* disregard stock transferred in the *absence* of such a plan. Accordingly, by disregarding stock transferred in transactions that are indisputably *not* part of a purpose-avoiding plan, the Rule flouts the bedrock principle that an agency "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 485 (2001).

**3.** Other provisions of Section 7874 reinforce that Treasury has no power to disregard unrelated acquisitions based on their timing. Section 7874(c)(3) provides that if a foreign corporation "acquires directly or indirectly substantially all" of a U.S. entity's properties

over a four-year period beginning two years before the 60% ownership threshold is met, "such actions shall be treated as pursuant to a plan." I.R.C. § 7874(c)(3). This reinforces the fact that recent acquisitions may be disregarded only if they are "pursuant to a plan." The Rule is thus inconsistent with this provision too. That is particularly true given that Section 7874(c)(3) supports only timing-based restrictions related to transactions which acquire "substantially all" of a U.S. entity's properties—which is not at issue in the Multiple Acquisition Rule.

Similarly, Section 7874(c)(2)(B)'s exclusion of a combined entity's stock "sold in a public offering *related to the acquisition*" further undermines the Rule's disregard of stock generated through acquisitions unrelated to the transaction at issue. *Id.* § 7874(c)(2)(B) (emphasis added). Incredibly, Treasury invokes this provision as *support* for the Rule. *See* 81 Fed. Reg. at 20,865. But that provision could only support a Rule that "disregard[s]" stock transferred in transactions "related to the acquisition." I.R.C. § 7874(c)(2)(B). Consequently, it plainly *undermines* the Rule's disregard of stock acquired in transactions even when they are *unrelated* to the acquisition at issue.

**4.** Even more obviously, Section 7874(c)(6) provides no refuge for the Multiple Acquisition Rule. That provision simply gives Treasury the ministerial power to issue "such regulations as may be appropriate to determine whether a corporation is a surrogate foreign corporation, including regulations . . . to treat" both "stock as not stock" and certain non-stock interests "as stock." *Id.* § 7874(c)(6). As "is clearly indicated by the examples stated in paragraph (c)(6) itself," this delegation only "permits the writing of rules which negate arrangements designed to avoid surrogate foreign corporation status in form but not substance." Jefferson P. VanderWolk, *Inversions Under Section 7874 of the Internal Revenue Code: Flawed Legislation, Flawed Guidance*, 30 Nw. J. Int'l L. & Bus. 699, 708–09 (2010); *cf. Samantar v.*

*Yousuf*, 560 U.S. 305, 317 (2010) (even if examples after the term "'include'" are "merely illustrative," they may limit provision's scope). In other words, Section 7874(c)(6) empowers Treasury to treat "stock as not stock" only when the "stock" at issue is another financial instrument dressed up as stock in order to manipulate the statutory ownership test. As Treasury itself has explained, "Congress foresaw the possibility" that corporations "may attempt to avoid the purposes of section 7874" through such schemes and thus "provided a specific grant of regulatory authority in this regard in section 7874(c)(6)." *See* 71 Fed. Reg. at 32,439, 32,442 (addressing scheme of dressing up stock as non-stock to manipulate the test).

The legislative history confirms Treasury's explanation. Just like Sections 7874(g) and (c)(4), Section 7874(c)(6) enables Treasury to disregard stock ownership only when necessary to carry out the Section's purposes:

> Transfers of properties or liabilities as part of a plan a principal purpose of which is to avoid the purposes of the proposal are disregarded. In addition, the Treasury Secretary is granted authority to prevent the avoidance of the purposes of the proposal, including avoidance through the use of related persons, pass-through or other noncorporate entities, or other intermediaries, and through transactions designed to qualify or disqualify a person as a related person or a member of an expanded affiliated group. *Similarly, the Treasury Secretary is granted authority to treat certain non-stock instruments as stock, and certain stock as not stock, where necessary to carry out the purposes of the proposal.*

*E.g.*, H.R. Rep. No. 108-755, at 574 (2004) (Conf. Rep.) (emphasis added); *see, e.g.*, *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 442 (5th Cir. 2001) ("The legislative history of the [Act] affirms the inconsistency of [the regulation] with the statute."); *see also United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1844 (2012) (plurality opinion) (similar).

