CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

ADAM D. STRAIT (Mass. BBO No. 670484)
MICHELLE C. JOHNS (Texas SBN 24010135)
PAUL T. BUTLER (MD Bar No. 9406230037)
Trial Attorneys
U.S. Department of Justice, Tax Division
P.O. Box 683
Washington, D.C. 20044-0683
Telephone: (202) 307-2135
Fax: (202) 307-2135
adam.d.strait@usdoj.gov

*Of counsel:*
RICHARD L. DURBIN
United States Attorney
Western District of Texas

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, and TEXAS ASSOCIATION OF BUSINESS,<br><br>      *Plaintiffs,*<br><br>*v.*<br><br>UNITED STATES INTERNAL REVENUE SERVICE, *et al.*,<br><br>      *Defendants.* | No. 1:16-cv-944-LY<br><br>**Defendants' Opposition to Plaintiffs' Motion for Summary Judgment** |

## TABLE OF CONTENTS

I.    **The Court Must Decide the Jurisdictional Questions Presented in the Defendants' Motion to Dismiss Before the Issues Raised in the Motion for Summary Judgment.** ........................ 2

II.    **I.R.C. § 7874 Authorizes Treasury to Determine What Stock Is Used To Calculate the Ownership Percentage, So the Rule Receives Deference.** .......................................................... 2

     A.    Congress Authorized Treasury to Issue the Rule. ...................... 5

     i.    *Section 7874(c)(6) Permits Issuance of Rules that Go Beyond True Ownership of Financial Instruments.* .................................. 5

     ii.    *Section 7874(g) Authorizes Regulations Designed to Ensure the Proxy Test in § 7874(a)(2)(B) Works Properly.* ............................... 7

     iii.    *The Rule Does Not Violate Any Other Principle of Construction or the Nondelegation Doctrine.* ....................................................... 7

     B.    The Rule Is a Permissible Interpretation of the Statute. ............................ 9

III.    **The Rule Is Not Arbitrary or Capricious.** ................................. 13

     A.    Treasury Provided a Reasoned Basis for the Rule. ...................... 13

     B.    The Rule Is Not a Change In Policy, or in the Alternative, Treasury Satisfied the Requirements to Justify a Policy Change ............ 15

     C.    The Rule Targets a Practice, Not a Particular Transaction. .................... 19

IV.    **Notice and Comment Was Not Required.** ............................... 21

     A.    The Treasury Department Has Authority to Issue Temporary Rules Without Notice and Comment. ......................................... 22

     B.    The Rule Is Interpretive, So Notice And Comment Was Not Required. ....................................................................................... 28

V.    **Conclusion** ........................................................................ 30

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alenco Comms. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ................................ 13

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ...................... 28

*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998) ............................ 24

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Govs. of Fed. Reserve Sys.*,
   745 F.2d 677 (D.C. Cir. 1984) ................................................ 24

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ................................ 8

*Burks v. United States*, 633 F.3d 347 (5th Cir. 2011) .............................. 27

*Central Tex. Tel. Co-op., Inc. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005) ...................... 30

*Chamber of Commerce v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ............................ 1, 32

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)......... passim

*City of Arlington, Texas v. FCC*, 569 U.S. ___, 133 S.Ct. 1863, 1868 (May
   20, 2013) ........................................................................... 3, 4, 5, 9

*Disabled Am. Vets. v. Sec'y of Vets. Affairs*, 419 F.3d 1317 (Fed. Cir. 2005)............ 24

*Duncan v. Walker*, 533 U.S. 167 (2001) ...................................................... 6

*E. Norman Peterson Marital Tr. v. Commissioner*, 78 F.3d 795 (2d Cir.
   1996) ............................................................................... 22

*Encino Motorcars, LLC v. Navarro*, 579 U.S. ___, 136 S.Ct. 2117 (June 20,
   2016) ....................................................................... 13, 16, 17, 18

*Ex parte McCardle*, 74 U.S. (7 Wall.) 506 (1868).......................................... 2

*FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................ 17

*Fertilizer Inst. v. EPA*, 935 F.2d 1303 (D.C. Cir. 1991)............................ 29

*Hays v. Sebelius*, 589 F.3d 1279 (D.C. Cir. 2009)................................ 7, 8

*Hospital Corp. of Am. v. Commissioner*, 348 F.3d 136 (6th Cir. 2003).................... 10

*In re Cajun Elec. Power Coop.*, 109 F.3d 248 (5th Cir. 1997) .................... 27

*Leather Indus. of Am. v. EPA*, 40 F.3d 392, 408-09 (D.C. Cir. 1994)...................... 13

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).................... 29

*Marcello v. Bonds*, 349 U.S. 302 (1955) .................................................... 23

*Mayo Found. for Med. Educ. & Res. v. United States*, 562 U.S. 44 (2011) ............... 29

*Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190 (D.C. Cir. 1984) ....................... 16

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................................................................................................... 10

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995) ................................................................................................... 29

*Nissho Iwai Am. Corp. v. Commissioner*, 89 T.C. 765 (1987) ................................... 25

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................... 6, 8

*NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ...................................... 19

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. ___, 135 S.Ct. 1199 (Mar. 9, 2015) ............................................................................................... 28, 29

*Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87 (1995) ............................................. 28

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) ............................... 28, 30

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) ................. 2

*Smiley v. Citibank (South Dakota) N.A.*, 517 U.S. 735 (1996) .............................. 4, 21

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ............................ 2

*Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000) ........................................................ 29

*Texas Sav. & Cmty. Bankers Ass'n v. Fed. Housing Fin. Bd.*, 201 F.3d 551 (5th Cir. 2000) ....................................................................................... 9

*United States v. Cook*, 494 F.2d 573 (5th Cir. 1974) ................................................. 10

*United States v. Johnson*, 632 F.3d 912 (5th Cir. 2011) ............................................ 23

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ..................................................... 29

*United States v. Morton*, 467 U.S. 822 (1984) ........................................................... 21

*Voisine v. United States*, 579 U.S. ___, 136 S.Ct. 2272 (June 27, 2016) .................. 24

*West v. Gibson*, 527 U.S. 212 (1999) ......................................................................... 7

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................................... 8, 9

*Zinniel v. Commissioner*, 89 T.C. 357 (1987) .......................................................... 25

**Statutes**

5 U.S.C. § 553.............................................................................. passim

5 U.S.C. § 559.................................................................... 22, 23

5 U.S.C. § 706.......................................................................... 13

I.R.C. § 7805(b) ................................................................ 22, 23

I.R.C. § 7805(e) ...................................................................... passim

I.R.C. § 7805(f) ........................................................................ 26

I.R.C. § 7874(a)(2)(B) ........................................................ passim

I.R.C. § 7874(b) .......................................................................... 3

I.R.C. § 7874(c)(2) ............................................................... 6, 11

I.R.C. § 7874(c)(3) ................................................................. 5, 6

I.R.C. § 7874(c)(4) ............................................................... passim

I.R.C. § 7874(c)(6) ............................................................... passim

I.R.C. § 7874(g) .................................................................... passim

Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100-647 (Nov. 10, 1988), 102 Stat. 3342.................................. 26

War Revenue Act of 1917, Ch. 63, 40 Stat. 300 (1917) ............................................. 24

**Other Authorities**

Notice 2014-52, 2014-42 I.R.B. 712 (Sept. 24, 2014) ................................................. 16

Notice 2015-79, 2015-49 I.R.B. 775 (Nov. 19, 2015) ................................................. 16

