# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; and
TEXAS ASSOCIATION OF BUSINESS,

*Plaintiffs*,

v.

INTERNAL REVENUE SERVICE; *et al.*,

*Defendants*.

Civil Action No. 1:16-cv-00944-LY

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.      PLAINTIFFS HAVE STANDING TO CHALLENGE THE RULE ............................... 2

    A.      Allergan Would Have Standing To Challenge The Rule........................................ 2

    B.      The Government's Remaining Arguments Against Standing Lack Merit........... 11

II.     THE AIA DOES NOT BAR THIS PURELY LEGAL CHALLENGE TO THE FACIAL VALIDITY OF A GENERALLY APPLICABLE TREASURY RULE ......... 15

    A.      The APA Expressly Authorizes Facial Challenges to Treasury Regulations ...... 15

    B.      This Facial Regulatory Challenge Does Not Fall Within the AIA's Terms Or Implicate Its Purposes.................................................................................. 17

    C.      Precedent Supports A Narrow Construction of the AIA ..................................... 23

    D.      This Lawsuit Also Falls Within the Two Recognized Exceptions to the AIA .................................................................................................................... 29

CONCLUSION.............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967).................................................................*passim*

*Abel v. Campbell,*
334 F.2d 339 (5th Cir. 1964) .............................................23, 24

*Adams v. Watson,*
10 F.3d 915 (1st Cir. 1993)......................................................5

*Alexander v. 'Americans United' Inc.,*
416 U.S. 752 (1974)...........................................................26, 27

*Alliance for Clean Coal v. Miller,*
44 F.3d 591 (7th Cir. 1995) .....................................................4

*Alliant Energy Corp. v. Bie,*
277 F.3d 916 (7th Cir. 2002) ...............................................4, 11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ....................................................2

*Bennett v. Spear,*
520 U.S. 154 (1997)................................................................11

*Bob Jones Univ. v. Simon,*
416 U.S. 725 (1974)...........................................................*passim*

*Bowen v. Mich. Acad. of Family Physicians,*
476 U.S. 667 (1986)................................................................30

*Bowers v. United States,*
423 F.2d 1207 (5th Cir. 1970) (per curiam).............................23

*Bryant v. Yellen,*
447 U.S. 352 (1980)...........................................................*passim*

*Campbell v. Guetersloh,*
287 F.2d 878 (5th Cir. 1961) ..................................................24

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)..................................................................11

*Clements v. Fashing,*
457 U.S. 957 (1982)................................................................10

i

*Clinton v. City of New York*,
524 U.S. 417 (1998)................................................................................*passim*

*Crenshaw Cnty. Private Sch. Found. v. Connally*,
474 F.2d 1185 (5th Cir. 1973) ...............................................................27

*Direct Mktg Ass'n v. Brohl*,
135 S. Ct. 1124 (2015)...........................................................................*passim*

*Enochs v. Williams Packing & Nav. Co.*,
370 U.S. 1 (1962)......................................................................21, 22, 30

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................................17

*Fletcher v. United States*,
452 F. App'x 547 (5th Cir. 2011) (per curiam) ....................................23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)................................................................................14

*Great Lakes Gas Transmission Ltd. P'ship v. FERC*,
984 F.2d 426 (D.C. Cir. 1993)...............................................................14

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)...............................................................20

*Herring v. Moore*,
735 F.2d 797 (5th Cir. 1984) (per curiam)............................................23

*Hibbs v. Winn*,
542 U.S. 88 (2004)......................................................................19, 22, 28

*Humphreys v. United States*,
62 F.3d 667 (5th Cir. 1995) (per curiam)..............................................23

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................................2

*Jones v. Gale*,
470 F.3d 1261 (8th Cir. 2006) .................................................................4

*Jones v. United States*,
889 F.2d 1448 (5th Cir. 1989) ......................................................17, 21

*Keado v. United States*,
853 F.2d 1209 (5th Cir. 1988) ...............................................................23

*Kemlon Prods. & Dev. Co. v. United States*,
638 F.2d 1315 (5th Cir. 1981) ...............................................................24

ii

*King v. Burwell,*
 135 S. Ct. 2480 (2015) .................................................................................17

*Linn v. Chivatero,*
 714 F.2d 1278 (5th Cir. 1983) .................................................................23, 24

*Lloyd v. Patterson,*
 242 F.2d 742 (5th Cir. 1957) (per curiam).....................................................23

*Lucia v. United States,*
 474 F.2d 565 (5th Cir. 1973) (en banc) .........................................................30

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ............................................................................. *passim*

*Mayo Foundation for Med. Educ. & Res. v. United States,*
 562 U.S. 44 (2011) .......................................................................................16

*McCabe v. Alexander,*
 526 F.2d 963 (5th Cir. 1976) (per curiam).....................................................23

*Morton v. Mancari,*
 417 U.S. 535 (1974) .....................................................................................17

*Mulcahy v. United States,*
 388 F.2d 300 (5th Cir. 1968) (per curiam).....................................................23

*NAACP v. City of Kyle,*
 626 F.3d 233 (5th Cir. 2010) ........................................................................13

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
 508 U.S. 656 (1993) ............................................................................4, 9, 10

*Poretto v. Usry,*
 295 F.2d 499 (5th Cir. 1961) ........................................................................23

*Rusk v. Cort,*
 369 U.S. 367 (1962) .....................................................................................16

*Sackett v. EPA,*
 132 S. Ct. 1367 (2012) ..................................................................................16

*Sage v. United States,*
 908 F.2d 18 (5th Cir. 1990) .....................................................................17, 24

*Sec. Indus. Ins. Co. v. United States,*
 830 F.2d 581 (5th Cir. 1987) ........................................................................23

*Shaughnessy v. Pedreiro*,
349 U.S. 48 (1955).............................................................16

*Smith v. Booth*,
823 F.2d 94 (5th Cir. 1987) (per curiam)...........................16

*Smith v. Rich*,
667 F.2d 1228 (5th Cir. 1982) ............................................24

*South Carolina v. Regan*,
465 U.S. 367 (1984)....................................................22, 29

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009)...............................................11, 12, 13

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014)........................................................10

*Tex. Cable & Telecomms. Ass'n v. Hudson*,
265 F. App'x 210 (5th Cir. 2008) ......................................11

*Time Warner Cable, Inc. v. Hudson*,
667 F.3d 630 (5th Cir. 2012) ..........................................3, 4

*TVA v. Hill*,
437 U.S. 153 (1978)............................................................17

*U.S. Airways Inc. v. FCC*,
232 F.3d 227 (D.C. Cir. 2000) ............................................9

*United States v. Doyal*,
462 F.2d 1357 (5th Cir. 1972) (per curiam)......................23

*Vasilinda v. United States*,
487 F.2d 24 (5th Cir. 1973) ..............................................23

*Walters v. United States*,
287 F. App'x 392 (5th Cir. 2008) ......................................23

*Warren v. United States*,
874 F.2d 280 (5th Cir. 1989) ............................................23

*Warth v. Seldin*,
422 U.S. 490 (1975)..............................................................2

**STATUTES**

5 U.S.C. § 551(1)..................................................................17

5 U.S.C. § 706(2)..................................................................20

26 U.S.C. § 7421(a) ......................................................15, 17

iv

**OTHER AUTHORITIES**

26 C.F.R. § 1.7874-8T(g)(6) ........................................................................13

Mark Terry, *Nixed Pfallergan Deal Has Investors Wondering if Allergan (AGN)*
    *Might Target Biogen (BIIB)*, BioSpace (Apr. 6, 2016), https://goo.gl/qVKo32 ......................8

## INTRODUCTION

The Government's jurisdictional position is remarkable. Having gerrymandered a regulation with the purpose and effect of preventing a particular merger from taking place and hindering the transacting parties from making similar deals in the future, the Government now claims that its rule cannot even be challenged in court. Neither Article III nor the Anti-Injunction Act ("AIA") provides the Government with such a lack of accountability.