In short, Section 7874(c)(6) authorizes the agency to treat stock as not stock (or vice versa) only when the relevant financial instruments do not reflect the true owners of the corporation. It does not authorize Treasury to disregard stock ownership that genuinely reflects such ownership. Again, the stock disregarded under the Rule is identical to stock that would be

counted if acquired *more than* three years earlier. So it is only the *timing* of the stock's acquisition, not its *character*, that condemns it in Treasury's eyes. But Section 7874(c)(6) only authorizes Treasury to "*determine*" if a corporation is a "surrogate foreign corporation"; it has no power to *redefine* "surrogate foreign corporation[s]" by excluding genuine stock from the stock ownership used to define such entities. I.R.C. § 7874(c)(6) (emphasis added). Indeed, construing Section 7874(c)(6) to allow Treasury to disregard *genuine* stock is *forbidden* because any such "interpretation" would render the express statutory percentages "superfluous," *Pilgrim's Pride*, 779 F.3d at 316, as it would permit the agency to change those percentages through revision of their components.

At a minimum, it is not remotely plausible that the agency was vested with such unfettered power in the limited grant provided by Section 7874(c)(6). After all, Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Am. Trucking*, 531 U.S. at 468.

And if Section 7874 somehow did give Treasury the boundless discretion to alter the tax status of a combined entity, that provision would constitute an impermissible delegation of legislative power. *See, e.g.*, *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 430 (1935) (statutory grant of authority that "establishe[s] no standard" and "la[ys] down no rule" violates the nondelegation doctrine). To avoid such constitutional concerns, this Court should refrain from giving these provisions an expansive scope, as the Supreme Court "[i]n recent years" has "appli[ed] . . . the nondelegation doctrine principally . . . [by] giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) (collecting cases); *see also In re Needham*, 354 F.3d 340, 345 n.8 (5th Cir. 2003) (rule "rais[ing] serious constitutional questions . . . is not entitled to *Chevron* deference").

**5.**     The foregoing establishes that Treasury must honor stock ownership that genuinely satisfies Section 7874's express percentage test because such stock necessarily satisfies Section 7874's "purposes."  Treasury cannot avoid this inexorable conclusion by claiming that, although such stock ownership satisfies Section 7874's express ownership test, the stock can still be disregarded on that ground that counting it would be inconsistent with what Treasury thinks are the "broad purposes" of that Section.  Any such claim runs contrary to the basic administrative law principle that "appeals to a statute's broad purposes do not allow the discovery of implicit delegations of authority when Congress has explicitly delineated the boundaries of delegated authority."  *Texas*, 497 F.3d at 502.  Here, the statute "explicitly delineated" the foreign ownership percentage necessary for a combined entity to be treated as a foreign corporation under Section 7874, and thus deprived the agency of the authority to make that determination.  Because the "best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President," inversions that genuinely satisfy the percentages set forth in the statutory text are, by definition, consistent with the statute's purposes. *W. Va. Univ. Hosps.*, *Inc. v. Casey*, 499 U.S. 83, 98 (1991).  Thus, Treasury's opposition to inversions because they have satisfied the statutory percentages through relatively recent (but unrelated) acquisitions—or in circumstances where the inverted corporation "continue[s] to conduct business in the same manner as [it] did [before]," 81 Fed. Reg. at 20,865—do not implement *statutory* purposes, but only the *agency's own* policy preferences.

More generally, the agency's hostility to inversions does not implement any congressional purpose, "broad" or otherwise.  The purpose of Section 7874 is not to *deter* inversions, but to *distinguish* between *permissible* inversions (those that show they have "sufficient non-tax effect and purpose to be respected," by satisfying the ownership percentages)

and *impermissible* inversions (those that the percentages reveal to have had "little or no non-tax effect or purpose"). *See* S. Rep. No. 108-192, at 142. And even assuming (wrongly) that Section 7874's purpose was to deter inversions, Treasury may not "simplistically . . . assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (*per curiam*). Such assumptions "frustrate[] rather than effectuate[] legislative intent" because "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Id.* Moreover, Treasury is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994); *see also Casey*, 499 U.S. at 98 (a statute's "purpose . . . includes not only what it sets out to change, but also what it resolves to leave alone").