**Regulations**

Alexander Hamilton, Treas. Dept. Circular to the Collectors of the Customs (Oct. 6, 1789).................................................................. 24

Guidance Under Section 7874 Regarding Surrogate Foreign Corporations, 74 Fed. Reg. 27920 (June 12, 2009) ....................................... 18

Inversions and Related Transactions, T.D. 9761, 81 Fed. Reg. 20,858 (Apr. 8, 2016) (Temp. Regs)................................................. 1, 14, 15, 16

Requirements Relating to Certain Exchanges Involving a Foreign
    Corporation, 44 Fed. Reg. 57,390 (Oct. 5, 1979) ....................................25

Termination of Private Foundation Status by Transfer to, or Operation as,
    Public Charity, 35 Fed. Reg. 15,913 (Oct. 9, 1970) ..............................24

Treas. Reg. § 1.7874-7T ................................................................................11

Treas. Reg. § 1.7874-8T (The Rule) ..................................................... passim

Treasury Regulation § 1.7874-2 ..........................................................15, 18

## Legislative History

H.R. Conf. Rep. 100-1104 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5048 ............25, 26

H.R. Rep. 108-548(I) (2004) ......................................................................10

Omnibus Taxpayer's Bill of Rights Act, S. 604, 100th Cong. (1987) ........25

S. Rep. 100-309 (1988) .............................................................................25

S. Rep. No. 108-192 (2003) .............................................10, 11, 12, 14

## Administrative Record

Agreement and Plan of Merger § 8.1(i), Ex. 2.1 to Allergan Form 8-K (filed
    Nov. 24, 2015), AR-1859 ........................................................................18

Dana Mattioli & Jonathan D. Rockoff, *New Rules Threaten AbbVie's Shire
    Deal*, Wall St. J. (Oct. 15, 2014), AR-4303 .........................................20

Dana Mattioli, *Tax-Inversion Players Swoop In for Seconds*, Wall St. J.
    (Oct. 10, 2014), AR-4296 .......................................................................20

I.R.C. § 7701(b)(3), AR-3200 .......................................................................12

I.R.C. § 936(a)(2)(A), AR-3078 ....................................................................12

Liz Hoffman and Richard Rubin, *Merger Adds to U.S. Tax Exodus*, Wall
    St. J. (Jan. 26, 2016), AR-4346 .......................................................19, 20

Liz Hoffman, *Rules Fail to Rein In Tax-Driven Takeovers*, Wall Street J.
    (May 19, 2015), AR-4310 .......................................................................12

Mindy Herzfeld, *Trends in 2014 Inversion Activity*, 144 Tax Notes 532
    (Aug. 4, 2014), AR-4239 ........................................................................20

Mindy Herzfeld, *What Can Treasury Do About Inversions?*, 144 Tax Notes
    895 (Aug. 25, 2014), AR-4245 ..............................................................20

Ronald Barusch, *Valeant-Salix Deal Shows Gap in Effort to Stop
  Inversion Drain*, Dow Jones Newswire (Feb. 26, 2015) AR-4208..........................14

Treas. Reg. § 1.367(a)-3(c)(3), AR-3291 ....................................................................12

The Department of Treasury identified a problem with the application of I.R.C. § 7874. Foreign acquirers that had already merged with at least one U.S. corporation had an inflated value through assets that were historically U.S.-based, and that should be treated as U.S.-based to be consistent with the purposes of § 7874. As a result of the foreign acquirers' inflated value, they could merge with other U.S. companies without suffering negative tax consequences. *See* Inversions and Related Transactions, T.D. 9761 (Temp. Regs), 81 Fed. Reg. 20,858, 20,865 (Apr. 8, 2016) (explaining need for the Rule). In response, drawing on express delegations of authority in § 7874, Treasury issued Temporary Treasury Regulation § 1.7874-8T ("the Rule"). The Rule is a reasonable interpretation of the statute and well within Treasury's authority to issue. Nevertheless, the Plaintiffs argue it should be set aside. (Mem. Supp. Mot. Summ. J. (Dkt. 32-1) ("Plfs. Br.").)

None of the Plaintiffs' arguments has merit. First, Congress gave Treasury broad authority to determine what constitutes a "surrogate foreign corporation" in order to ensure § 7874's purposes are upheld. In the Rule, Treasury exercised that authority by interpreting the value of the foreign acquirer not to include value representing substantially U.S.-based assets. The Rule was drafted pursuant to an express grant of authority—or, at minimum, a reasonable interpretation of a statutory delegation with ambiguous scope. The Rule is entitled to deference because it interprets the term "stock (by vote or value)" in a reasonable way consistent with the statute. The Rule is not arbitrary or capricious because Treasury provided a reasoned basis for it. Finally, the Rule is not procedurally

defective because Treasury complied with the rules governing a temporary Treasury regulation and, in the alternative, because the Rule is interpretive and thus exempt from notice-and-comment. The Court should deny the Plaintiffs' Motion.

## I. The Court Must Decide the Jurisdictional Questions Presented in the Defendants' Motion to Dismiss Before the Issues Raised in the Motion for Summary Judgment.

Before reaching the substantive contentions in the Plaintiffs' Motion, the Court must decide whether it has subject-matter jurisdiction. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93-95 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). Here, the United States has challenged the Court's jurisdiction on the face of the Complaint. (*See* Defs. Mot. Dismiss (Dkt. 31).) If the Court cannot conclusively resolve the jurisdictional questions at this stage of the case, the Court should hold the summary judgment motion in abeyance until jurisdiction is resolved. Without jurisdiction, the Court may not proceed to consider the merits issues presented in the Plaintiffs' Motion. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[J]urisdictional questions ordinarily must precede merits determinations in dispositional order . . . .").

## II. I.R.C. § 7874 Authorizes Treasury to Determine What Stock Is Used To Calculate the Ownership Percentage, So the Rule Receives Deference.

The Plaintiffs' first argument is that Treasury lacked authority to issue the Rule. To the contrary, I.R.C. § 7874(c)(6) and (g) unambiguously confer on Treasury the authority to interpret the term "stock (by vote or value)" in § 7874(a)(2)(B)(ii).

In addition, I.R.C. § 7805(a) gives Treasury authority to issue regulations necessary for the enforcement of the Internal Revenue Code.  The Rule is Treasury's exercise of the authority Congress delegated, and it is entitled to deference.  *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).

The *Chevron* line of cases governs whether courts defer to an agency's interpretation of a statute.  *See id.  Chevron* sets out a two-step inquiry.  First, the court determines whether a statute speaks directly to the precise question at issue.  If so, the statute controls.  *City of Arlington, Texas v. FCC*, 569 U.S. ___, 133 S.Ct. 1863 (May 20, 2013).  Otherwise, if the statute leaves a gap regarding the specific issue, the court determines whether the agency's rule is based upon a permissible construction of the statute.  *Id.*

In this case, the "precise question at issue," *Chevron*, 467 U.S. at 842, is what "stock" is to be used in calculating the ownership percentage.  As explained in the Defendants' Motion to Dismiss (see Dkt. 31 at 6-7), the ownership percentage test in § 7874(a)(2)(B)(ii) looks at how much of "the stock (by vote or value)" of the foreign acquirer is held by the former shareholders of the U.S. target.  *See* § 7874(a)(2)(B).  If the ownership percentage is over 60% and the other criteria in § 7874(a)(2)(B) are met, the acquirer will be deemed a "surrogate foreign corporation."  § 7874(a)(2)(B).  And if it is over 80% and the other conditions are met, the surrogate foreign corporation is treated as a U.S. corporation for U.S. tax purposes.  *See* § 7874(b).