Given that their membership includes the injured targets of this regulation, Plaintiffs have standing to challenge it. Without disputing that the regulation singled out these members for adverse treatment, caused the collapse of their $160 billion merger, and continues to impede their ability to compete for similar opportunities, the Government now claims that these businesses cannot obtain their day in court unless they first make specific plans to engage in a new deal that would also be fatally burdened by the rule. But precedent squarely forecloses that unrealistic demand, which is particularly inappropriate in a motion to dismiss.

Nor does the AIA pose an obstacle to review. This facial, pre-enforcement challenge to a final agency regulation under the Administrative Procedure Act ("APA") is the sort of suit that federal courts resolve every day. The fact that the regulation concerns taxes does not insulate it from judicial scrutiny under the APA. The AIA bars challenges to tax "assessments" and "collections" so that Treasury may retain disputed tax funds during litigation; neither its text nor its purpose—let alone any controlling precedent—shields the regulations of an entire agency of the Government from ordinary APA review. In any event, this suit falls within both of the recognized exceptions to the AIA, as there will be *no* judicial review of this arbitrary and capricious regulation absent this Court's intervention. Plaintiffs' members thus need not engage in a $160 billion merger, carry out additional transactions, pay the Government, and then sue for a refund just to figure out whether this regulation is facially invalid in the first place.

<u>**ARGUMENT**</u>

**I.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE RULE.**

An association may sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The Government does not dispute the latter two elements.  *See* Defs.' Mot. Dismiss 11 n.1 (Dkt. No. 31) ("MTD"); *see also Warth v. Seldin*, 422 U.S. 490, 515 (1975); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010). It insists, however, that none of Plaintiffs' members would themselves have standing to challenge the Multiple Acquisition Rule.  *See* MTD 11.  That view cannot be squared with either basic principles of standing or the facts alleged in the Complaint.

**A.     Allergan Would Have Standing To Challenge The Rule.**

To satisfy Article III's case-or-controversy requirement, a plaintiff must suffer an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and likely to "be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). At least one of Plaintiffs' members, Allergan, easily meets that test.  Allergan was the target of a gerrymandered regulation that caused the collapse of its merger with Pfizer and continues to impair its ability to compete for merger opportunities.  Invalidation of that rule would remove that burden.  *See* Compl. ¶¶ 43–44, 46–47, 61.

The Government does not dispute that the Rule injured Allergan by triggering the breakup of its pending merger with Pfizer.  *See* MTD 15–16.  Nor does it deny that the Rule continues to hinder Allergan in obtaining future merger partners or that such injuries are generally sufficient to establish standing.  *See* MTD 18.  Nor does it dispute that the Rule singled

out Allergan for disfavored treatment. *See* MTD 28–29 (acknowledging allegation, which must be assumed to be true for purposes of motion to dismiss, "that the Rule specifically targeted the Pfizer-Allergan merger"). Despite accepting all these allegations as true—as it must—the Government contends that Plaintiffs lack standing because they "fail to identify a single [merger] 'opportunity' Allergan would pursue" if the Rule were invalidated. MTD 21 (brackets omitted).

The notion that Allergan, the target of the challenged action, must identify a specific future merger to satisfy Article III is foreign to the law. "When the suit is one challenging the legality of government action" and "the plaintiff is himself an object of the action," there "is ordinarily little question that the action . . . has caused him injury." *Lujan*, 504 U.S. at 561–62. That is particularly true when the action singles him out for a burden his *competitors* need not bear, as "[t]he Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998). It is even more obvious when the action has already harmed him. And it is undeniable at the pleadings stage.

 **1.** When a law "discriminates against" a business "by extending [a] benefit . . . to its competitors while denying that same benefit" to it, "no further showing of suffering based on that unequal positioning is required for purposes of standing." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012). For instance, the Fifth Circuit rejected an argument, similar to the Government's here, that a cable provider had to establish a "concrete" economic harm to challenge a Texas law excluding it and another provider from the benefit of a license made available to competitors. *Id.* at 635–37. The court explained that the law "singles out certain" providers "as ineligible for the benefit," and that given this "exclusion" from "benefits bestowed on similar parties," the provider had no need to demonstrate "a quantifiable economic

injury." *Id.* at 636–37; *see also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").

Likewise, when plaintiffs bring Commerce Clause challenges to state laws threatening their ability to enter into transactions with out-of-state businesses, courts do not demand that they identify future deals. To the contrary, "the difficulty of identifying particular transactions is not fatal," for a law "that deprives a firm of an opportunity to *compete* for business gives standing to sue, without need for proof that the firm would have won the competition." *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 918, 920–21 (7th Cir. 2002); *see also, e.g.*, *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006) (plaintiff did not have "to show that he had contracted with an out-of-state corporation in order to have standing"). In short, where a law "impinges on" a plaintiff's ability "to compete on an equal footing in interstate commerce," there is no need to "identify any business overtures that were made and rebuffed on the basis" of the law, as a "showing of specific 'lost opportunities' is neither required to establish standing nor reasonably expected." *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995).

Here, the Rule discriminates against Allergan and similarly situated foreign companies that have acquired multiple U.S. corporations within a three-year period. That discrimination was no accident; the Rule was specifically designed to capture Allergan's acquisitions from October 2013 through March 2015. *See* Compl. ¶ 43 (quoting statement that Treasury "was targeting Pfizer-Allergan" by using "the history of the inversions by Allergan"). Due to this gerrymandered Rule, Allergan can no longer offer tax benefits under Section 7874 to prospective

merger partners, while its competitors still can. In competing for merger opportunities, Allergan is thus disadvantaged, and that is all that must be shown to establish standing. Indeed, where a regulation "disadvantages the plaintiff's competitive position in the relevant marketplace," the "future injury-in-fact is viewed as 'obvious.'" *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993). In fact, this challenge presents a far *stronger* case for standing than those discussed above because it is undisputed that at least one concrete transaction (the Pfizer-Allergan deal) has *already* been scuttled by the Rule. *See* Compl. ¶ 44; MTD 15–16.

Having gerrymandered a rule to kill the Pfizer merger and handicap Allergan in competing for merger partners, the Government has the audacity to ask that Allergan identify specific mergers that it would complete despite the fact that the Government has made such mergers unworkable. That approach would turn Article III on its head: Standing requirements exist to prevent parties from airing generalized grievances in the courts, not to slam courthouse doors on those *targeted* for disfavored treatment by the Government.

**2.** Even if Allergan did not suffer an economic disadvantage by being singled out, the Complaint still has alleged redressable injury more than sufficient to establish standing. The Supreme Court's decisions in *Clinton* and *Bryant v. Yellen*, 447 U.S. 352 (1980), make this clear. In both cases, the Court found standing even though the relevant challengers did not come close to satisfying the draconian showing the Government demands here and even though their allegations of injury were far more "speculative" and less "concrete" than Plaintiffs'. MTD 11.

In *Clinton*, the President line-item vetoed a tax benefit conferred by Congress on certain businesses. The vetoed provision would have allowed food processors to defer capital gains tax if they sold to farmers' cooperatives—a deferral that was already available for transactions with *corporate* buyers. 524 U.S. at 423–25. After the President's action, one such farmers'

cooperative, Snake River, challenged the Line Item Veto Act. *Id.* at 425–26. The Court held that this potential purchaser had standing because taking away favorable tax treatment from food processors that could potentially sell to Snake River "inflicted a sufficient likelihood of economic injury to establish standing." *Id.* at 432. And the Court rejected the Government's argument that Snake River's injury was too "speculative" because the cooperative had not identified a particular contract that it would have undertaken in the future. *Id.* at 430. As the Court explained, Snake River did not have to prove that it "would have actually obtained a facility on favorable terms" absent the veto, it needed only to show that the veto imposed an economic burden on the sorts of deals that Snake River was interested in pursuing. *Id.* at 433 n.22. Since "denial of a benefit in the bargaining process can itself create an Article III injury," the President's removal of the "statutory bargaining chip" provided by the vetoed law constituted "immediate injury" in and of itself. *Id.* at 432, 433 n.22.[1]

In *Yellen,* the Department of Interior had taken a position that imposed water-use regulations and a price cap on the sale of farmland that diminished the value of certain farms in Imperial Valley, California. *See* 447 U.S. at 355–67 & n.17. After a court rejected Interior's position and the Government declined to appeal, a "group of Imperial Valley residents . . . who desired to purchase the excess lands that might become available" if Interior's burdensome position were revived, appealed the ruling. *Id.* at 366. The Supreme Court held that they had "standing to . . . press the appeal," even though "no owner of [the burdened] excess land would be required to sell" under Interior's position and even though the "absence of detailed

---

[1] The Government's claim that any future merger will "depend on many factors other than tax considerations" is beside the point. MTD 16; *see* MTD 12, 16–17. It made the same claim in *Clinton* to no avail. *See* Br. for Appellants at 28, *Clinton,* 524 U.S. 417 (No. 97-1374), 1998 WL 263832 ("Because the likely tax treatment of any capital gain is only one of many factors bearing on a processor's decision whether to undertake a particular transaction, the effect (if any) of [the amendment] on the general availability of processing facilities is inherently speculative.").

information about [the residents'] financial resources" precluded them from proving that they would "be able to purchase the excess lands" if they did go on the market due to Interior's policy. *Id.* at 366–67 & n.17. Despite this uncertainty and the complete absence of any specific plans to purchase any affected lots, the residents had suffered sufficient injury because any lands that were sold would have been "available for purchase at prices below the market value." *Id.* at 367.