In short, disregarding stock issued in prior legitimate acquisitions does not further the "purposes" of Section 7874; it renders that Section irrelevant. To categorically exclude such stock is no different than to decree that a 55% threshold would be more "consistent with the purposes of section 7874" simply because that lower threshold would result in fewer inversions. Treasury is no more authorized to do the former than the latter.

## II.    TREASURY ENGAGED IN ARBITRARY AND CAPRICIOUS RULEMAKING.

Even if the Rule fell within Treasury's authority, it would still be unlawful given that it was the result of an "arbitrary" and "capricious" rulemaking. 5 U.S.C. § 706(2)(A). "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions," including when it changes its policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). An agency therefore "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy,'" as "an

'unexplained inconsistency' . . . is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Id.* at 2126 (brackets omitted). And where (as here) the "prior policy has engendered serious reliance interests," an even "more detailed justification" becomes necessary. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That is because rubberstamping a shift in positions that "impose[s] potentially massive liability . . . for conduct that occurred well before that interpretation was announced . . . would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct a regulation prohibits or requires,'" and "result in precisely the kind of 'unfair surprise'" administrative law condemns. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (brackets omitted).

In issuing the Multiple Acquisition Rule, Treasury ignored these basic principles. From Section 7874's enactment in 2004 until the Rule's announcement in 2016, the agency gave no hint that stock issued in earlier domestic acquisitions would be categorically excluded from the denominator of the ownership fraction when testing whether a current acquisition satisfied the ownership test. *Cf. id.* at 2168 ("[If] an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute.").

To the contrary, Treasury told corporations that such acquisitions would alter the application of the ownership test *only* if they were part of a plan to avoid Section 7874. In a regulation that has been in place since 2009, the agency explained that if a foreign corporation acquired multiple domestic corporations "pursuant to a plan," those acquisitions would be treated as a single acquisition under the ownership test, thereby resulting in a different treatment of the stock issued in those transactions. *See* 26 C.F.R. § 1.7874-2(e), (k) (Example 7); T.D. 9453, 74 Fed. Reg. 27,920, 27,927, 27,930 (June 9, 2009). For example, if a foreign corporation with 50 shares of stock outstanding separately acquired two domestic corporations "pursuant to a plan"

for 100 shares each over a three-year period, the acquisitions would be analyzed together as a single transaction resulting in an ownership percentage of 80% ((100 +100)/250), and the foreign corporation would be treated as a "domestic" one. But if the same set of acquisitions had occurred in the absence of a plan, the first acquisition would result in an ownership percentage of 66% (100/150), the second would result in an ownership percentage of only 40% (100/250), and the foreign corporation would not be reclassified as "domestic." In other words, Treasury told foreign corporations that so long as they did not acquire multiple U.S. corporations "pursuant to a plan," they could rest assured that the stock issued in these acquisitions would be treated like any other type of stock when applying the ownership test.

Yet in the Multiple Acquisition Rule, Treasury decreed that stock issued in the prior acquisitions of multiple U.S. corporations—even though *not* done "pursuant to a plan"—would be disregarded if the earlier acquisitions fell within a three-year window, even with respect to pending transactions agreed to well in advance of the Rule's announcement. 26 C.F.R. § 1.7874-8T(b), (g), (i). Thus, corporations that had relied on Treasury's earlier regulation in entering into pending mergers could no longer consummate them without incurring a massive tax penalty.

Given the "serious reliance interests" created by its earlier regulation, Treasury, at a minimum, had to give "'good reasons for the new policy.'" *Encino*, 136 S. Ct. at 2127. Yet it did not even acknowledge that it was upending an administrative framework in place for almost seven years, let alone give good reasons for doing so. This "unexplained inconsistency" alone renders the Rule "unlawful." *Id.* at 2126 (brackets omitted). Moreover, Treasury went on to give "almost no reasons at all" for the Rule itself, *id.* at 2127, never explaining why it was "not consistent with the purposes of section 7874" to respect as outstanding stock issued in past U.S. acquisitions, or why it no longer mattered whether there existed a "plan to undertake the

subsequent domestic entity acquisition at the time of the prior domestic entity acquisitions," 81 Fed. Reg. at 20,865. Worse, the reason for this unacknowledged shift was to punish a particular transaction—the proposed Pfizer-Allergan merger—making this Rule the executive equivalent of an inherently "arbitrary" bill of attainder rather than an exercise in reasoned decisionmaking. *See Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 286 (1827).