But what stock in the foreign acquirer is counted for the purposes of § 7874(a)(2)(B)(ii) is not definitively answered by the statutory text.  Congress gave

Treasury power to adjust the meaning of the term "stock (by vote or value)" in two other provisions of § 7874. First, Congress directed Treasury to issue "such regulations as may be appropriate to determine whether a corporation is a surrogate foreign corporation," including regulations "to treat stock as not stock." § 7874(c)(6), (c)(6)(B). Second, it directed Treasury to issue "regulations as are necessary to carry out this section, including regulations *providing for such adjustments to the application of this section* as are necessary to prevent the avoidance of the purposes of this section." § 7874(g). The plain terms of those provisions show that Congress did not mean to have the last word on what stock would be included. Instead, it wanted Treasury to have the authority to adjust the meaning of "stock" in the statute within the parameters set by the rest of the statute. *See Arlington*, 133 S.Ct. at 1868 (discussing *Smiley v. Citibank (South Dakota) N.A.*, 517 U.S. 735, 740-41 (1996), and the presumption of delegation created by ambiguity in a statute).

The Plaintiffs do not argue with any of that. They say only that Treasury's authority in those provisions, as circumscribed by the rest of § 7874, does not permit *this* Rule. (*See* Plfs. Br. 20-22.) Thus, they say, Treasury exceeded its authority. (*Id.* at 12-24.) That is always the question a court faces when considering an agency's interpretation of a statute it administers, regardless of whether it is framed as a question of the scope or the application of the agency's authority. *Arlington*, 133 S.Ct. at 1870-71. "The question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *Id.* at 1871.

Here, the text favors Treasury's assertion of authority. *Chevron*'s first step is satisfied by Congress's express delegations, which mean that Congress has not spoken definitively on the issue of what stock to use in calculating the ownership percentage. *Chevron*'s second step is satisfied because, resolving any ambiguities in Treasury's favor, it reasonably construed § 7874 when it decided to issue a rule pertaining to multiple acquisitions of U.S. companies. *Arlington*, 133 S.Ct. at 1868.

### A. Congress Authorized Treasury to Issue the Rule.

#### i. Section 7874(c)(6) Permits Issuance of Rules that Go Beyond True Ownership of Financial Instruments.

The Plaintiffs' rejection of § 7874(c)(6) as authority for the Rule is based on a distortion of the statute's plain language. They argue that the only proper rules under (c)(6) are those that recharacterize financial instruments to reflect the true ownership of the merging companies in order to disregard transactions done to artificially satisfy the percentage ownership test. (Plfs. Br. 20-21.) But Congress told Treasury to "prescribe such regulations as may be appropriate to determine whether a corporation is a surrogate foreign corporation, *including*" regulations that recharacterize financial instruments. § 7874(c)(6). Congress did not say that recharacterization rules were only appropriate if they reflected true ownership. The Plaintiffs reach that conclusion by pointing out that § 7874(c)(4) specifically addresses the purposeful avoidance of § 7874's purposes, and § 7874(c)(3) deems gradual acquisitions to be "pursuant to a plan" in some circumstances. They say these provisions prove that regulations issued under § 7874(c)(6) can only address plans to avoid § 7874. In fact, they prove the opposite.

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotation marks and brackets omitted). That rule is especially pertinent here, where the text is all in a single enactment. *See id.* at 430-31. Congress restricted § 7874(c)(2)(B)'s scope to disregarding stock sold in public offerings "related to the acquisition." It focused §§ 7874(c)(3) and (c)(4) on plans to avoid the statute. Congress could have placed similar restrictions in § 7874(c)(6). It didn't. The most reasonable inference is that Congress intended § 7874(c)(6) to have a broader scope than other provisions in § 7874.[1]

Indeed, the Plaintiffs' reading of § 7874(c)(6) effectively reads that provision out of the statute. If Congress meant to address *only* intentional manipulation of the statute, the per se rule it enacted in § 7874(c)(4) to disregard transfers intended to avoid the statute, together with the broad rulemaking authority in § 7874(g) to prevent avoidance, would have been sufficient. Under the Plaintiffs' reading, § 7874(c)(6) does not confer any additional power on Treasury beyond what is given in § 7874(g), so it is "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Such a reading is to be avoided. *Id.*

---

[1] Nor did Congress limit § 7874(c)(6) to financial instruments. That provision also permits Treasury to issue rules other than stock exclusion rules, such as those regarding "substantial business activities." *See* Treas. Reg. § 1.7874-3; *see also* Substantial Business Activities, 80 Fed. Reg. 31,837, 31,841 (June 4, 2015) (stating that § 1.784-3 was issued under authority of (c)(6) and (g)). The Plaintiffs' reading of (c)(6) leaves no room for these regulations.

## ii. Section 7874(g) Authorizes Regulations Designed to Ensure the Proxy Test in § 7874(a)(2)(B) Works Properly.

The Plaintiffs take a similarly crabbed view of § 7874(g), which authorizes Treasury to issue "such regulations as are necessary to carry out this section, *including* regulations . . . as are necessary to prevent the avoidance of the purposes of this section." The Plaintiffs argue that "including" means "only." (Plfs. Br. 16-17.) They are wrong: the plain language shows that Treasury can issue *all* regulations necessary to carry out § 7874, of which avoidance-prevention regulations are a subset. *See, e.g.*, *West v. Gibson*, 527 U.S. 212, 218 (1999) ("The word 'including' makes clear that 'appropriate remedies' are not limited to the examples that follow that word."). And as explained below in Part II.B, Treasury permissibly decided that the Rule is necessary both to "carry out" § 7874 and to prevent the avoidance of § 7874's purposes.

## iii. The Rule Does Not Violate Any Other Principle of Construction or the Nondelegation Doctrine.

The Rule is also perfectly consistent with the other sections of § 7874. First, the Plaintiffs argue that Treasury has "no power to alter the numerator and denominator that establish the statutory percentage." (Plfs. Br. 13.) That claim conflicts with Congress's express delegation to Treasury to determine what stock to treat as "not stock," and what other instruments to treat as stock. *See* § 7874(c)(6). Similarly, Treasury can "adjus[t] . . . the application of" each part of § 7874's test to prevent avoidance of the statute's purposes. § 7874(g). Congress's broad, express delegation distinguishes this case from *Hays v. Sebelius*, 589 F.3d 1279, 1281-82 (D.C. Cir. 2009). In *Hays*, the D.C. Circuit held that a rule interpreting the

Medicare Act would "fundamentally alter the reimbursement scheme" because Congress "minutely detailed" reimbursement rates in statute and did not mean for the agency to alter them. *Id.* at 1282. The proposed rule was based on a claim of ambiguity in the statute. *Id.* at 1281. Here, Congress provided a fairly detailed scheme, but specifically instructed Treasury to "adjust" its "application." § 7874(g).

The Plaintiffs similarly suggest that the anti-avoidance rule in § 7874(c)(4) implies that Treasury lacked authority to issue the Rule because it instructs Treasury to disregard stock transferred as part of an avoidance plan. (Plfs. Br. 18-19.) That argument is not persuasive. The interpretive principle on which the argument relies—that the expression of one mode is the exclusion of another—is not a universal rule, and it carries force only when there is reason to think that "Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). That is especially true where, as here, there is no statutory language suggesting exclusiveness, such as the word "only" or a list of terms that appears to be exhaustive. *See id.* at 168. The statutory language suggests instead that Congress deliberately left the plan-avoidance language out of § 7874(c)(6) in order to give Treasury authority broader than the per se statutory rule in § 7874(c)(4). *See Nken*, 556 U.S. at 430-31.