The injury here is far more concrete and obvious than that suffered by the challengers in *Clinton* and *Yellen*. *First*, Allergan's injury is more direct because the challenged rule directly burdens *it*, while the challengers in *Clinton* and *Yellen* were not themselves affected by the rule they sought to reinstate through litigation. They were simply potential *purchasers* seeking to restore a tax benefit (*Clinton*) or a property burden (*Yellen*) on potential *sellers*.

*Second*, as in *Clinton* and *Yellen*, it is uncontested that the Rule denies a "benefit in the bargaining process" for inversions by removing the tax advantages Allergan seeks. *Clinton*, 524 U.S. at 433 n.22. Indeed, the very purpose of the Rule is to impose an economic burden on companies precisely to deter inversions. *See* Pls.' Mot. Summ. J. 8–9 (Dkt. No. 32-1) ("MSJ"); *cf. Clinton*, 524 U.S. at 432 (noting that Congress had passed the amendment "for the specific purpose of providing a benefit to a defined category of potential purchasers"). The fact that the Rule singled out Allergan for this burden underscores the concrete nature of its injury. *Cf. Clinton*, 524 U.S. at 432 (noting that "the President selected" the amendment "as one of the only two tax benefits in [the legislation] that should be canceled").

*Third*, Allergan's concrete interest is much better established. In *Yellen*, the residents did not identify any properties "that *might* become available" under Interior's position or show that they had the money to buy them if they did. 447 U.S. at 366 (emphasis added). In *Clinton,* Snake River "engaged in . . . negotiations" with a food-processor owner who had "expressed an

interest" in selling, but did not commit to a deal. 524 U.S. at 432; *see also id.* at 459 (Scalia, J., concurring in part and dissenting in part) ("[A]ll we know from the record is that Snake River had two discussions with [the processor] concerning the sale of its processing facility on the tax deferred basis the Act would allow; that [the processor] was interested; and that Snake River ended the discussions after the President's action."). By contrast, Allergan had signed an agreement with Pfizer setting forth the terms of a $160 billion merger. *See* Compl. ¶¶ 32–34.

*Finally*, as in *Clinton*, Allergan aims to use the withheld tax benefits in future deals if this Court sets aside the Rule. Just as Snake River was "considering the possible purchase" of other processors in the event that the President's action were reversed, 524 U.S. at 427, Allergan will "actively pursue merger opportunities" if the Rule is set aside, Compl. ¶ 47. And "ample" potential targets exist, *Clinton*, 524 U.S. at 432, including other large U.S. pharmaceutical companies. *See, e.g.*, Mark Terry, *Nixed Pfallergan Deal Has Investors Wondering if Allergan (AGN) Might Target Biogen (BIIB)*, BioSpace (Apr. 6, 2016), https://goo.gl/qVKo32. By contrast, the residents in *Yellen* did not allege any such "active pursuit" or document their ability to buy property if it became available.

**3.** *Clinton* and *Yellen* thus refute the Government's principal argument that economic injury is too speculative unless Allergan has "concrete plans" for particular inversions *now*, notwithstanding that the Rule currently makes such plans futile. MTD 19. *Clinton* and *Yellen* establish that if the challenged policy denies "a benefit in the bargaining process" by economically burdening transactions that the challengers are interested in, this suffices without detailed allegations or proof that they are currently pursuing such opportunities *notwithstanding* the harm caused by the challenged action. *Clinton*, 524 U.S. at 433 n.22; *see also Ne. Fla.*, 508 U.S. at 666 ("To establish standing" under such circumstances, a challenger "need only

demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an unequal basis."). Since burdening desired transactions is obviously "economic injury," the challengers show that they personally suffered that injury if they have an interest in the type of bargain being burdened.

Under *Clinton*, this interest is more than established if the party had "concrete plans" to do such a deal prior to the challenged action and cancelled those plans in its wake. Contrary to the Government's mischaracterization, *Clinton* in no way requires challengers to have *future* "concrete plans" to engage in the transactions rendered economically infeasible; a past such plan easily suffices. MTD 18–19; *see Clinton*, 524 U.S. at 432–33. Here, Allergan and Pfizer not only had a "concrete plan," but a concrete agreement. *See* Compl. ¶¶ 32–34. With respect to future activity, the most that is required is that the challenger allege that it will "actively pursue" the sorts of transactions burdened *if* the injury-causing rule is set aside. Article III does not impose the unrealistic requirement of alleging that the challenger will "actively pursue" transactions *in the face* of the policy that makes those deals economically unfeasible. Again, all that Snake River alleged in *Clinton* was that it was "currently considering the possible purchase of other processing facilities," not that it was actively pursuing an identified target. 524 U.S. at 427. Likewise, the residents in *Yellen* had simply expressed a generalized "desire[]" to purchase unidentified farmlands "that might become available." 447 U.S. at 366. And the challenger in *Northeastern Florida* just asserted that its "members regularly bid on construction contracts" and "*would have bid* on contracts set aside pursuant to the city's ordinance were they so able." 508 U.S. at 668 (emphasis added); *cf. U.S. Airways Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000).

More generally, the Government's draconian standard makes no sense. Companies will not waste valuable time and resources actively negotiating transactions *now* if the transaction is

not economically feasible because of the challenged Government policy. Allergan's injury is precisely that the Rule has rendered inversions so economically unfeasible that it will not pursue them. Allergan cannot sensibly be required to pursue economically harmful activity it has eschewed because of the Rule in order to establish that the Rule has injured it by practically foreclosing such negotiations. To challenge the Rule, Allergan need not exacerbate its injury by wasting money on concrete negotiations for deals rendered economically impracticable under the Rule. At most, all that is required is an assertion that Allergan will renew its "activ[e] pursu[it]" of inversions once the Rule is set aside—precisely what Plaintiffs have alleged. Compl. ¶ 47.

In other words, since Article III injury is established by showing that the plaintiff has *refrained* from certain activity *because* of the challenged rule, it does not require plaintiffs to show they are *now engaging* in the activity *despite* the rule. Article III does not even "require[] a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law," let alone prepare to do so. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014); *see also Clements v. Fashing*, 457 U.S. 957, 962 (1982) (officials could challenge provision requiring resignation from office upon announcement of candidacy for another office, despite promise "not [to] announce their candidacy" while that provision stood). *Lujan* itself confirmed this basic point when it *rejected* the notion that "a property owner claiming a decline in the value of his property from governmental action might have to specify the exact date he intends to sell his property and show that there is a market for the property, lest it be surmised he might not sell again." 504 U.S. at 593 (Blackmun, J., dissenting). Rather, the Court explained that the present burden causing the decline in property value would make the "existence of standing . . . clear," without any requirement to allege future specific actions detailing the extent of the burden. *Id*. at 564 n.2 (majority opinion). Thus, the undisputed harm imposed on

Allergan is sufficient injury, regardless of whether it exacerbates that injury by spending money now pursuing inversions that the Rule has rendered economically disadvantageous.