Even ignoring this unexplained shift aimed at penalizing a specific deal, the Rule is arbitrary and capricious because, as discussed above, Treasury "relied on factors which Congress has not intended it to consider [and] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Specifically, it considered only the *timing* of transactions and entirely neglected their *purpose*.[11]

## III. TREASURY FAILED TO PROVIDE NOTICE OR A CHANCE TO COMMENT.

Finally, the Multiple Acquisition Rule must be set aside because it was issued "without observance of procedure required by law"—namely, the notice-and-comment procedure mandated by the APA itself. 5 U.S.C. § 706(2)(D); *see id.* § 553(b)–(d).

### A. Treasury Flouted The APA's Notice-And-Comment Requirements.

Before an agency adopts a rule carrying the force and effect of law, the APA requires it to comply with a specific set of procedures: it must issue a "notice of proposed rule making"; "give interested parties an opportunity to participate in the rule making through submission of written data, views, or arguments"; and promulgate a final rule only "[a]fter consideration of the relevant matter presented." *Id.* § 553(b)–(c). It must then publish the rule at least "30 days before its effective date," *id.* § 553(d), to "afford persons affected a reasonable time to prepare for the

---

[11] In addition, Treasury's "failure to comply with required § 553 procedures" in adopting the Rule, as discussed below in Part III, also "renders [this] agency action arbitrary and capricious." *United Mine Workers of Am. v. Dole*, 870 F.2d 662, 666 (D.C. Cir. 1989).

effective date . . . or to take any other action which the issuance of rules may prompt," S. Rep. No. 79-752, at 15 (1945).  A rule issued in violation of these requirements must be set aside.  *See U.S. Steel Corp. v. EPA*, 595 F.2d 207, 212–13, 215 (5th Cir. 1979).

There can be no dispute that Treasury ignored these requirements here.  Because the Rule has the "force and effect of law," Treasury had to satisfy the APA's "notice-and-comment requirement."  *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015).  Yet even though it had previously issued two notices concerning regulations proposed to "address certain transactions structured to avoid the purposes of section 7874," the agency admitted that the Rule was one of several "new rules that address issues that were not discussed in either notice."  81 Fed. Reg. at 20,858.  Despite this conceded lack of notice, Treasury decreed that this substantive Rule would apply immediately.  Announced on April 4, 2016 and published on April 8, the Rule "applie[d]" to all transactions "completed on or after April 4."  26 C.F.R. § 1.7874-8T(i); *see* 81 Fed. Reg. at 20,858.  Treasury thus gave corporations no opportunity to rearrange their transactions—let alone offer their comments—before it rewrote the law.  And that timing was no accident, as the point of rushing this substantive Rule out the door was plainly to stop the imminent Pfizer-Allergan merger from taking place.

### B.     There Is No Excuse For Treasury's Disregard Of The APA Here.

Recognizing its failure to provide notice, Treasury declared, without explanation, that it had "determined that section 553(b) of Administrative Procedure Act . . . does not apply to th[is] regulation."  81 Fed. Reg. at 20,588.  Unfortunately, this view of tax law as an APA-free zone is nothing new.  Indeed, the Fifth Circuit recently observed with some concern that the promulgation of "Temporary Regulations without subjecting them to notice and comment procedures . . . is a practice that the Treasury apparently employs regularly."  *Burks v. United States*, 633 F.3d 347, 360 n.9 (5th Cir. 2011).  But as courts have been repeatedly forced to

explain, neither Defendants nor their regulations are exempt from the APA's demands. *See, e.g.*, *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55 (2011) ("[W]e are not inclined to carve out an approach to administrative review good for tax law only."); *Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (*en banc*) ("The IRS is not special in this regard; no exception exists shielding it—unlike the rest of the Federal Government—from suit under the APA."). So too here. There is no excuse for Treasury's suspension of the APA's requirements in this case, which is presumably why it did not even attempt to offer one.