Finally, the Plaintiffs also argue that the grants of authority in §§ 7874(c)(6) and 7874(g) violate the non-delegation doctrine, which prevents Congress from delegating its legislative power to another branch of government. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Even in sweeping regulatory schemes,

the Court has never demanded that statutes provide criteria for how much is too much, or how hazardous is too hazardous. *Id.* at 475. In enacting § 7874 to curtail inversions, Congress expressed concern over those that resulted in a minimal presence in a foreign county and where the bulk of the merged company came from its U.S. target. Congress gave Treasury authority in § 7874(c)(6) to provide additional stock exclusion rules to determine surrogate foreign corporation status. That was not an impermissible delegation of legislative authority.[2]

## B. The Rule Is a Permissible Interpretation of the Statute.

The statutory text of I.R.C. § 7874 expressly authorizes Treasury to issue a regulation determining what "stock" is to be used in calculating the ownership percentage, even where multiple domestic entity acquisitions are not made pursuant to a plan. At the very least, the breadth of § 7874(c)(6) and (g) and the competing canons of interpretation explained above mean that the statute does not "foreclos[e]" Treasury's assertion of its authority to issue such a rule. *See Arlington*, 133 S.Ct. at 1871; *see also Texas Sav. & Cmty. Bankers Ass'n v. Fed. Housing Fin. Bd.*, 201 F.3d 551, 554 (5th Cir. 2000) ("A statute is ambiguous [for purposes of *Chevron*] if it is susceptible of more than one accepted meaning." (internal quotation

---

[2] Likewise, the Plaintiffs claim that Congress could not have intended to delegate such broad authority to Treasury. (Plfs. Br. 22 (citing *American Trucking Associations*.) In *American Trucking*, since the power to consider costs when setting air quality standards was a major issue of public policy, the Court found it implausible that Congress would give the EPA sweeping power through specific words like "adequate margin" and "requisite." 531 U.S. at 468. Here, Congress defined a statutory scheme, then gave Treasury discretion to say how specific pieces of that scheme should be applied. Its language leaves no doubt Congress meant to give Treasury discretion in deciding what stock should be considered.

marks omitted)).  Therefore, *Chevron* step one is satisfied.  At step two, the question is whether Treasury's reading is permissible—even if it "differs from what the court believes is the best statutory interpretation."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  *See also United States v. Cook*, 494 F.2d 573, 574 (5th Cir. 1974) ("A Treasury Regulation which is a reasonable interpretation of a section of the Internal Revenue Code has the force and effect of law."); *Hospital Corp. of Am. v. Commissioner*, 348 F.3d 136, 144-45 (6th Cir. 2003) (giving *Chevron* deference to temporary Treasury Regulation interpreting statute).

In passing § 7874, Congress explained that "inversion transactions resulting in a minimal presence in a foreign country of incorporation are a means of avoiding U.S. tax and should be curtailed."  S. Rep. No. 108-192 (2003), at 142.  *See also* H.R. Rep. 108-548(I) (2004), at 246.  It was especially concerned about inversions that "permit corporations and other entities to continue to conduct business in the same manner as they did prior to the inversion, but with the result that the inverted entity avoids U.S. tax on foreign operations and may engage in earnings-stripping techniques to avoid U.S. tax on domestic operations."  S. Rep. No. 108-192, at 142.

Congress therefore designed § 7874, including the ownership percentage test, to act as a proxy test for measuring whether the inversion had "sufficient non-tax effect and purpose to be respected," and if so, whether certain benefits of inverting should be limited.  *Id.*  The ownership test captures Congress's belief that where most of the foreign acquirer's post-merger value is from the acquired U.S. target, it is not a genuine foreign corporation (if § 7874(a)(2)(B)'s other conditions are met.)

The purpose of § 7874 is not to penalize *all* foreign acquisitions of U.S. companies, but to distinguish three types: inversions that are respected; those that lack "sufficient non-tax effect and purpose to be respected"; and those that are respected but for which the benefits should be limited.

"Stuffing" transactions prevent that proxy test from working properly. They artificially inflate the value of the foreign acquirer compared to the U.S. target. Congress recognized that, and provided that stuffing transactions undertaken principally to avoid § 7874 would be disregarded. *See* § 7874(c)(4). It also recognized that stuffing transactions without a principal purpose of avoiding § 7874 can prevent the test from working effectively. It addressed one type of stuffing in § 7874(c)(2)(B), which disregards stock issued in a public offering related to the acquisition, regardless of intent. But as explained above, in § 7874(c)(6) and (g), Congress also provided Treasury with the flexibility to address other forms of stuffing. Under that authority, Treasury has, for instance, issued a rule to prevent the stuffing of passive assets into a foreign acquirer from enabling the acquirer to merge with a U.S. target without tripping § 7874's ownership percentage test. *See* Treas. Reg. § 1.7874-7T. In such a situation, the U.S. target would presumably "continue to conduct business in the same manner as [it] did prior to the inversion" while avoiding U.S. taxes, S. Rep. No. 108-192, at 142, avoiding § 7874's purposes.

The acquisition of multiple U.S. companies is another form of stuffing. As the foreign acquirer stuffs itself with historically U.S.-resident companies, its market value increases. Without the Rule, a foreign acquirer that is primarily

composed of historically U.S.-resident companies can masquerade as a genuine foreign acquirer, even though most of its value is from acquired U.S. companies. Because § 7874 was intended to reach acquisitions by companies that are not genuine foreign corporations, inversions where the bulk of the foreign acquirer's value is U.S.-based are transactions that avoid § 7874's purposes. In effect, multiple successive mergers abuse the 60% safe harbor in the statute to facilitate ever-larger inversions, rather than allowing it to identify mergers that lack "sufficient non-tax effect and purpose to be respected," S. Rep. No. 108-192, at 142. Finally, permitting multiple inversions through the same foreign acquirer effectively rewards companies that have already inverted. *See, e.g.*, Liz Hoffman, *Rules Fail to Rein In Tax-Driven Takeovers*, Wall Street J. (May 19, 2015), AR-4310.

The Rule also reasonably incorporates a 36-month lookback period for determining the stock value attributable to prior inversions. *See id.* After some time has passed, it is more difficult to say what portion of the foreign acquirer's value is attributable to U.S.-based assets, so a lookback period is appropriate, and Treasury's choice of a 36-month lookback period was reasonable. The Internal Revenue Code and Treasury Regulations are replete with three-year lookbacks in other contexts. *See, e.g.*, I.R.C. § 936(a)(2)(A), AR-3078 (U.S. possessions tax credit); I.R.C. § 7701(b)(3), AR-3200 to 3201 (substantial presence test for residency); Treas. Reg. § 1.367(a)-3(c)(3), AR-3291 (exclusion of gain on transfer of stock to qualified foreign subsidiaries); *see also* Treas. Reg. § 1.7874-10T (anti-"skinny down" rule designed to prevent U.S. companies from diluting stock value

through distributions not made in the ordinary course of business).  A 36-month lookback period is consistent with those other rules and easy to administer, so it was not arbitrary or capricious.  The Court should defer to Treasury's decision.  *See Leather Indus. of Am. v. EPA*, 40 F.3d 392, 408-09 (D.C. Cir. 1994) (holding that because "the agency's line drawing does not appear irrational" and plaintiff could not show that consequences were "dire," court would leave it to agency's discretion).