**4.** Finally, the Government's demand that Plaintiffs identify future merger partners is particularly misplaced in a motion to dismiss. When standing is assessed "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," as courts reviewing motions to dismiss must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561; *accord Bennett v. Spear*, 520 U.S. 154, 167–68 (1997). The need to provide general allegations does not require a plaintiff to "identif[y] a partner committed to a merger," as "supplying details is not the function of a complaint." *Alliant Energy*, 277 F.3d at 918, 920; *see also, e.g.*, *Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 217 (5th Cir. 2008) (general allegation of "regulatory allowance of increased competition" is "more than sufficient" to establish standing at pleading stage). At a minimum, the Government's motion to dismiss should be denied for this reason.

**B.    The Government's Remaining Arguments Against Standing Lack Merit.**

**1.** The Government also invokes *Lujan* and *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), a pair of decisions that involved plaintiffs in a far different situation than Plaintiffs' members. MTD 19–20. In both cases, the Court held that environmental groups could not establish standing based solely on assertions that their members planned to visit areas affected by regulatory decisions, without specifying which area they would visit or when they would do so. *See Summers*, 555 U.S. at 495–96; *Lujan*, 504 U.S. at 563–64. Neither case involved a prior concrete injury accompanied by "continuing, present adverse effects"—in fact, "no actual harm" had occurred at all. *Lujan*, 504 U.S. at 564 & n.2; *see Summers*, 555 U.S. at 495 (only identified "injury in the past . . . not tied to the application of the challenged regulations"). And neither case involved a plaintiff that was "an object of the [challenged]

11

action"; rather, the "asserted injury" stemmed "from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Lujan*, 504 U.S. at 561–62; *see Summers*, 555 U.S. at 493 ("The regulations under challenge here neither require nor forbid any action on part of the [plaintiffs].").  Thus, the Court understandably demanded details—details which would readily be available to the plaintiffs, were they truly affected—to establish the "imminence" of the alleged *future* harm to the plaintiffs *themselves*.  *See Lujan*, 504 U.S. at 564 & n.2; *Summers*, 555 U.S. at 493–96.

Here, by contrast, the Rule both triggered the collapse of the Pfizer-Allergan merger and *continues* to reduce Allergan's value as a potential merger partner by eliminating the possibility of certain tax benefits.  *See* Compl. ¶¶ 44, 46–47.  Under these circumstances, Article III does not mandate details about future transactions.  Unlike in *Summers* and *Lujan*, the Rule imposes an "ongoing, present injury" on Allergan—the effects of the Rule's deleterious tax treatment which manifested themselves in the cancellation of the Pfizer merger.  And for the same reason, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is also inapposite.  The only way that Allergan's injury will disappear is if it forswore any potential future inversions, thus escaping the regulatory burden of the Rule.  But Plaintiffs' assertion that Allergan will "actively pursue" such inversions if the Rule is invalidated suffices to allege the ongoing burden of the Rule (as well as the fact that the injury will be redressed if the Rule is set aside).  Compl. ¶ 47.

In short, Allergan is directly regulated and burdened by the challenged action, whereas the environmentalists in *Lujan* and *Summers* were not already regulated or already burdened, and therefore needed to allege facts showing how they would *come within* the policy's harmful effect in the future—*i.e.*, that the status quo would *change*.  Given that Allergan and Pfizer were the primary "object[s] of" the Rule and have already refrained from concrete actions because of it,

Plaintiffs need only show that the status quo has *not* changed because at least one of them still desires to engage in covered deals. This is precisely how *Lujan* distinguished the hypothetical property owner already suffering injury from environmentalists who had not yet been exposed to the challenged regulatory regime. *See* 504 U.S. at 564 n.2; *id.* at 593 (Blackmun, J., dissenting).[2]

2.      In a last-ditch effort to defeat standing, the Government contends that the lack of an identified opportunity is a "crucial omission[]" due to the Rule's limited three-year lookback window. MTD 21. According to the Government, few if any of Allergan's potential merger opportunities will ultimately be affected by the Rule, because its prior acquisitions of U.S. corporations will eventually "age out" of the Rule as time elapses. *Id.*

This argument founders on both the facts and the law. As a factual matter, it is far from clear that Allergan will actually "age out" of the Rule in any meaningful sense. As the Government notes, the Rule, "[g]enerally speaking," only disregards stock issued in U.S. acquisitions that occurred within three years of the signing date of the inversion at issue. MTD 21. But the Rule also provides that "if another binding contract to effect a *substantially similar acquisition* was terminated with a principal purpose of avoiding section 7874," then the relevant signing date becomes the date on which that "other contract" became binding. 26 C.F.R. § 1.7874-8T(g)(6) (emphasis added). Because the signing date of the Pfizer-Allergan deal was November 22, 2015, and because that merger "was terminated" to avoid the adverse tax effects created by the Rule, the three-year lookback period will continue to cover Allergan's acquisitions between October 2013 and March 2015 if it engages in a "substantially similar acquisition" in

---

[2] The Government's passing reference to *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010), is misplaced for a similar reason. MTD 18. In that case, the NAACP lacked standing to challenge zoning ordinances under the Fair Housing Act because it had not identified *any* member who "has been unable to purchase a residence . . . as a result of the revised ordinances" or who "may [be] deprive[d] . . . of the opportunity to acquire a new residence" in the future. 626 F.3d at 237. Indeed, the association had *waived* any claim to associational standing. *See id.* at 236 & n.2.

the future.  *See* Compl. ¶¶ 32, 39, 44.  Given that this term is not defined in the Rule and could cover a merger between Allergan and a U.S. pharmaceutical company of comparable size to Pfizer, it is likely that the Rule will *indefinitely* hinder Allergan in pursuing merger opportunities, as none of its potential partners will be able to safely assume that the deal would not qualify.

For present purposes, however, this Court need not define what constitutes a "substantially similar acquisition."  It is enough that the Rule hangs a cloud of uncertainty over the tax treatment of future mergers between Allergan and other large pharmaceutical companies. Allergan and any prospective merger partner will have to take into account the risk that Treasury classifies the transaction as "substantially similar" to the terminated Pfizer deal and thereby alters the status of the combined entity for tax purposes.[3]  This lingering doubt puts Allergan at a perpetual disadvantage to its competitors, which is more than enough to establish cognizable harm.  *See Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 430 (D.C. Cir. 1993) (agency's position that a business must bear the risk of a contingency that would not materialize until 15 years in future "has a present injurious effect" on its "competitive posture").

And as a legal matter, even if it were clear that Allergan would "age out" of the Rule in the future, that would not deprive it of standing to sue *now*.  Rather, standing is assessed "at the time the action commences." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000); *accord Lujan*, 504 U.S. at 569 n.4.  Even on the Government's theory, Allergan's injury will persist for at least "the next 18 months" (MTD 21) until the most recent of its prior acquisitions ages out of the three-year lookback; that is enough.  The Government cannot defeat standing by speculating that mootness may occur in March 2018.

---

[3] Any assurance by the Government in this litigation cannot eliminate this risk, as Treasury has already shown its willingness to shift its position to punish a pending merger.  *See* MSJ 24–27.

## II.  THE AIA DOES NOT BAR THIS PURELY LEGAL CHALLENGE TO THE FACIAL VALIDITY OF A GENERALLY APPLICABLE TREASURY RULE.

Plaintiffs are suing under the APA to set aside a Treasury regulation that is contrary to law and that was adopted absent the requisite procedures.  That action is specifically authorized by the APA and has been the standard method of challenging agency regulations for decades.  Nonetheless, the Government contends that regulations concerning taxes are somehow exempt from this APA command, by virtue of the AIA.  In its view, nobody is able to challenge the legal validity of the Rule unless they first undertake a very costly and disruptive inversion, engage in activities that incur taxes by virtue of the Rule, pay up, and then sue for a refund.

That objection is badly misguided.  The AIA only applies to taxpayer suits seeking to "*restrain*" tax "*assessment or collection*."  26 U.S.C. § 7421(a) (emphases added).  Neither those statutory terms nor the Act's purpose (to allow Treasury to retain disputed tax funds pending litigation) have any force in the context of this Complaint—and surely do not overcome the basic APA presumption in favor of judicial review.  Supreme Court and Fifth Circuit precedent further establish that the AIA does not block a pre-enforcement facial challenge to a regulation.