**1.** The usual justification for dispensing with the notice-and-comment procedure—the good-cause exception—does not apply. Under the APA, an agency need not comply with this procedural requirement "when [it] for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rule issued)" that doing so would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B); *see also id.* § 553(d)(3) (excepting rules from 30-day publication requirement if "good cause found and published with the rule"). But Treasury made no such good-cause finding, much less provided the necessary statement of reasons "in the rule issued."

**2.** Although Treasury did not, its counsel may argue now that Section 7805(e) of the Internal Revenue Code allowed the agency to ignore the APA by labeling the Rule a "temporary" regulation. *See, e.g.*, *Intermountain Ins. Serv. of Vail Liab. Co. v. Comm'r*, 134 T.C. 211, 245–47 (2010) (Halpern & Holmes, JJ., concurring in result) (rejecting this argument). But that view of Section 7805(e) misreads the statute, particularly in light of the APA's command that a "[s]ubsequent statute may not be held to supersede or modify" the APA's procedural requirements "except to the extent that it does so expressly." 5 U.S.C. § 559. Enacted in 1988, more than 40 years after Congress passed the APA, Section 7805(e) does not

remotely suggest that Treasury regulations are exempt from the APA's demands, let alone provide a clear statement to that effect. Instead, it simply requires that "[a]ny temporary regulation issued by" Treasury "shall also be issued as a proposed regulation" and "shall expire within 3 years after the date of issuance of such regulation." That language was added *to rein Treasury in*, not relieve it from the APA's requirements further, as Congress was concerned with Treasury's increasing practice of issuing immediately effective "temporary" regulations under the APA's interpretative-rule exception and then delaying their finalization. *See, e.g.*, S. Rep. No. 100-309, at 7 (1988). Indeed, Congress even considered narrowing or eliminating the interpretative-rule exception for all Treasury regulations. *See, e.g.*, S. 1774, 100th Cong. § 17(a) (1987); S. 604, 100th Cong. § 8(a) (1987). In other words, all Section 7805(e) says is that if Treasury issues an immediately effective "temporary regulation" under the APA's good-cause or interpretative-rule exceptions, it must comply with an *additional* set of limitations that protect against abuse of those exceptions. Those supplementary *restrictions* on Treasury's authority hardly amount to a license to ignore the fundamental APA requirements already in place.

## CONCLUSION

"[W]hen Congress has made an explicit delegation of authority to an agency, Congress did not intend to delegate additional authority *sub silentio*." *Texas*, 497 F.3d at 503. In carefully delineating Treasury's delegated authority in Section 7874, Congress did *not* authorize it to alter the numerical thresholds of the statutory ownership test by punishing legitimate business transactions that fully complied with the framework created by Congress. Still less did it authorize the agency to ignore multiple procedural requirements of the APA in doing so. For these reasons, Plaintiffs respectfully request that this Court enter summary judgment in their favor and set aside the Multiple Acquisition Rule under the APA.

Respectfully submitted,

Dated: October 11, 2016

/s/ Laura Jane Durfee

LILY FU CLAFFEE*
  D.C. Bar No. 450502
  LClaffee@USChamber.com
KATE COMERFORD TODD*
  D.C. Bar No. 477745
  KTodd@USChamber.com
STEVEN P. LEHOTSKY*
  D.C. Bar No. 992725
  SLehotsky@USChamber.com
WARREN POSTMAN*
  D.C. Bar No. 995083
  WPostman@USChamber.com
**U.S. CHAMBER LITIGATION CENTER**
1615 H Street NW
Washington, DC 20062
Telephone: (202) 463-5337
Facsimile: (202) 463-5346

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

MICHAEL A. CARVIN*
  D.C. Bar No. 366784
  macarvin@jonesday.com
RAYMOND J. WIACEK*
  D.C. Bar No. 925966
  rjwiacek@jonesday.com
ANDREW M. EISENBERG*
  D.C. Bar No. 445346
  ameisenberg@jonesday.com
JACOB M. ROTH*
  D.C. Bar No. 995090
  yroth@jonesday.com
BRINTON LUCAS*
  D.C. Bar No. 1015185
  blucas@jonesday.com
**JONES DAY**
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
**JONES DAY**
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

*Admitted pro hac vice

31