## III.   The Rule Is Not Arbitrary or Capricious.

Under 5 U.S.C. § 706(2)(A), a court is to hold aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  "*Chevron* step-two [addressed in Part II.B, above] focuses on the agency's interpretation of its statutory power, while APA arbitrary-and-capricious review focuses on the reasonableness of the agency's decision-making process pursuant to that interpretation."  *Alenco Comms. v. FCC*, 201 F.3d 608, 619 (5th Cir. 2000).  In either case, "review is narrow and deferential."  *Id.* at 619-20 (internal quotation marks omitted).  The arbitrary-and-capricious test simply requires the agency to "give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. ___, 136 S.Ct. 2117, 2125 (June 20, 2016).  The Plaintiffs' argument that the Rule is arbitrary and capricious" (Plfs. Br. 24.) ignores longstanding precedent and incorrectly assumes that the Rule represented a change in policy.  The Treasury Department gave adequate reasons for the Rule. The Rule should be upheld.

### A. Treasury Provided a Reasoned Basis for the Rule.

The Treasury Department provided a clear basis for the Rule in its preamble.  Treasury explained that the Rule addresses its "concern[] that a single

foreign acquiring corporation may avoid the application of section 7874 by completing multiple domestic entity acquisitions over a relatively short period of time," where the statute would have applied if the acquisitions had happened pursuant to a plan. Temp. Regs, 81 Fed. Reg. at 20,865. Treasury went on to explain that it is an "avoid[ance]" of the statute because "a substantial portion of the value of a foreign acquiring corporation may be attributable to its completion of multiple domestic entity acquisitions over the span of just a few years." *Id.* In other words, the value of the foreign acquirer may consist in substantial part of U.S.-based assets that are operated from the United States, were historically owned in the United States, and were until recently subject to U.S. tax laws.

Treasury explained that § 7874 "is intended to address transactions in which" a domestic entity acquired by a foreign one "continue[s] to conduct business in the same manner as [it] did prior to the inversion." *Id.* (quoting S. Rep. No. 108-192, at 142) (internal quotation marks omitted). It would evade that purpose to permit a foreign acquirer that is still substantially U.S.-based to acquire *another* U.S.-based company, facilitating the latter to leave the U.S. tax base. That takes what are fundamentally U.S.-based assets and dresses them up as foreign assets, preventing the proper application of § 7874's proxy test. *See* Ronald Barusch, *Valeant-Salix Deal Shows Gap in Effort to Stop Inversion Drain*, Dow Jones Newswire (Feb. 26, 2015) AR-4208, 4209 (noting that "Congress and Treasury have tried to restrict inversions [by] . . . defin[ing] which companies are 'really' foreign and which are going through a process to gain the favorable foreign treatment").

After explaining why the Rule fits with other portions of § 7874, Treasury explained that the application of § 7874 should not "depend on whether there was a demonstrable plan to undertake the subsequent domestic entity acquisition at the time of the prior domestic entity acquisitions." *Id.* That makes perfect sense: acquisitions as part of a plan are already addressed by § 7874(c)(4) and Treasury Regulation § 1.7874-2(e), but the harm Treasury described happens regardless of the existence of a plan.

To address the specific problem it identified, the preamble explains, Treasury decided to "exclude[] from the denominator of the ownership fraction" the portion of the foreign acquirer's stock that was issued in connection with recent mergers with U.S. companies. Temp. Regs, 81 Fed. Reg. at 20.865. That approach only eliminates the value of the company that was very recently U.S.-based, so it targets the specific problem that Treasury recognized and explained in the preamble. As Treasury said, the Rule is "consistent with the policies underlying the other stock exclusion rules under section 7874." *Id.*

## B. The Rule Is Not a Change In Policy, or in the Alternative, Treasury Satisfied the Requirements to Justify a Policy Change.

Plaintiffs assert that the Rule is arbitrary and capricious because it represents an unexplained change in policy. (Plfs. Br. 24.) They are wrong twice over. The Rule is not a change in policy, but even if it is, the change was explained.

First, the Rule was not a change in policy. Treasury had not previously issued any published guidance or statement of policy directly addressing multiple transactions by the same foreign acquirer that were not done as part of a plan or a

series of related transactions. Treasury was not required to acknowledge a change because no change occurred. *Cf. Encino Motorcars*, 136 S. Ct. at 2126. Instead, Treasury issued a new rule. As the preamble states, in addition to rules set forth in Notice 2014-52, 2014-42 I.R.B. 712 (Sept. 24, 2014), and Notice 2015-79, 2015-49 I.R.B. 775 (Nov. 19, 2015), "the temporary regulations set forth new rules that address issues that were not discussed in either notice . . . [including] rules that disregard stock of the foreign acquiring corporation that is attributable to certain prior domestic entity acquisitions." Temp. Regs, 81 Fed. Reg. at 20,858.

The Plaintiffs' contention that the Rule was a change in policy ignores the well-established principle that agencies do not have to issue a comprehensive set of regulations all at once. Agencies "need not deal in one fell swoop with the entire breadth of a novel development; instead, reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind." *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984). In this case, the Rule is one of a series of steps Treasury has taken to address abusive inversions. *See* Notice 2014-52, §§ 1, 5 (explaining concern that certain recent inversion transactions were not consistent with purposes of § 7874 and stating that further guidance would be issued); Notice 2015-79, §§ 1, 6 (providing further expected guidance and stating that additional guidance would be issued "to further limit . . . inversion transactions that are contrary to the purposes of section 7874"). Treasury was systematically addressing a series of issues it identified as being inconsistent with § 7874. The Rule was simply one step.

Even assuming the Rule is a change in policy, which it is not, Treasury's preamble was sufficient. Even when changing policy, an agency "'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Encino Motorcars*, 136 S.Ct. at 2125-26 (quoting *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). More detail may be required if a new policy rests upon factual findings contrary to previous ones, *see id.*, or when a previous policy has "engendered serious reliance interests that must be taken into account," *id.* at 2126 (quoting *Fox*, 556 U.S. at 515-16). Changes are not held to a higher standard, but they must be explained. *See id.*

Here, the Rule does not rely on any factual findings that repudiate prior regulatory pronouncements. Treasury interpreted a statute, and its concerns are the same ones that motivated the Notices and other stock exclusion rules. Nor did the Rule impinge on "serious reliance interests." In *Encino Motorcars*, the Court found that there was a substantial reliance interest where the Department of Labor changed a 33-year-old policy that classified entire categories of employees throughout an industry. The Supreme Court noted that industry-wide practices, including the negotiation and structuring of employee compensation plans, were based upon the prior policy; that the change was directly contrary to prior case law; and that the new policy would require costly systemic changes. 136 S. Ct. at 2126.