### A.  The APA Expressly Authorizes Facial Challenges to Treasury Regulations.

As a general matter, the APA authorizes facial, pre-enforcement review of final agency regulations where those regulations bear on the primary conduct of the regulated parties.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–53 (1967).  As explained above, the Rule puts Plaintiffs' members in precisely the "dilemma" that the Supreme Court has repeatedly held necessitates review of a regulation before it is enforced against affected entities:  either refrain from engaging in an inversion covered by the Rule, or else proceed and risk subjecting all of the foreign parent's income to taxation in the United States.  *Id.* at 152.  This is precisely why the APA grants Plaintiffs "access to the courts" to resolve the "legal issue" of the Rule's validity *before* being

15

required to make an important business decision that might "harm them severely and unnecessarily." *Id.* at 153.

The Government nonetheless contends that the AIA forecloses application of the APA to regulations concerning taxes. As explained below, the AIA precludes only those suits that fall within its plain terms and implicate its core purpose—*i.e.*, challenges to *tax assessments* or other such IRS adjudications. *E.g.*, *Smith v. Booth*, 823 F.2d 94, 96–98 (5th Cir. 1987) (per curiam). Thus, the AIA does not reach facial challenges to tax regulations outside the context of a dispute over specific tax liabilities. But as a threshold matter, the Government faces a heavier burden than proving that Plaintiffs' reading of the AIA is incorrect. For two reasons, this interpretation of the AIA would be required even if it were merely plausible—a standard plainly satisfied here.

*First*, the APA "embodies the basic presumption to judicial review," and its text and history "manifest[] a congressional intention that it cover a broad spectrum of administrative actions." *Abbott Labs.*, 387 U.S. at 140; *see also Sackett v. EPA*, 132 S. Ct. 1367, 1373 (2012) (noting "presumption of reviewability for all final agency action"). As such, its "generous review provisions" must be given a "hospitable" interpretation, with any ambiguity construed in favor of judicial review. *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955). Thus, the burden is on the Government to justify its expansive reading of the AIA by "clear and convincing evidence" that Congress wanted to override the "broadly remedial provisions" of the APA for tax regulatory challenges. *Rusk v. Cort*, 369 U.S. 367, 379–80 (1962). The Government plainly cannot do so, because the Supreme Court has expressly rejected "carving out an approach to administrative review good for tax law only," *Mayo Foundation for Med. Educ. & Res. v. United States*, 562 U.S. 44, 55 (2011), and because the APA includes the IRS as an "agency" subject to its requirements, even while excluding other federal entities, 5 U.S.C. § 551(1).

16

*Second*, the Government's approach effectively repeals the APA as to IRS regulations, even though those rules often resolve policy "question[s] of deep 'economic and political significance.'" *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Yet such "repeals by implication" are highly disfavored; only where two statutes are truly "irreconcilable" may courts conclude that one supplants the other. *TVA v. Hill*, 437 U.S. 153, 189–90 (1978). Thus, the APA and AIA must be given effect wherever their provisions can be read to "co-exist." *Morton v. Mancari*, 417 U.S. 535, 550 (1974). The two can be read to "co-exist" quite comfortably: the APA governs facial challenges to IRS regulations, while the AIA governs individualized taxpayer disputes with the IRS. Under this interpretation, the APA and AIA "'make sense' in combination," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000), while the Government's view gratuitously *creates* a readily-avoidable conflict between the APA and AIA.

In any event, Plaintiffs' reading of the AIA is not only *plausible*, but is *compelled* by the AIA's terms and purpose. As explained below, the AIA bars taxpayers from withholding taxes allegedly due during the pendency of challenges to particular IRS determinations. It does not bar facial challenges to generally applicable regulations when no taxes are allegedly owed.

## B. This Facial Regulatory Challenge Does Not Fall Within the AIA's Terms Or Implicate Its Purposes.

By its terms, the AIA prohibits only suits that are "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a). Its function is to "insur[e] that, *once a tax has been assessed*, the taxpayer ordinarily has no power to prevent the IRS from collecting it; his only recourse is to pay the tax in full, and then sue for a refund." *Jones v. United States*, 889 F.2d 1448, 1449–50 (5th Cir. 1989) (emphasis added). In short, the AIA "bars taxpayers from *challenging their tax liabilities* by methods other than those specifically prescribed"—*i.e.*, a refund suit. *Sage v. United States*, 908 F.2d 18, 26 (5th Cir. 1990) (emphasis added).

By its plain terms, that statute has no application to facial challenges to rules under the APA, where no "tax" is allegedly due, no IRS "assessment or collection" efforts are underway; and there is nothing to "restrai[n]." In that scenario, the only issue is whether a general rule complies with the APA; if not, it must be "set aside." Moreover, foreclosing facial regulatory challenges to Treasury's tax rules would not advance the AIA's purposes, given that there are no disputed taxes at issue that should remain in the public fisc pending a refund suit. In short, the AIA bars suits to *enjoin* the *assessment or collection* of *allegedly due taxes*, not APA challenges to *set aside* agency *regulations* that may bear on the tax treatment of *future* transactions.

1. Although the Government relegates it to a footnote (MTD 25 n.4), the Supreme Court's recent decision in *Direct Marketing Association v. Brohl*, 135 S. Ct. 1124 (2015), provides the dispositive construction of the AIA's terms. *Brohl* explained that "assessment" and "collection" are terms of art that "refer to discrete phases of the taxation process" only, and thus authorized a challenge to a reporting requirement that "facilitate[d] audits" to assess taxes. *Id.* at 1129, 1131. Specifically, "assessment" is "the official recording of a taxpayer's liability"—a step that "occurs after information relevant to the calculation of that liability is reported to the taxing authority"—and "collection" is "the act of obtaining payment of taxes due." *Id.* at 1130. The AIA bars suits to "restrain" those activities; this rule must be read "narrowly," reaching only "negative injunctions" that "stop[]" those phases of taxation (as opposed to "merely inhibit[] them"). *Id.* at 1133. The AIA thus applies only to suits seeking to enjoin these phases of the taxation process; it does not reach challenges to antecedent steps, even if taken to "improve" the Government's "ability to assess and ultimately collect" a challenger's taxes. *Id.* at 1129, 1131.[4]

---

[4] *Brohl* technically involved the Tax Injunction Act ("TIA"), the analogue to the AIA for state taxes, but the Court specifically noted that the TIA "was modeled on the [AIA]" and "[w]e assume that words used in both Acts are generally used in the same way." 135 S. Ct. at 1129.

The AIA's plain text, as interpreted in *Brohl*, applies only to suits seeking to enjoin the IRS from taking steps, as part of the formal taxation process, to assess or collect tax that is allegedly due or owing. It does not bar the courthouse doors to APA challenges to generally applicable tax regulations, where no tax is allegedly due and the object of the suit is merely to clarify the legal rules that would govern taxation of potential future transactions. Specifically, *Brohl* made clear that the text of the AIA, in three different ways, applies only to individualized, as-applied disputes over a tax that has been (or is being) assessed for a particular taxpayer, not to challenges to general rules simply because they may have a downstream effect on taxes.

*First*, the AIA concerns suits directed toward "assessment or collection" of taxes, those being "discrete phases of the taxation process." *Id.* at 1129. In particular, an "assessment" is an individualized determination about a particular taxpayer: the "official recording of a taxpayer's liability" based on "information relevant to the calculation of that liability [that] is reported to the taxing authority." *Id.* at 1130; *see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("assessment" is an "official recording of liability that triggers levy and collection efforts"). But there is no such "assessment" of a taxpayer's "liability" unless and until a tax rule is applied to him. A regulation itself is not an assessment. Regulations set forth abstract rules for how the IRS will compute a tax when it comes due; they are not a "phase[] of the taxation process." 135 S. Ct. at 1129.