This case presents none of those factors. The Code provision at issue here was enacted in 2004; the Rule, twelve years later. Nor does the Rule contradict case law or any specific prior regulation. The Plaintiffs' claim that Treasury

Regulation § 1.7874-2 is a contradictory prior announcement once again misconstrues one part of the statutory and regulatory regime as limiting other, separate provisions. That regulation deals with multiple acquisitions by a single foreign acquirer as part of a plan. Section 7874(a)(2)(B) treats acquisitions of "*a* domestic corporation," § 7874(a)(2)(B)(i) (emphasis added); Treasury Regulation § 1.7874-2 specifies that if more than one U.S. corporation is acquired pursuant to a plan, the ownership percentage is determined with respect to all of the acquisitions at once. *See* § 1.7874-2; Guidance Under Section 7874 Regarding Surrogate Foreign Corporations, 74 Fed. Reg. 27920, 27922 (June 12, 2009). The Plaintiffs' claim of a change in policy is based only on their interpretation of that regulation: they assumed that because § 1.7874-2 regulated multiple domestic entity acquisitions pursuant to a plan, there could be no regulation for multiple acquisitions *not* pursuant to a plan. Their unjustified assumption does not constitute a reliance interest. *Cf. Encino Motorcars*, 136 S.Ct. at 2123 (final rule "took the opposite position from the proposed rule"). Finally, the Rule does not necessitate systemic changes—it affects a relatively small number of entities, and then only the tax consequences when they merge with a U.S. corporation, not their day-to-day business activities.[3]

---

[3] In the only specific transaction the Plaintiffs have identified as affected by the Rule, the proposed Pfizer Inc.-Allergan plc merger, the parties specifically contracted for the possibility that the regulations implementing § 7874 might change. *See* Agreement and Plan of Merger § 8.1(i), Ex. 2.1 to Allergan Form 8-K (filed Nov. 24, 2015), AR-1859. That does not suggest a "serious reliance interest" that should preclude a policy change.

In short, the Plaintiffs only assert a vague and general reliance on their interpretation of the state of the law before the Rule. (*See* Plfs. Br. 1, 25-26; Compl. ¶¶ 2, 59-60 (Dkt. 2).) Even assuming that the Rule is a change in policy, they have not shown that reliance interests, if any exist, "are so substantial that [Treasury] should be precluded from reconsidering the issue." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294-295 (1974).

## C. The Rule Targets a Practice, Not a Particular Transaction.

The Plaintiffs allege extensively that the Rule specifically targeted the proposed merger between Pfizer Inc. and Allergan plc. That simply is not true.

Treasury and the IRS routinely review publicly-available information regarding business transactions and combinations. By doing so, they develop a better understanding of developments in the marketplace and whether Code sections and the regulations are operating as intended. These reviews play a role in the guidance process—for example, a review may reveal or confirm a shortcoming in the law that regulations or other guidance could address. Therefore, in considering the need for the Rule, Treasury and the IRS reviewed publicly-available information indicating that, in certain cases, a single foreign acquiring corporation could avoid the application of section 7874 by engaging in several distinct inversion transactions over a relatively short period of time. *See, e.g.*, Liz Hoffman and Richard Rubin, *Merger Adds to U.S. Tax Exodus*, Wall St. J. (Jan. 26, 2016), AR-4346 (discussing Johnson Controls Inc.-Tyco International PLC merger and noting that it "underscores the snowball effect of inversions").

Treasury learned of those transactions in news articles and journals more than a year before Pfizer and Allergan announced their proposed merger on November 22, 2015.  For instance, one article notes that a review of 2014 deals "shed[s] light on the role played by certain foreign companies, which become serial acquirers, permitting multiple domestic companies to complete inversions."  Mindy Herzfeld, *Trends in 2014 Inversion Activity*, 144 Tax Notes 532, 534 (Aug. 4, 2014), AR-4239, 4241.  *See also, e.g.*, Dana Mattioli, *Tax-Inversion Players Swoop In for Seconds*, Wall St. J. (Oct. 10, 2014), AR-4296, 4297 ("[Valeant Pharmaceuticals] has since become a serial acquirer, completing more than 100 transactions, including joint ventures for more than $19 billion"); Mindy Herzfeld, *What Can Treasury Do About Inversions?*, 144 Tax Notes 895 (Aug. 25, 2014), AR-4245, 4246.

To be sure, Treasury took note of the proposed Pfizer-Allergan merger in designing the Rule, just as it took note of other mergers—including multiple mergers through the same foreign acquirer.  *See, e.g.*, Hoffman & Rubin, *supra*, AR-4346 (discussing Johnson Controls, Inc.-Tyco International PLC); Dana Mattioli & Jonathan D. Rockoff, *New Rules Threaten AbbVie's Shire Deal*, Wall St. J. (Oct. 15, 2014), AR-4303 to 4304 (discussing AbbVie Inc.-Shire PLC and Medtronic Inc.-Covidien PLC); Mattioli, *supra*, AR-4296 (discussing Endo International PLC-Auxilium Pharmaceuticals Inc. and others).  That was entirely proper.  To require Treasury to close its eyes to any merger, past or pending, is to ask a regulator to disregard public information and ignore the real-world consequences of its rules.

And Treasury's consideration of the proposed Pfizer-Allergan deal (as one of multiple transactions) in designing the Rule does not affect the Rule's validity in the slightest. A specific scenario can illustrate a weakness in a regulatory scheme that requires the agency to fix it. For example, in *Smiley*, 517 U.S. 735, the regulation at issue was allegedly prompted by the facts of that particular case and similar ones in which the Comptroller of the Currency had participated as amicus curiae. Nevertheless, even though the regulation was issued over 100 years after the enactment of the relevant statute, the Supreme Court gave *Chevron* deference to the regulation. *Id.* at 744-45. "Nor does it matter that the regulation was prompted by litigation, including this very suit . . . . That it was litigation which disclosed the need for the regulation is irrelevant." *Id.* at 741. And in *United States v. Morton*, 467 U.S. 822 (1984), the Supreme Court gave *Chevron* deference to regulations issued after the beginning of a lawsuit to which the government was a party. The Court held that the timing was "of no consequence" to the question of deference to the regulation. *Id.* at 835 n.21. Here, too, the relationship between the proposed Pfizer-Allergan merger and the Rule is of no consequence to whether the Rule deserves deference.

## IV.   Notice and Comment Was Not Required.

Finally, the Plaintiffs contend that the Rule should be set aside because the Treasury Department allegedly failed to provide notice of the Rule and an opportunity to comment on it. That is a misunderstanding of Treasury's authority. I.R.C. § 7805(e) governs Treasury's authority to issue "temporary" rules. Those rules are effective immediately, but expire after three years. They are issued

simultaneously with a notice of proposed rulemaking, typically containing the identical rule, which permits an opportunity to be heard before the rule is made permanent.  Treasury properly exercised that authority when it issued the Rule.  In the alternative, the Rule fit within the APA's exception for interpretative rules.

### A. The Treasury Department Has Authority to Issue Temporary Rules Without Notice and Comment.

The federal tax laws are complex and they sometimes change.  When they do change, the taxpaying public often needs immediate guidance on how the laws are to be interpreted and applied.  The Treasury Department fills that need through temporary regulations (similar to "interim-final" rules in other contexts).[4] Section 7805(e), not the APA, controls the procedures for issuing those regulations.

The APA provides a set of general rules for agency rulemaking.  It usually requires agencies to publish notices of proposed rulemaking in the Federal Register and allow interested persons an opportunity to comment, 5 U.S.C. § 553(b), (c), although there is an exception for "interpretative rules," § 553(b)(A).  The rule usually cannot take effect until 30 days after it is published.  § 553(d).

Congress can alter the APA's general framework by specifying different rulemaking procedures in the organic statute that the agency administers.  *See* 5 U.S.C. § 559.  That is what Congress did in § 7805.  For example, under § 7805(b)(1), Treasury has the option to make a regulation apply to any tax period ending after public notice of the regulation's contents—even if the rule is not yet

---

[4] Temporary regulations are entitled to the same weight as final ones.  *E. Norman Peterson Marital Tr. v. Commissioner*, 78 F.3d 795, 798 (2d Cir. 1996).

final. *See also* § 7805(b)(3) (retroactivity authority to prevent abuse); § 7805(b)(2) (retroactivity to implement new statutes).