*Second*, the AIA bars efforts to block the assessment or collection of "any tax." But in the context of a pre-enforcement facial challenge to a regulation, there is no "tax" even arguably due. Instead, the point of the challenge is to clarify the rules that would apply to potential future *activity*, so that a reasoned decision can be made about whether to engage in that activity. *See Abbott Labs.*, 387 U.S. at 152–54. In such a scenario there is no tax—even according to the Government—allegedly due. Indeed, no additional tax would be due under the Rule unless and

until an inversion occurs *and* the inverted company later engages in one of the "post-inversion transactions" that bear on its taxes *and* repatriates foreign income to the United States.  MTD 4.  Thus, the Rule here is *three* steps removed from any *potential* "assessment" of any tax.

*Finally*, the Court in *Brohl* held that "to restrain" bears its traditional "meaning in equity" of orders that "stop" the agency's activities; it does not encompass suits that "merely inhibit[]" future "assessments."  135 S. Ct. at 1132–33; *cf. id.* at 1136 (Ginsburg, J., concurring).  An APA regulatory challenge does not seek "to restrain" tax assessment for two reasons.  First, such a challenge at most "*inhibits*" an assessment against some future taxpayer by exposing the flawed legal basis for such a hypothesized assessment.  Second, a suit under the APA does not "stop" or "enjoin" *anything*.  The APA authorizes courts to "set aside" unlawful rules.  5 U.S.C. § 706(2).  "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are *vacated*—not that their application to the individual petitioners is *proscribed*."  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (emphases added).  That is, the Rule would be stripped of legal effect, but the IRS would not be subject to any injunction.

In short, the AIA requires disputes over specific tax liabilities to be routed through refund suits.  But with respect to a pre-enforcement facial challenge brought under the APA to the substantive or procedural validity of a generally applicable rule, there is no live, particularized tax dispute between the parties.  The injury here is that the Rule is *preventing* affected parties from undertaking inversions, such that no dispute over specific taxes will arise.  *See supra* Part I.  So none of the IRS's assessment or collection machinery is yet at work (or even contemplated), and there is no request (or need) to restrain that machinery by judicial order.  All that is at issue is the legitimacy, on its face, of an agency rule.  And the only request is for the Court to set it aside, so that it will not govern in the future.  Nothing in the AIA's text bars such an action.

**2.**     Moreover, the purpose of the AIA would not at all be furthered by closing the courthouse doors to APA challenges.  Precedent establishes that the AIA's purpose is not to shield lawless IRS actions from judicial review, but to ensure that disputes with taxpayers over amounts due to the public fisc are decided in refund suits so that contested funds are held by Treasury in the interim.  Consequently, the AIA requires that the taxpayer turn over the disputed amounts and then sue to get them back, by precluding the taxpayer from prospectively enjoining the IRS from obtaining the sums through the ordinary assessment and collection process.

But the Government's interest in resolving taxpayer disputes through refund suits in no way supports precluding challenges to unlawful IRS regulations well before any dispute arises or assessment occurs.  Prior to a concrete conflict over actual dollars, there are no disputed sums to be lodged in the Treasury or recovered in a refund suit.  Thus, there is no valid reason to convert the AIA's channeling of tax disputes through refund suits into a ban on challenging unlawful tax regulations.  That is particularly true here, where the Government's position would amount to a permanent ban on *any* challenge to the legality of its Rule, because no company will engage in a multi-billion dollar inversion on the hope that it will recover the illegally imposed taxes many years later in a refund suit.  *See also infra* Part II.D.1.

The AIA's "manifest purpose" is "to permit the United States to assess and collect taxes *alleged to be due* without judicial intervention, and to require that the legal right to the *disputed sums* be determined in a *suit for refund*."  *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962) (emphases added).  That procedure ensures "prompt collection" of "lawful revenue," *id.*, in light of the "Government's need to assess and collect taxes as expeditiously as possible," *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974); *see also Jones*, 889 F.2d at 1449–50 ("The Act insures that, once a tax has been assessed, the taxpayer ordinarily has no power to prevent the

IRS from collecting it."); *cf. Hibbs*, 542 U.S. at 104. The Act was "intended to require taxpayers to litigate their claims in a designated proceeding"—specifically, "a suit for a refund"—but not to foreclose judicial review entirely. *South Carolina v. Regan*, 465 U.S. 367, 374 (1984).

That requirement makes sense where, to use *Williams Packing*'s terms, a specific tax is "alleged to be due." 370 U.S. at 7. If a taxpayer could defer payment of an allegedly due tax just by filing suit, that would throw a wrench into administration of the tax system; funds the Government needs now would be held hostage by vagaries of litigation, with no predictability for Treasury. Thus, where a taxpayer challenges an assessment or other particularized IRS determination upon which taxes hinge, there is an obvious interest in deferring the challenge until *after* the disputed sum is in Treasury's hands.

However, when no tax is "alleged to be due" and the plaintiff is instead challenging the facial validity of a Treasury regulation, it makes no sense to foreclose a prospective challenge. There is no allegation that anyone owes taxes; there are no "disputed sums" to be adjudicated. *Id.* Indeed, here, as a result of the Rule's punitive effect on inversions, Plaintiffs' members are no longer actively exploring such deals. Compl. ¶¶ 46–47. Thus, if this suit does not proceed, Treasury will never assess any taxes against Plaintiffs' members based on the Rule. Allowing it to proceed will not interfere with "prompt collection" of "lawful revenue," *Williams Packing*, 370 U.S. at 7, or cause any detrimental effect on how "expeditiously" Treasury can collect, *Bob Jones*, 416 U.S. at 736. Barring this suit would therefore accomplish nothing for the interest at the heart of the AIA. Its only impact would be to deprive regulated parties of the opportunity for clarity on the applicable law. Even the Government does not have a legitimate interest in sowing ambiguity. To the contrary, the APA is meant to provide advance clarity to regulated parties otherwise facing a "dilemma" over how to structure their affairs. *Abbott Labs.*, 387 U.S. at 152.

## C.   Precedent Supports A Narrow Construction of the AIA.

Although the text and purposes of the AIA show that it does not reach APA challenges to generally applicable tax regulations, the Government insists that Fifth Circuit and Supreme Court precedent somehow mandate this result. That is incorrect. All the cases it relies on simply applied the AIA to individual tax disputes where the taxpayer sought to avoid the refund-suit route by stopping the IRS from ever assessing or collecting the particular disputed sums. Thus, these authorities are irrelevant to the facial challenge to a tax regulation at issue here. Indeed, the Government cites not a single case applying the AIA in such circumstances.[5]

**1.**   The Government first quotes *Linn v. Chivatero* for the proposition that the AIA forbids enjoining activities that "may culminate in the assessment or collection of taxes," 714 F.2d 1278, 1282 (5th Cir. 1983), suggesting this principle applies here since agency regulations may "culminate" in assessments. MTD 23. But *Linn rejected* an AIA argument, holding that a suit seeking return of privileged materials accidentally provided to the IRS was not barred, even though the IRS might have relied on them to issue a future assessment. 714 F.2d at 1282. The decision thus affirmed that not "every IRS action" falls "within the Act's scope." *Id.* at 1285.

---

[5] All the Fifth Circuit cases applying the AIA have involved individual challenges to specific IRS actions. *See, e.g.*, *Fletcher v. United States*, 452 F. App'x 547 (5th Cir. 2011) (per curiam) (deficiency notice); *Walters v. United States*, 287 F. App'x 392, 393 (5th Cir. 2008) (penalties); *Humphreys v. United States*, 62 F.3d 667, 673 (5th Cir. 1995) (per curiam) (jeopardy assessment); *Keado v. United States*, 853 F.2d 1209, 1214 (5th Cir. 1988) (assessment); *Sec. Indus. Ins. Co. v. United States*, 830 F.2d 581 (5th Cir. 1987) (assessment); *Herring v. Moore*, 735 F.2d 797 (5th Cir. 1984) (per curiam) (assessment); *Vasilinda v. United States*, 487 F.2d 24 (5th Cir. 1973) (assessment); *Bowers v. United States*, 423 F.2d 1207 (5th Cir. 1970) (per curiam) (assessment); *Mulcahy v. United States*, 388 F.2d 300 (5th Cir. 1968) (per curiam) (assessment and tax lien); *Poretto v. Usry*, 295 F.2d 499 (5th Cir. 1961) (penalty); *Lloyd v. Patterson*, 242 F.2d 742 (5th Cir. 1957) (per curiam) (jeopardy assessment and tax lien); *Warren v. United States*, 874 F.2d 280, 282 (5th Cir. 1989) (penalty); *McCabe v. Alexander*, 526 F.2d 963, 965 (5th Cir. 1976) (per curiam) (sale of property to pay tax liabilities); *United States v. Doyal*, 462 F.2d 1357, 1358 (5th Cir. 1972) (per curiam) (enforcement of tax levy); *Abel v. Campbell*, 334 F.2d 339 (5th Cir. 1964) (foreclosure sale).