Section 7805(e) likewise provides a set of requirements divergent from the APA. Titled "Temporary Regulations," it provides that "[a]ny temporary regulation issued by the Secretary shall also be issued as a proposed regulation," § 7805(e)(1), and that "[a]ny temporary regulation shall expire within 3 years after the date of issuance of such regulation," § 7805(e)(2).

Those provisions in § 7805(e) override inconsistent aspects of the APA. *See, e.g.*, *United States v. Johnson*, 632 F.3d 912, 924 (5th Cir. 2011) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling."). True, § 559 provides that a "[s]ubsequent statute may not be held to supersede or modify [the APA] . . . except to the extent that it does so expressly," and § 7805 does not state that it is an exception to the APA. But no "magical passwor[d]" is needed for Congress to modify an agency's rulemaking procedures, even if exemptions from the APA are not lightly presumed. *Marcello v. Bonds*, 349 U.S. 302, 310 (1955).[5] Instead, as then-Judge Scalia explained, 5 U.S.C. § 559 serves as a Congressionally-directed rule of construction. "[S]urely the import of the § 559 instruction is that Congress's *intent to make a substantive change* [to the

---

[5] The Tax Court concurrence the Plaintiffs cite appears to erroneously rely on a magic-password reading of § 559. *See Intermountain Ins. Serv. of Vail v. Commissioner*, 134 T.C. 211, 245-47 (2010) (Halpern & Holmes, JJ., concurring), *rev'd*, 650 F.3d 691 (D.C. Cir. 2011), *op. on appeal vac'd*, 2012 WL 2371486 (June 11, 2012). Nor does it consider Treasury's practice or the legislative history of § 7805(e). The opinion is neither binding nor persuasive.

APA] be clear." *Ass'n of Data Processing Serv. Orgs. v. Bd. of Govs. of Fed. Reserve Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984) (emphasis in original). In evaluating Congressional intent to override the APA, courts look to the usual tools of statutory interpretation. *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998). In this case, Treasury's previous rulemaking practice, the legislative history, and the text of the statute clearly indicate that Congress intended § 7805 to control the procedures for temporary regulations.

Treasury's previous practice is instructive because Congress is assumed to legislate against the backdrop of the relevant established law. *See, e.g.*, *Voisine v. United States*, 579 U.S. ___, 136 S.Ct. 2272, 2281 (June 27, 2016). Where Congress is reacting to an agency's practices, those practices are part of the backdrop and inform a court's interpretation of the enacted law. *See Disabled Am. Vets. v. Sec'y of Vets. Affairs*, 419 F.3d 1317, 1322-23 (Fed. Cir. 2005). Treasury has been issuing interpretive rules since Alexander Hamilton, *see* [Treas. Dept. Circular to the Collectors of the Customs](#) (Oct. 6, 1789), and its general authority to issue regulations has been largely unchanged since 1917, *see* War Revenue Act of 1917, Ch. 63, § 1005, 40 Stat. 300, 326 (1917) (codified as amended at § 7805(a)). Treasury began issuing "temporary" regulations in the 1970s. *See, e.g.*, Termination of Private Foundation Status by Transfer to, or Operation as, Public Charity, 35 Fed. Reg. 15,913 (Oct. 9, 1970). Later that decade, it began simultaneously proposing its temporary regulations as final ones, seeking notice and comment before they were finalized. *See* Requirements Relating to Certain

Exchanges Involving a Foreign Corporation, 44 Fed. Reg. 57,390 (Oct. 5, 1979).

Treasury did so relying on its authority under § 7805. *See id.* Contemporary case

law distinguished between temporary and proposed Treasury regulations, giving

weight only to the former. *Compare Nissho Iwai Am. Corp. v. Commissioner*, 89

T.C. 765, 776 (1987) (temporary regulations afforded same weight as final

regulations), *with Zinniel v. Commissioner*, 89 T.C. 357, 369-70 (1987) (proposed

regulations entitled to no deference and suggesting that Treasury could have issued

"temporary or final" regulations).

　　In 1987, Congress began considering legislation regarding Treasury's

regulatory authority. In its deliberations, Congress recognized Treasury's existing

rulemaking practices, including its use of "temporary regulations":

> The IRS publishes all regulations in the Federal Register. Before
> final regulations are promulgated, proposed regulations are issued.
> . . . The IRS also issues some regulations as temporary regulations.
> Generally, temporary regulations are effective immediately upon
> publication and remain in effect until replaced by final regulations.
> When the IRS issues temporary regulations, it generally also issues
> those same regulations in proposed form by cross-reference.

H.R. Conf. Rep. 100-1104 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5048, 5277. One of

its motivating concerns was to ensure that Treasury considered the impact of new

regulations on small businesses. Another was the length of time that some new

rules remained in temporary form. *See* S. Rep. 100-309, at 7 (1988). Prior to

enactment, Congress considered repudiating Treasury's use of temporary

regulations altogether by requiring *all* Treasury regulations to comply with § 553.

*See* Omnibus Taxpayer's Bill of Rights Act, S. 604, 100th Cong. § 17 (1987).

But that is not the language Congress eventually passed.  *See* Technical and

Miscellaneous Revenue Act of 1988 (TAMRA), § 6232(a), Pub. L. No. 100-647 (Nov.

10, 1988), 102 Stat. 3342, 3734-35 (codified at I.R.C. § 7805(e) and (f)).  The

language Congress enacted blessed Treasury's practice with respect to temporary

regulations.  Congress explained:

> [E]ach time the IRS issues temporary regulations, the IRS must simultaneously issue those regulations in proposed form. **The IRS may continue its present practice of issuing proposed regulations by cross-reference at the time temporary regulations are issued.** Temporary regulations are permitted to remain in effect for no more than [three[6]] years after the date of their issuance. The expiration of temporary regulations at the end of this [three]-year period **is not to affect the validity of those regulations during the [three]-year period.**

H.R. Conf. Rep. 100-1104, 1988 U.S.C.C.A.N. at 5278 (emphases added).  Rather

than requiring Treasury to seek comment under 5 U.S.C. § 553(b) or delay the

effective date of its regulations under § 553(d), the final bill addressed Congress's

two specific concerns.  It required Treasury to consult the Small Business

Administration regarding the regulation's effect on small businesses.  *See id.*;

TAMRA § 6232(a) (codified at § 7805(f)).  And it permitted Treasury to continue

issuing temporary regulations as long as they expired in three years and were also

issued as proposed regulations.  *See id.* (codified at § 7805(e)).

Because it authorizes Treasury to issue temporary regulations and prescribes

the procedures for doing so, § 7805(e) governs in this situation rather than the APA.

---

[6] The Conference Report's explanation of the Senate Amendment refers to a two-year sunset for temporary regulations, but the limit was set at three in the final law.  *See* H.R. Conf. Rep. 100-1104, 1988 U.S.C.C.A.N. at 5278; *see also* § 7805(e)(2).

The Plaintiffs argue otherwise: they contend that § 7805(e) provides additional restrictions on top of the APA's rules in 5 U.S.C. § 553.  (Pls. Mot. 30.)  That reading of § 7805(e) makes little sense.  An immediately-effective regulation issued under the good-cause exceptions in § 553 is final, not temporary.  *See* § 553(b)(B); § 553(d)(3).  By contrast, § 7805(e) speaks only to "temporary" regulations.  The two statutes simply do not cover the same ground.  If they *did* cover the same ground, § 7805(e) would be rendered insignificant, if not a nullity.  *Cf. Duncan*, 533 U.S. at 174 (explaining canon against surplusage).  The Plaintiffs' reading would give Treasury a choice between issuing a final rule under § 553's good-cause standards or issuing a temporary rule under those standards *and* § 7805(e)'s restrictions. Faced with that choice, there would be no reason for Treasury to issue temporary regulations, and § 7805(e) clearly contemplates that it will.[7]

Taken as a whole, § 7805(e), its context, and its legislative history serve as a clear instruction that Treasury's temporary regulations need not comply with the APA's notice-and-comment strictures.