The language from *Linn* that the Government quotes—about acts that "culminate" in assessments—was drawn from a trio of cases in which the Fifth Circuit applied the AIA to bar suits that sought to restrain the IRS from conducting *specific audits or investigative efforts*. Such activities, the court explained, are indivisible from the assessment process, as the IRS can only assess taxes after it gathers this information. Thus, the court barred a challenge to enjoin an IRS agent from investigating a plaintiff's tax returns, *see Smith v. Rich*, 667 F.2d 1228, 1230 (5th Cir. 1982); a suit to enjoin the IRS's "information gathering process" by precluding the agency from contacting a taxpayer's customers to verify the taxpayer's return, *see Kemlon Prods. & Dev. Co. v. United States*, 638 F.2d 1315, 1318–20 (5th Cir. 1981); and an action to prohibit the IRS from looking at the taxpayer's "bank transactions" in order to assess "additional income tax liability" for "unreported income," *see Campbell v. Guetersloh*, 287 F.2d 878, 879–81 (5th Cir. 1961).

Each of those cases involved a crystallized tax dispute between the IRS and the taxpayer over taxes that the IRS believed or suspected were due. In *Campbell*, for example, the IRS had been "threatening to issue a statutory notice of deficiency," and the plaintiffs sued to prevent the IRS from examining records it needed to finalize its tax assessment. 287 F.2d at 879. Likewise, in *Kemlon*, the IRS "questioned the accuracy of the valuation of certain patents," believing that Kemlon had "obtained a larger depreciation deduction than was properly allowable"; Kemlon sued to stop the auditors from contacting certain third-parties to verify that concern. 638 F.2d at 1317. And in *Smith*, the IRS advised the plaintiffs that "all deductions are being disallowed" for two annual returns and asked for a copy of a third; the plaintiffs sued to enjoin the IRS from proceeding. 667 F.2d at 1229–30. All these cases thus involved efforts by plaintiffs to stop the IRS from taking necessary steps to assess particular taxes it believed were due; they were plainly trying to "challeng[e] their tax liabilities" other than through a refund suit. *Sage*, 908 F.2d at 26.

These cases thus simply reaffirm the undisputed proposition that the AIA forecloses a taxpayer's efforts to restrain the IRS from taking steps that are "part of the process of assessment and collection" of taxes in a particular dispute. *Brohl*, 135 S. Ct. at 1131. The taxpayer must recover the disputed sums in a refund suit, and cannot prevent the IRS from undertaking the assessment process. At most, these cases thus stand for the proposition that there is no material difference between enjoining an IRS "assessment" and enjoining the immediately preceding and necessary steps—either way, the dispute over the allegedly due taxes would be adjudicated prospectively in district court, rather than retrospectively in a refund suit. They lend no support to the expansive notion that challenging the legality of tax rules is foreclosed simply because the regulations set forth Treasury's view of the tax liability standards it *would* advocate in the event there ever is a transaction that would lead to an assessment or ensuing dispute with an individual taxpayer. Put another way, cases holding that a taxpayer may not forestall an incipient tax assessment by suing to block the IRS from taking an immediately antecedent step (like reviewing records), provide no support for the entirely different notion that a purely legal challenge to a regulation is somehow forbidden, when no specific taxes are owed or even contemplated.

This is particularly true because *Brohl* made perfectly clear that, even in the individual dispute context, some steps to facilitate the IRS's assessment of a taxpayer's liability are outside the AIA's scope. Specifically, *Brohl* held that the TIA did *not* preclude a challenge to a tax reporting requirement. *See id.* at 1131. Although reporting may "improve" a taxing authority's "ability to assess and ultimately collect" taxes—*e.g.*, by "faciliat[ing] audits"—such reporting is *antecedent* to assessment or collection, which are "discrete phases of the taxation process that do not include . . . private reports of information relevant to tax liability." *Id.* at 1129, 1131. If individualized information-gathering to resolve a crystallized factual dispute is too attenuated

from the "discrete phases of the taxation process" to fall within the AIA, then *a fortiori* agency action establishing the legal rules to be applied in future tax disputes arising from future transactions is far beyond the AIA's reach.

This Court need not resolve whether *Brohl* undermines *Kemlon*'s conclusion that challenges to "information gathering" are barred by the AIA. Regardless, *Brohl* clearly refutes the Government's position here that tax regulations are within the AIA simply because they are the first step in what may eventually "culminate" in a hypothetical future assessment against a hypothetical taxpayer. Thus, whether or not information-gathering remains within the AIA's scope post-*Brohl*, steps *antecedent* even to such information-gathering are necessarily outside it.

**2.** Even further afield, the Government relies on the Supreme Court's twin decisions in *Bob Jones* and *Alexander v. 'Americans United' Inc.*, 416 U.S. 752 (1974). In those cases, the Court held that the AIA blocked suits to compel the IRS to afford § 501(c)(3) status to the plaintiffs, which would have exempted those institutions from taxes that were otherwise due. Both cases thus involved particularized IRS determinations that directly controlled the plaintiffs' specific tax liabilities—not facial challenges to generally applicable government policies about eligibility for § 501(c)(3) status. Thus, these cases simply make the obvious point that plaintiffs cannot artfully plead around the AIA by challenging *the determination of their tax-exempt status* as opposed to *assessment of their taxes*—that is merely a semantic difference. Those cases have no relevance here, where there has been no particularized determination at all as to Plaintiffs' members or their taxes, and there is no live dispute over anyone's particular tax liabilities, given how the Rule has caused Plaintiffs' members to refrain from inversion transactions that would trigger the additional taxes.

In *Bob Jones*, the IRS "commence[d] administrative procedures leading to the revocation of petitioner's § 501(c)(3) ruling letter." 416 U.S. at 735. The university sued for "injunctive relief preventing the [IRS] from revoking . . . [its] tax-exempt status." *Id.* Notably, it alleged that revocation would subject it to "income tax liability of three-quarters of a million dollars for one year and in excess of half a million dollars for another." *Id.* at 738. The university's liability *vel non* for these specific taxes hinged on whether its exempt status was continued or withdrawn. *See id.* at 746 (noting allegation that university "will have taxable income upon the withdrawal of its § 501(c)(3) status"). Likewise, in *Americans United*, the IRS "issued a ruling letter revoking" the plaintiff's tax-exempt status, effectively "render[ing] [it] liable for unemployment (FUTA) taxes." 416 U.S. at 755. That plaintiff sought "injunctive relief requiring reinstatement" of its prior tax status. *Id.* at 756–57. Again, the plaintiff's specific "liability for FUTA taxes hinge[d]" on "its entitlement to § 501(c)(3) status." *Id.* at 762.

"Because an injunction preventing the [IRS] from withdrawing a § 501(c)(3) ruling letter would necessarily preclude the collection of . . . taxes from the affected organization," the Court reasoned that "a suit seeking such relief" is precluded by the AIA. *Bob Jones*, 416 U.S. at 731–32. The legitimacy of the IRS's determination as to tax-exempt status controlled the plaintiff's particular tax liabilities, and therefore attacking the former is "merely a restatement" of an attack on the latter. *Americans United*, 416 U.S. at 761. Or as the Fifth Circuit had explained a year before, if § 501(c)(3) status is withdrawn, the non-profit "will be liable for taxes" while "if the injunction issues, any assessment or collection of such increased taxes will be prohibited"; and the AIA "is directed against that result." *Crenshaw Cnty. Private Sch. Found. v. Connally*, 474 F.2d 1185, 1188 (5th Cir. 1973). In short, if there is a live dispute over allegedly due taxes, the AIA defers adjudication until a refund action. These cases just applied that basic rule.