---

[7] In *Burks v. United States*, 633 F.3d 347, 360 n.9 (5th Cir. 2011), the court suggested that it was "unclear" whether temporary Treasury Regulations received *Chevron* deference.  The *Burks* footnote is not entitled to substantial weight for four reasons.  First, it is clearly dictum: the case was resolved on different grounds, namely that the statute was unambiguous and foreclosed the interpretation set out in the temporary regulation.  *See id.* at 360 & n.9; *see also In re Cajun Elec. Power Coop.*, 109 F.3d 248, 256 (5th Cir. 1997) (defining dicta).  Next, *Burks* presented substantially different facts, including the issue of whether the regulations merely represented the agency's litigating position.  *See* 633 F.3d at 360 n.9.  Third, the court did not discuss § 7805(e), a critical part of the analysis.  Finally, *Burks* does not purport to resolve the issue; it states only that it is "unclear."

## B. The Rule Is Interpretive, So Notice And Comment Was Not Required.

As explained above, I.R.C. § 7805(e) supersedes 5 U.S.C. § 553(b), permitting the Treasury Department to issue temporary regulations without notice and comment. But even if § 553(b) applies to temporary Treasury regulations, notice-and-comment was not required for this Rule because it is interpretive.

The APA permits agencies to issue "interpretative rules" (or "interpretive rules") without subjecting them to notice and comment. § 553(b)(A). Precisely what an interpretive rule is, the APA does not say, and the Supreme Court has largely declined to elaborate. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. ___, 135 S.Ct. 1199, 1204 (Mar. 9, 2015) (noting that the term's meaning "is the source of much scholarly and judicial debate"). *See also Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) ("[T]he spectrum between a clearly interpretive rule and a clearly substantive one is a hazy continuum."). The Fifth Circuit has stated that "[g]enerally speaking . . . 'regulations,' 'substantive rules,' or 'legislative rules' are those which create law; whereas interpretive rules are statements as to what the [agency] thinks the statute or regulation means." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (internal quotation marks omitted). *See also Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995) (holding that rule regarding amortization of certain losses was "a prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers"). That a rule "may affect how parties act does not make the rule legislative—regardless of the consequences of a rulemaking, a rule

will be considered interpretative if it represents an agency's explanation of a statutory provision." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991). Treasury regulations, including interpretive ones, are entitled to judicial deference. *See Mayo Found. for Med. Educ. & Res. v. United States*, 562 U.S. 44, 55-57 (2011).[8]

Often, the distinction between interpretive rules and substantive rules is articulated as only the latter having the "force of law." *E.g.*, *Perez*, 135 S.Ct. at 1204. That distinction is ultimately of little help. When an interpretive rule is entitled to deference, it is binding on courts, and therefore, as a practical matter, has the force of law. *See id.* at 1211-12 (Scalia, J., dissenting); *see also Mayo*, 562 U.S. at 57-58 (allowing *Chevron* deference to interpretive Treasury Regulation). Binding consequences flow from the statute and courts' decisions, not from the regulation itself.

In § 7874, Congress did not give Treasury an unbounded command to "create new law . . . in what amounts to a legislative act." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) (internal quotation marks omitted). Section 7874 is a highly prescriptive statute with a complex architecture, but as explained above, Congress expressly delegated the authority to interpret aspects of the definition of a surrogate foreign corporation, *see* § 7874(c)(6), and to issue regulations to carry out

---

[8] Usually rules that are entitled to *Chevron* deference have gone through notice and comment. *See Perez*, 135 S.Ct. at 1204; *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173-174 (2007). *See also Mayo*, 562 U.S. at 57-58. But it is clear that notice and comment is not a necessary condition for *Chevron* deference. The Supreme Court has deferred to regulations issued without it. *See United States v. Mead Corp.*, 533 U.S. 218, 231 & n.13 (2001) (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995)).

the purposes of the statute, § 7874(g). The Rule does not alter the statutory test. Instead, it interprets, in one set of circumstances, the term "stock (by . . . value)," § 7874(a)(2)(B), so as not to include certain stock that would be inconsistent with the purposes of § 7874. The interpretation clarifies the term "stock (by . . . value)" for purposes of applying the percentage ownership test in the circumstances set out in the Rule. *See Shell Offshore*, 238 F.3d at 628 ("[I]nterpretive rules are statements as to what the [agency] thinks the statute . . . means.").

Instead of creating new law, to issue an interpretive rule, an agency "must be interpreting something." *Central Tex. Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005). The regulations under § 7874, of which there are several in addition to the Rule, provide additional detail to the specific architecture of § 7874 to advise the public how the Treasury Department construes the statute. Although they are issued under specific grants of authority in § 7874, they construe the meaning of a particular term within § 7874. For the Rule, as explained above, it elaborates on the meaning of "stock (by . . . value)" in § 7874(a)(2)(B).

Because the Rule is interpretive, notice and comment was not required under 5 U.S.C. § 553(b)(B).

## V. Conclusion

For the foregoing reasons, the Court should deny the Plaintiffs' Motion for Summary Judgment (Dkt. 32). Furthermore, if the Court cannot conclusively resolve the jurisdictional issues raised in the United States' Motion to Dismiss at this stage of the case, the Court should hold the Plaintiffs' Motion in abeyance.

Respectfully submitted,

CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

Date: November 8, 2016            /s/ Adam Strait
ADAM D. STRAIT (Mass. BBO No. 670484)
PAUL T. BUTLER (MD Bar No. 9406230037)
Trial Attorneys
U.S. Department of Justice, Tax Division
P.O. Box 683
Washington, D.C. 20044-0683
Telephone: (202) 307-2135
Fax: (202) 307-2135
adam.d.strait@usdoj.gov
paul.t.butler@usdoj.gov

MICHELLE C. JOHNS
Texas State Bar No. 24010135
Department of Justice, Tax Division
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9762
(214) 880-9741 (FAX)
Michelle.c.johns@usdoj.gov


*Of counsel:*
RICHARD L. DURBIN
United States Attorney
Western District of Texas

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2016, I filed the foregoing with the Court in this case through the Court's CM/ECF system. I further certify that as a result of filing the document with the Court, pursuant to Local Rule CV-5(b), I served a copy of it on the following:

Laura Durfee (ldurfee@jonesday.com)

Michael A. Carvin (macarvin@jonesday.com)

Andrew M. Eisenberg (ameisenberg@jonesday.com)

Gerald Brinton Lucas (blucas@jonesday.com)

Jacob M. Roth (yroth@jonesday.com)

Raymond J. Wiacek (rjwiacek@jonesday.com)

*Attorneys for the Plaintiffs*

Kathryn Comerford Todd (ktodd@uschamber.com)

Lily Fu Claffee (lclaffee@uschamber.com)

Steven P. Lehotsky (slehotsky@uschamber.com)

Warren Postman (wpostman@uschamber.com)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Date: November 8, 2016

/s/ Adam Strait
ADAM D. STRAIT
Trial Attorney
U.S. Department of Justice, Tax Division