*Bob Jones* and *Americans United* thus might apply if a corporation engaged in an actual inversion, transferred its foreign subsidiaries to its new foreign parent, invested foreign income in the U.S.—and then sued to enjoin the IRS from characterizing it as a domestic corporation under the Rule.  As in *Bob Jones*, that would be asking a court to stop the IRS from rendering a particularized tax determination that directly controls the income tax liability:  in substance, an effort to enjoin an assessment.  But in this case, none of that has happened.  Instead, Plaintiffs are asking the court to evaluate the Rule's legality under the APA—a determination that does *not* affect Plaintiffs' members' current tax liabilities, since no inversion or subsequent tax-reducing activity has occurred.  (Indeed, the Government's goal with this Rule is for that *never* to occur.)  Unlike *Bob Jones*, Plaintiffs are trying, not to indirectly litigate their tax liabilities by challenging an antecedent determination, but to clarify the legal rules that would govern their potential future activities.  *Bob Jones* and *Americans United* do not begin to extend the AIA to the latter context.

**3.** Finally, *Clinton* itself undermines the Government's argument.  That decision, as explained above, involved the Line Item Veto Act, which harmed the challenger because it had been exercised to strike a congressionally approved *tax benefit*.  *See* 524 U.S. at 424–27.  Yet not even the Government argued that the challenger should proceed to engage in the transaction subject to the putative tax benefit and then have its business partner seek a refund when the benefit was denied.  The parties and Court alike understood that the challenge to the statute was properly subject to federal-court jurisdiction, notwithstanding the downstream tax consequences that had motivated the plaintiffs to sue and gave them standing.  *See id.* at 432.  So too here:  the APA challenge to Treasury's regulation is justiciable here and now, even though, if successful, it will affect taxes owed by Plaintiffs' members down the road.  *Cf. Hibbs*, 542 U.S. at 110–12 (using courts' failure to address TIA in prior cases to support narrow construction).

**D.** **This Lawsuit Also Falls Within the Two Recognized Exceptions to the AIA.**

Finally, even if the AIA barred all pre-enforcement challenges to Treasury regulations, this case falls within *both* of the two judicially recognized exceptions to the AIA. *First*, because Plaintiffs' members cannot risk undertaking inversions subject to the Rule while it remains in effect, there is no other "adequate" opportunity for them to adjudicate their challenge. They will never have the opportunity to file a tax refund action—and the AIA is meant only to funnel tax disputes toward that procedure, not foreclose review altogether. *Second*, for the three reasons explained in Plaintiffs' summary judgment briefing, Treasury's Rule is "arbitrary" and "capricious"—the standard the en banc Fifth Circuit has adopted for the traditional equitable exception to the AIA—and Plaintiffs' members will suffer irreparable harm absent review.

**1.** In *Regan*, the Supreme Court held that the AIA bars suit only where the "aggrieved party" has "an alternative legal avenue by which to contest the legality of a particular tax." 465 U.S. at 373; *see also Bob Jones*, 416 U.S. at 746 (noting that AIA "might well" not apply if aggrieved party "has no access at all to judicial review"). After all, the statute is meant to funnel disputes to a particular forum, not to insulate IRS decisions from judicial review.

The Government argues that Plaintiffs' members "can obtain relief by filing a refund suit." MTD 26. But that ignores the crux of the problem: For reasons discussed above, *no tax is or ever will be owed*. Plaintiffs' members called off their inversion because of the Rule. Compl. ¶ 44. And they will not engage in similar deals subject to the Rule, for doing so would risk exposing the foreign parent to U.S. taxation. *Id.* ¶ 47. The point is not that it would be too "onerous" to "file a refund suit" (MTD 27), but rather that there is no tax to seek to recoup and never will be. Thus, dismissal under the AIA is forbidden, because there is at least a serious "risk that [such dismissal] would entirely deprive [Plaintiffs' members] of any opportunity to obtain review." *Regan*, 465 U.S. at 380–81.

29

Indeed, this risk is particularly severe, because even if one of Plaintiffs' members were willing to enter into an affected inversion deal, "it is by no means certain" that it "would be able to convince" *another* business to share that risk. *Id.* at 380. Thus, "the remedy suggested by" the Government—wait for a member to convince a third party to engage in an inversion and then have the combined entity file a refund suit—is inadequate: The AIA does not "require [a] plaintiff to find a third party to contest its claims." *Id.* at 381. In short, because this facial challenge is the *only* opportunity to obtain judicial review of the Rule, the AIA does not foreclose it. *Cf. Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (citing "strong presumption that Congress intends judicial review of administrative action.").

**2.** Because they lack an adequate alternative remedy, Plaintiffs' members will suffer irreparable injury if they cannot obtain pre-enforcement review. *Abbott Labs.*, 387 U.S. at 152–54. Under those circumstances, *Williams Packing* recognizes an exception to the AIA if "it is clear" that the Government "cannot establish its claim." 370 U.S. at 7. The Fifth Circuit, en banc, construed that test as applying whenever Treasury's actions are "arbitrary, capricious, and without factual foundation." *Lucia v. United States*, 474 F.2d 565, 573 (5th Cir. 1973) (en banc). For reasons explained in Plaintiffs' summary judgment brief (incorporated by reference here), the Rule is exactly that—arbitrary and capricious. It is surely deserving of proceedings on the merits under that standard, which is what *Lucia* ordered for a taxpayer's challenge to the allegedly arbitrary "projection procedure" employed by the IRS to calculate his gambling proceeds. *Id.* at 574; *see also id.* at 573 (remanding "for a trial on the merits" on this issue).

## CONCLUSION

For these reasons, the Government's motion to dismiss should be denied.

Respectfully submitted,

Dated: November 8, 2016

/s/ Laura Jane Durfee

LILY FU CLAFFEE*
  D.C. Bar No. 450502
  LClaffee@USChamber.com
KATE COMERFORD TODD*
  D.C. Bar No. 477745
  KTodd@USChamber.com
STEVEN P. LEHOTSKY*
  D.C. Bar No. 992725
  SLehotsky@USChamber.com
WARREN POSTMAN*
  D.C. Bar No. 995083
  WPostman@USChamber.com
**U.S. CHAMBER LITIGATION CENTER**
1615 H Street NW
Washington, DC 20062
Telephone: (202) 463-5337
Facsimile: (202) 463-5346

*Counsel for Plaintiff Chamber of
Commerce of the United States of
America*

MICHAEL A. CARVIN*
  D.C. Bar No. 366784
  macarvin@jonesday.com
RAYMOND J. WIACEK*
  D.C. Bar No. 925966
  rjwiacek@jonesday.com
ANDREW M. EISENBERG*
  D.C. Bar No. 445346
  ameisenberg@jonesday.com
JACOB M. ROTH*
  D.C. Bar No. 995090
  yroth@jonesday.com
BRINTON LUCAS*
  D.C. Bar No. 1015185
  blucas@jonesday.com
**JONES DAY**
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
**JONES DAY**
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

*Admitted pro hac vice

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 8th day of November, 2016, I filed the foregoing Opposition to Defendants' Motion to Dismiss with the Court through the Court's CM/ECF system. I further certify that I will serve a true and correct copy of the foregoing Opposition on the following attorneys:

Adam D. Strait
Michelle C. Johns
Paul T. Butler
U.S. Department of Justice, Tax Division
P.O. Box 683
Washington, DC  20044-0683
*Counsel for Defendants*

Pierre H. Bergeron
Charles E. Talisman
Rachael Harris
Squire Patton Boggs (US) LLP
2250 M Street Northwest
Washington, DC 20037

Dylan O. Drummond
Squire Patton Boggs (US) LLP
2000 McKinney Avenue, Suite 1700
Dallas, TX 75201

Linda Kelly
National Association of Manufacturers
733 10th Street NW, Suite 700
Washington, DC 20001
*Counsel for Amicus*

Date: November 8, 2016.

/s/ Laura Jane Durfee
_____

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
JONES DAY
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Attorney for Plaintiffs*