# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; and
TEXAS ASSOCIATION OF BUSINESS,

          *Plaintiffs*,

   v.

INTERNAL REVENUE SERVICE; *et al.*,

          *Defendants*.

Civil Action No. 1:16-cv-00944-LY

**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...........................................................................................................ii

INTRODUCTION .........................................................................................................................1

ARGUMENT .................................................................................................................................1

I.     TREASURY EXCEEDED ITS STATUTORY AUTHORITY ...........................................1

II.    TREASURY ENGAGED IN ARBITRARY AND CAPRICIOUS RULEMAKING..................................................................................................................10

III.   TREASURY HAS NO EXCUSE FOR HAVING BYPASSED APA NOTICE-AND-COMMENT PROCEDURES ..............................................................................12

CONCLUSION............................................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Mining Cong. v. Mine Safety & Health Admin.,*
   995 F.2d 1106 (D.C. Cir. 1993) ........................................................................15

*Barnhart v. Peabody Coal Co.,*
   537 U.S. 149 (2003) ..........................................................................................5

*Batterton v. Francis,*
   432 U.S. 416 (1977) ........................................................................................15

*Brown Express, Inc. v. United States,*
   607 F.2d 695 (5th Cir. 1979) ..........................................................................15

*Burks v. United States,*
   633 F.3d 347 (5th Cir. 2011) ..........................................................................14

*Chamber of Commerce of U.S. v. OSHA,*
   636 F.2d 464 (D.C. Cir. 1980) .................................................................14, 15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ......................................................................................1, 2

*Davidson v. Glickman,*
   169 F.3d 996 (5th Cir. 1999) ..........................................................................15

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ....................................................................................11

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................................11

*Gustafson v. Alloyd Co.,*
   513 U.S. 561 (1995) ..........................................................................................5

*Intermountain Ins. Serv. of Vail, LLC v. Comm'r,*
   134 T.C. 211 (2010) ........................................................................................14

*Marcello v. Bonds,*
   349 U.S. 302 (1955) ..................................................................................12, 13

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ..................................................................... 14, 15

*Methodist Hosp. of Sacramento v. Shalala*,
38 F.3d 1225 (D.C. Cir. 1994) ....................................................................... 12, 13

*New Jersey v. EPA*,
626 F.2d 1038 (D.C. Cir. 1980) ........................................................................... 13

*O'Gilvie v. United States*,
519 U.S. 79 (1996) ............................................................................................... 13

*Phillips Petroleum Co. v. Johnson*,
22 F.3d 616 (5th Cir. 1994) ................................................................................. 14

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ............................................................................................ 6, 10

*Sossamon v. Texas*,
563 U.S. 277 (2011) ............................................................................................... 6

*Syncor Int'l Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997) ............................................................................... 15

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007) ................................................................................. 5

*Util. Air Reg. Grp. v. EPA*,
134 S. Ct. 2427 (2014) ........................................................................................... 4

*Washington v. Comm'r*,
692 F.2d 128 (D.C. Cir. 1982) ............................................................................... 7

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ............................................................................................... 4

**STATUTES**

5 U.S.C. § 553 ................................................................................................. 12, 13, 14

5 U.S.C. § 559 ............................................................................................................. 12

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

**Page(s)**

I.R.C. § 382(k)(6)(B) ...............................................................................6

I.R.C. § 7805(e) ...............................................................................12, 13

I.R.C. § 7874 ...................................................................................*passim*

I.R.C. § 9833 ..............................................................................................13

**OTHER AUTHORITIES**

Michael Asimow, *Public Participation in the Adoption of Temporary Tax Regulations*, 44 TAX LAW. 343 (1990) ...................................................14

H.R. Rep. No. 108-755 (2004) (Conf. Rep.)...........................................5, 6

Kristin Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 NOTRE DAME L. REV. 1727 (2007) ....................................................13, 14

Staff of the Joint Committee on Taxation, 99th Cong., General Explanation of Tax Reform Act of 1986 (J. Comm. Print 1987) .........................................6

T.D. 9265, 71 Fed. Reg. 32,437 (June 6, 2006)..........................................6

T.D. 9761, 81 Fed. Reg. 20,858 (Apr. 8, 2016) .........................................6

## INTRODUCTION

The Government's brief confirms the dire need for judicial review of Treasury's Multiple Acquisition Rule. The Government claims that it has unfettered power to determine which stock counts for Section 7874's ownership test. That claim, if accepted, has no limiting principles and would render meaningless the precise numerical thresholds set out in the statute. Properly read, Section 7874 permits Treasury to address three ways in which parties might *evade* the statutory test through artificial ploys. But the Government offers no coherent account for why the bona fide transactions targeted by the Rule undermine the test or the statutory purposes.

Instead of even plausibly targeting attempts to evade the statutory ownership test, the Rule simply furthers Treasury's desire to stop inversions that Congress has deigned to allow. As the Government admits, one such deal—the Pfizer-Allergan merger—is what sparked Treasury to act in the first place. Indeed, scuttling it is the only goal that makes sense of the Rule's gerrymandered three-year lookback period and manufactured rush to publication. But such naked regulatory manipulation of legal transactions is the *opposite* of reasoned decisionmaking, particularly when it reflects a marked change from past guidance. And the rush to publication without the requisite notice-and-comment procedure cannot be justified by the Government's radical notion that the IRS is exempt from basic APA requirements or by claiming that the Rule's conceded "adjustment" of Section 7874's scheme is in fact merely "interpretive."

## ARGUMENT

## I.  TREASURY EXCEEDED ITS STATUTORY AUTHORITY.

**A.**     With respect to Treasury's authority, "Congress has directly spoken to the precise question at issue" through Section 7874's ownership test. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). A combined entity will not be recharacterized under Section 7874 if the shareholders of the acquired U.S. corporation genuinely receive less than "60

percent" of the combined entity's "stock" in exchange for their stock in the acquired company. I.R.C. § 7874(a)(2)(B)(ii). Nothing about that test is ambiguous: If those shareholders receive less than 60% of genuine stock as part of a bona fide transaction, the parties cannot be punished under Section 7874. It is obvious that Treasury has not been delegated discretion to adjust the statutory percentage. And it is equally clear that if Treasury lacks authority to adjust the statutory percentage directly, it cannot do so indirectly by altering the stock in the numerator or denominator. When it comes to the meaning of "60 percent" of the combined entity's stock, there is no statutory "gap" to "fill." *Chevron*, 467 U.S. at 843; *see* Dkt. No. 32-1 ("MSJ") 13–14.

The only authority Treasury has to "adjust" this test or "disregard" stock is contained in the specific statutory delegations to do so. But all of these express delegations to adjust are limited to situations in which stock ownership that nominally complies with the test does not accord with its purposes. As previously shown, this can occur in three circumstances, each anticipated in a specific statutory delegation. MSJ 5–6.

*First*, companies could manipulate the ownership test through prior acquisitions designed to artificially satisfy it. Section 7874(c)(4) thus says stock should be "disregarded" if obtained through recent acquisitions that are "part of a plan a principal purpose of which is to avoid the purposes of this section"—*i.e.*, the deliberate "stuffing" the Government condemns here but is not even arguably a condition for triggering the Rule. Dkt. No. 43 ("Opp.") 11–12. *Second*, the test could be artificially satisfied by falsely identifying financial instruments as "stock," when they are not genuinely stock (or vice versa). Section 7874(c)(6) therefore authorizes Treasury to prevent this artifice by "treating stock as not stock" (and vice versa). *Third*, the test could be falsely satisfied by using affiliated parties to mask the true owners. Section 7874(g) hence permits Treasury to stop parties from circumventing the test through "use of related persons" or

manipulation of "expanded affiliated groups," as well as by generally authorizing it to adjust the formula if "necessary to prevent the avoidance of the purposes of this section." Under Plaintiffs' reading, the statutory ownership test and these three express delegations are mutually complementary: The test can be altered if, but only if, it has been manipulated in the ways anticipated and addressed by the three express delegations.

The Government's position, by contrast, renders both the ownership test and the express delegations meaningless. By converting the limited delegation of Section 7874(c)(6) into a blanket authorization to "alter the numerator and denominator" used to calculate the statutory ownership percentage, the Government has claimed unfettered power to manipulate the specific threshold set by Congress, regardless of whether Sections 7874's purposes are threatened. Opp. 7. This interpretation violates both the text of Section 7874 and the bedrock principle that statutes must not be interpreted to render any provision meaningless.

**1.** The Government contends that Section 7874 has *not* "spoken to" the question whether a company should be treated as a "surrogate foreign corporation" if "at least 60 percent of the stock" is held by the "former shareholders of the domestic corporation," even though the statute plainly commands that a corporation "*shall* be treated as a surrogate foreign corporation" in such circumstances. I.R.C. § 7874(a)(2)(B) (emphasis added). According to the Government, the statute leaves to Treasury's unfettered discretion the question how to treat less than 60% domestic stock ownership because Section 7874 does not define the (self-defining) term "stock" and because, in Section 7874(c)(6)'s subordinate clause, Treasury is authorized to "treat stock as not stock." Opp. 4. This somehow grants Treasury *carte blanche* to "adjust the meaning of the term 'stock'" in calculating the ownership percentage, in any way, for any reason. *Id.*

Section 7874(c)(6) cannot be read so broadly as to swallow the specific thresholds Congress set. Section 7874 commands that the 60% threshold "shall" be the relevant threshold for identifying a surrogate foreign corporation. I.R.C. § 7874(a)(2)(B). The Government's reading would allow Treasury to negate that carefully determined threshold at whim. But it is axiomatic that "an agency has no power to 'tailor'"—or "adjust[]"—"precise numerical thresholds" to fit "bureaucratic policy goals." *Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2444–45 (2014). Indeed, the Government's reading would render this provision an unconstitutional delegation, as it offers *no* limiting principle to constrain Treasury's supposed power. Opp. 8–9.

In addition to wiping out the ownership test, the Government's theory would also render the statute's delegations meaningless. For example, if Section 7874(c)(6) authorizes Treasury to disregard stock *for any reason*, then Section 7874(g)'s authorization to do so when "necessary to prevent the avoidance of the purposes of this section" serves no purpose.

The Government's reading also makes a nullity out of Section 7874(c)(4)'s statement that stock acquired in prior acquisitions may be disregarded only when issued as "part of a plan a principal purpose of which is avoid the purposes of this section." But it is not plausible that Congress would allow Treasury to disregard *only* plans to purposefully avoid Section 7874 in the provision *directly addressing* prior acquisitions, yet simultaneously grant unfettered discretion to disregard stock from *any* prior acquisitions in the subordinate clause of a provision having *nothing to do with* the issue. Congress does not "hide elephants in mouseholes," much less elephants that trample down the rest of the carefully calibrated statutory scheme. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Because Section 7874(c)(4) "directly addresse[s] the extent of authority delegated" to Treasury on how to treat stock issued in prior acquisitions, "neither the agency nor the courts are

free to assume that Congress intended [the agency] to act in situations left unspoken." *Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007). To use the Government's phrase, there is ample reason to think "Congress considered the unnamed possibility"—*i.e.*, empowering Treasury to disregard genuine stock not issued as part of an avoidance scheme—"and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003), *quoted in* Opp. 8.

In short, it is *the Government's* view that renders large swaths of Section 7874 not only "insignificant," but "wholly superfluous," and that therefore must be "avoided." Opp. 6. By contrast, *Plaintiffs'* reading of Section 7874(c)(6) is consistent with and preserves all of Section 7874. Section 7874(c)(6) serves the important role of establishing that Treasury not only has power to disregard stock based on *why* it was acquired (as authorized by Section 7874(c)(4)), or on *who* owns it (as authorized by Section 7874(g)), but also if the financial instruments themselves paint a misleading picture of the true owners. That is, Section 7874(c)(6) allows Treasury to "treat stock as not stock" when the "stock" is in reality another instrument masquerading as stock. MSJ 20–22.

This interpretation is the only reading that gives effect to both the ownership test and the statutory delegations. It is also confirmed by the rest of the provision, which conversely lets Treasury "treat warrants, options, contracts to acquire stock, convertible debt instruments, and other similar interests as stock." I.R.C. § 7874(c)(6)(A); *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps."). The delegation to "treat stock as not stock" thus merely lets Treasury treat fake stock for what it *really is*; it is not a general authorization to "disregard" *genuine* stock when computing the ownership percentage. This view is also confirmed by legislative history, which describes this provision as "[s]imilar[]" to the explicitly anti-avoidance provisions of Sections 7874(g) and (c)(4). *E.g.*, H.R. Rep. No. 108-

755, at 574 (2004) (Conf. Rep.). It is further confirmed by the provision's demand that Treasury issue "appropriate" regulations, as a regulation nullifying other parts of the statute would not be "appropriate." *See Sossamon v. Texas*, 563 U.S. 277, 286 (2011). And it is again confirmed by the uniform interpretation of its statutory predecessor.[1]

In any event, Treasury's newly discovered power under Section 7874(c)(6) to redefine stock for any reason is a purely *post hoc* justification, invented after Plaintiffs exposed the flaws in the preamble's reasoning. The preamble's perfunctory reference to Section 7874(c)(6) never hinted that the provision contained this sweeping power, choosing instead to repeatedly describe the Rule as an "avoid[ance]" measure. T.D. 9761, 81 Fed. Reg. 20,858, 20,865 (Apr. 8, 2016). Having now recognized that the Rule cannot be defended as an avoidance measure, Treasury cannot defend the Rule on a new, alternative theory not contained in the record. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Thus, even if Treasury's *post hoc* interpretation were permissible, which it is not, it still could not sustain the Rule.

**2.** Even more remarkably, the Government says Section 7874(g)—which allows adjustments to "prevent the avoidance of the purposes of this section"—in fact allows Treasury to disregard stock even when doing so would *not* prevent avoidance of those purposes. Opp. 7. The Government claims that the text just quoted can be ignored since it is found in an "including" clause of Section 7874(g), and that the only relevant authorization is the preceding delegation to issue "such regulations as are necessary to carry out" this provision. But focusing exclusively on

---

[1] Section 382(k)(6)(B), which uses identical language, allows Treasury to issue "regulations disregarding, in appropriate cases, certain stock that would otherwise be counted . . . *when necessary to prevent avoidance of* [the statutory framework]." *E.g.*, Staff of the Joint Committee on Taxation, 99th Cong., General Explanation of Tax Reform Act of 1986, at 301 (J. Comm. Print 1987) (emphasis added); *see* I.R.C. § 382(k)(6)(B). As Treasury has recognized, Section 7874(c)(6) must be read similarly. *See* T.D. 9265, 71 Fed. Reg. 32,437, 32,442 (June 6, 2006).

that general authorization *hurts* the Government's case. A regulation that *revises* the statute's ownership test hardly "carr[ies] out" the statute, much less is "necessary" to its implementation.

Moreover, the Government *itself* invokes Section 7874(g)'s "including" clause as the basis for its claimed authority to adjust the ownership test and disregard "stock." Specifically, it contends that Treasury's power to adjust the ownership test derives from Section 7874(g)'s authorization to promulgate rules "including regulations *providing for such adjustments to the application of this section* as are necessary to prevent the avoidance of the purposes of this section." Opp. 4. Needless to say, the Government cannot simultaneously claim that the italicized part of Section 7874(g)'s "including" clause grants Treasury the power to "adjust" the statute, but then ignore the non-italicized language in the same clause that identifies the *standard* for doing so.

**B.** Even apart from the statutory demand that regulations be "necessary" or "appropriate," I.R.C. § 7874(c)(6), (g), any rule "inconsistent with the enacting Congress's purpose" is inherently "beyond the permissible rulemaking authority of the Treasury," *Washington v. Comm'r*, 692 F.2d 128, 137 (D.C. Cir. 1982). Thus, as even the Government (sometimes) admits, its power to "adjust the meaning of 'stock' in the statute" must be exercised "within the parameters set by the rest of the statute." Opp. 4. Yet the Government can defend the Rule only by claiming limitless authority to redefine the specific statutory thresholds, which underscores that the Government cannot explain why the Rule was "necessary to prevent the avoidance of the purposes of this section." Opp. 7.

Apparently recognizing that genuine stock issued in a bona fide prior acquisition is fully in accord with Section 7874's purposes, the Government resorts to name-calling to baselessly imply that such legitimate transactions have an avoidance purpose. It labels prior acquisitions of

U.S. corporations "stuffing" and pejoratively implies that "stuffing" is a deliberate device to allow corporations to "masquerade as a genuine foreign acquirer," "abuse . . . the statute to facilitate ever-larger inversions," "dress[] . . . up" U.S. assets as foreign ones, and "avoid the Section's application by stuffing itself with other U.S. companies." Opp. 11–12, 14; Dkt. No. 31, at 29. Of course, Treasury *is* empowered to invalidate inversions if a corporation "*masquerades* as a genuine foreign acquirer" or otherwise "*abuse[s]* . . . the statute." But the Rule here would apply without any showing that the company is "masquerad[ing] as a genuine foreign purchaser" and unambiguously imposes tax penalties on a *truly* "genuine foreign acquirer" whose prior domestic acquisitions were *not* done with the purpose of artificially satisfying the test. In short, as Plaintiffs have made clear, while Treasury surely may disregard stock resulting from a stuffing scheme designed to satisfy the statutory percentage test, the fatal flaw in the Rule is that it disregards bona fide prior acquisitions that are not part of any stuffing scheme. MSJ 15–24.

Indeed, the Government's own explanation of the statute confirms that transactions affecting the U.S. ownership percentage without any intent to avoid Section 7874's purposes are fully consistent with the statute. As the Government correctly notes, Section 7874's "ownership percentage test" was "designed" to measure whether the inversion had "sufficient non-tax effect and purpose to be respected." Opp. 10. The "non-tax effect" is obviously satisfied if there is less than 60% domestic ownership (40% or more foreign). And, by definition, the "non-tax purpose" prong is satisfied if the ownership percentage is derived from transactions that were not done for tax purposes—*i.e.*, to artificially satisfy the ownership percentage test. Just like the preamble, the Government's brief cannot explain why an inverted corporation with a 44% (or 49%) foreign ownership stake derived from non-tax motivated prior acquisitions within three years contravenes Section 7874's purposes, while inverted corporations with only a 41% foreign

ownership stake somehow satisfy that section simply because the prior domestic acquisition occurred outside the three-year window (or because there were no prior domestic acquisitions).

Recognizing this flaw, the Government seeks to convert Section 7874 into a prophylactic ban on *any* inversions where the foreign acquirer had previously acquired a U.S. corporation, claiming without a scintilla of support that "Congress belie[ved] that where most of the acquirer's post-merger value is from the acquired U.S. target, it is not a genuine foreign corporation." Opp. 10. That is simply a frontal assault on the ownership test. That test allows inversions even if "most" (59%) of the "post-merger" value is held by domestic corporation shareholders and thus where 41% of the resulting entity is "foreign." Further, the Rule itself does not apply where "most" of the combined entity's value is from a prior domestic acquisition, so long as it occurred more than three years ago. The fact that Treasury does not condemn such four-year-old acquisitions demonstrates that the statute does not frown on prior acquisitions simply because "most" of the post-merger value is derived from a U.S. corporation, or because they "facilitate ever-larger inversions" or "reward[] companies that have already inverted." Opp. 12. Rather, the statute frowns on them only if they are part of a purpose-avoiding plan.[2]

The Government argues that there is nothing wrong with a three-year lookback period, but that misses the point. Even Treasury recognizes that Section 7874 authorizes inversions regardless of whether the 41% foreign ownership stake is attributable to prior domestic acquisitions, which is why it counts such prior acquisitions if they occurred over three years ago.

_____

[2] The Government also seizes on a snippet of legislative history to suggest that inversions "avoid § 7874's purposes" whenever the U.S. target "continues to conduct business in the same manner as it did before the inversion." Opp. 11 (brackets omitted). That nonsensical interpretation would bar *all* inversions because the acquired U.S. corporation *always* continues doing the same business: acquired pharmaceutical companies do not start making cars post-acquisition. In context, the legislative history simply reflects the oft-stated point that acquisitions motivated by a "tax purpose," rather than a "non-tax" business "purpose," may be disregarded. *See* MSJ 2–4.

Thus, there is no rational basis for arguing that the ownership test is undermined by such bona fide prior acquisitions, whether they occurred one or three or five years previously.[3]

## II.   TREASURY ENGAGED IN ARBITRARY AND CAPRICIOUS RULEMAKING.

Even if Treasury had the unlimited authority it claims, the Rule would still be arbitrary and capricious.   Treasury failed to offer a reasoned basis for its action, refused to even acknowledge that it was changing positions, and singled out a pending deal for disfavored treatment.   The discussion above refutes the Government's claim that Treasury gave a reasoned basis to conclude that the Rule furthers the purposes of Section 7874, and the Government's attempts to excuse the Rule's remaining deficiencies are similarly unpersuasive.

**A**.   The Government first defends Treasury's unexplained shift in positions by denying that there was any change.   Because no prior regulation "directly" addressed multiple acquisitions "that were not done as part of a plan," the Government argues, the Rule was "new" rather than a "change" in policy.   Opp. 15–16.   That mischaracterizes the regulatory history.   The issue of multiple acquisitions is one Treasury *had specifically addressed*—by telling foreign corporations that stock issued in such acquisitions would be treated differently from other stock *only if* they were undertaken "pursuant to a plan."   Opp. 18; MSJ 25–26.   Treasury's plain and considered policy was thus that multiple acquisitions would *not* be treated differently so long as they were *not* undertaken pursuant to a plan.   The Rule *reversed* that Treasury policy.

---

[3] The Government's cryptic, unsupported claim that "[a]fter some time has passed, it is more difficult to say what portion of the foreign acquirer's value is attributable to U.S.-based assets" (Opp. 12) provides no support for the Rule.   It never explains why stock issued in a U.S. acquisition would be any more difficult to measure if the transaction occurred three years ago or four years ago.   And the fact that there are three-year lookbacks elsewhere in tax law is beside the point (Opp. 12–13): the lookback here is not itself a problem, but proof that the Rule lacks a legitimate basis.   In any event, this *post hoc* rationale, never mentioned in the preamble, cannot serve as a basis for the Rule.   *See Chenery*, 318 U.S. at 87.

The Government then pivots to the claim that even if Treasury switched positions, it did not have to acknowledge that shift because the Rule did not "impinge on 'serious reliance interests.'" Opp. 17. That assertion cannot be squared with law or fact. As a legal matter, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position," regardless of whether its previous policy "engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). And factually, the notion that the Rule did not upset significant reliance interests nears the absurd. Pfizer and Allergan agreed to a $160 billion merger in reliance on Treasury's rules; its collapse triggered a $150 million breakup fee. That the companies accounted for the general possibility that the law might change (Opp. 18 n.3)—as any sensible business would—does not give Treasury license to yank the rug from under them. *See Encino*, 136 S. Ct. at 2122–24, 2127 (change upset reliance interests even though agency's prior policy was itself product of changes).

**B.**     Admitting that "Treasury took note of the proposed Pfizer-Allergan merger in designing the Rule," the Government argues that a regulation may still permissibly be "prompted by" a specific deal that exposes "a weakness in a regulatory scheme." Opp. 20–21. Maybe so, but the point is that this Rule does *not* fix a general "weakness" in the scheme. Rather, its lookback period was gerrymandered to capture Allergan's prior acquisitions and the Rule was then rushed out the door—without notice or an opportunity to comment—before the company could complete its merger. As discussed above, there is no other sensible explanation for the lookback, and as discussed below, the Government has given no reason why it was necessary to dispense with notice and comment. An unexpected, gerrymandered rule aimed at scuttling a pending deal is the definition of arbitrary and capricious.

### III. TREASURY HAS NO EXCUSE FOR HAVING BYPASSED APA NOTICE-AND-COMMENT PROCEDURES.

The Government does not offer any reason for why it had good cause to publish the Rule without providing notice or opportunity to comment, the two basic prerequisites to rulemaking under the APA. Instead, it tries to excuse its failure in two ways. *First*, the Government claims Treasury *never* needs to comply with the APA when issuing *temporary* regulations, because Congress supposedly exempted such rules categorically. *Second*, the Government claims that, even under the APA, the Rule is exempt from notice and comment because it is merely "interpretive" in nature. Both arguments border on the absurd.

**A.** The APA's notice-and-comment requirements make no exception for "temporary" rules. 5 U.S.C. § 553(b)–(c). The Government nonetheless argues that a tax statute, I.R.C. § 7805(e), trumps the APA by permitting Treasury to issue temporary regulations without following those procedures, thereby creating a loophole that would allow the IRS to issue *all* rules without any notice to or comment by the public. Section 7805(e) does no such thing.

At the outset, a "[s]ubsequent statute may not be held to supersede or modify" the APA, "except to the extent that it does so *expressly*." 5 U.S.C. § 559 (emphasis added). Modifications are thus "not lightly to be presumed." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). Rather, Congress must express "its clear intent that APA notice-and-comment procedures need not be followed." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994).

Yet Section 7805(e) merely imposes *restrictions* on temporary rulemaking by Treasury: "Any temporary regulation issued by the Secretary shall also be issued as a proposed regulation" and "expire within 3 years." None of that is "inconsistent" (Opp. 23) with the APA's command that the temporary regulations themselves be subjected to notice and comment. This is thus unlike the few cases where courts have found real conflicts between the APA and later

enactments. *E.g.*, *Marcello*, 349 U.S. at 309–10 (statute created "'sole and exclusive procedure' . . . to exclude the application of [the APA]"); *Methodist Hosp.*, 38 F.3d at 1236 & n.18 (statute provided that agency "shall" publish "interim final" rule and *then* allow "public comment thereon"); *cf.* I.R.C. § 9833 (Treasury "may promulgate" certain "interim final rules"). Treasury can easily "reconcile[] the commands of the two acts," *New Jersey v. EPA*, 626 F.2d 1038, 1047 (D.C. Cir. 1980), by subjecting its temporary rules to notice and comment unless an APA exception applies.[4]

The Government says that by *limiting* temporary rulemaking in two ways without also expressly requiring notice and comment, Congress "clearly indicate[d]" its intent to supplant the APA. Opp. 24. But Congress had no need to require notice and comment in Section 7805(e), as the APA already did so. Congress was concerned with certain aspects of Treasury's rulemaking practice and acted to stop those abuses by imposing restrictions that go beyond the normal APA rules. Opp. 25–26. That hardly means Congress repealed, *sub silentio*, the background norms to which it was adding. The far more natural reading is that Congress "wanted to leave the law where it found it" on issues not specifically altered by Section 7805(e), like notice and comment. *O'Gilvie v. United States*, 519 U.S. 79, 89 (1996); *see id.* at 89–90 (rejecting similar reliance on negative inference from later amendment).

Indeed, both courts and scholars have uniformly agreed that Section 7805(e) "hardly suggests Congress meant to waive notice and comment for all temporary regulations."

---

[4] Nor does this render Section 7805(e) a "nullity." Opp. 27. The statute requires that if Treasury has "good cause" to issue a temporary rule without notice or comment, 5 U.S.C. § 553(b)(B), it must also propose it as a final rule subject to those procedures, with the temporary rule to sunset in three years. Absent Section 7805(e), Treasury could skip even *post*-publication comments and retain the rule indefinitely. Thus, "it is not necessary to read I.R.C. § 7805(e) as independent authorization for temporary regulations in order to give that provision effect." Kristin Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 NOTRE DAME L. REV. 1727, 1739 (2007).

*Intermountain Ins. Serv. of Vail, LLC v. Comm'r*, 134 T.C. 211, 245–47 & nn.16–17 (2010) (Halpern & Holmes, JJ., concurring in result); *see also Burks v. United States*, 633 F.3d 347, 360 n.9 (5th Cir. 2011) (comments on final rule "not an acceptable substitute for pre-promulgation notice and comment" of temporary rule); Michael Asimow, *Public Participation in the Adoption of Temporary Tax Regulations*, 44 TAX LAW. 343, 363–64 (1990) (no evidence in text or history of intent to take "drastic step" of repealing APA); Hickman, *supra*, at 1738–40 (rejecting Government's view). Indeed, the Government cites *no* authority sustaining its radical theory, which would let Treasury issue *any* "temporary" rule without notice or comment, even if (like here) there is no urgency or other "good cause," 5 U.S.C. § 553(b)(B). In all events, the Government's argument at most reflects a *possible implication* of the statute, not the *express modification* that is required to alter the requirements of the APA

**B.** The Government also invokes the APA exemption for interpretive rules. 5 U.S.C. § 553(b)(A). That theory approaches the frivolous. This Rule—issued pursuant to "express delegations of authority" (Opp. 1), designed to "fix" a "weakness" in the statutory scheme (Opp. 21), and aspiring to carry "force and effect of law" (Opp. 10)—is a *quintessential* legislative rule.

In applying this exemption, courts distinguish "interpretive" rules from "legislative" or "substantive" ones. The core difference is between rules that "*explain* the statute" (interpretive) and those that "*implement* the statute" (legislative). *Chamber of Commerce of U.S. v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980) (emphases added). If a rule "clarif[ies] a statutory . . . term, remind[s] parties of existing statutory duties, or 'merely track[s]' preexisting requirements," it is interpretive. *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014); *see Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994) (interpretive rule is "clarification or explanation of existing laws"). But if a rule "supplements a statute" or "effects a substantive change in

existing law," *Mendoza*, 754 F.3d at 1021—if it "*modifies* or *adds* to a legal norm based on the agency's *own authority*," *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 95 (D.C. Cir. 1997)—then it is legislative.

The Rule bears all the hallmarks of a legislative rule. Absent the Rule, there would have been no basis under Section 7874 for "enforcement action" against the Pfizer-Allergan deal. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). After all, the Government admits it issued the Rule to fix "a problem with the application of I.R.C. § 7874." Opp. 1; *see also* Opp. 9 (invoking authority "to provide *additional* stock exclusion rules" beyond those in statute). That proves that the Rule "supplements" the statute; it does not just "clarify" its terms. *Mendoza*, 754 F.3d at 1021; *see also Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999) (rule was legislative because it "impose[d] conditions . . . beyond those required" by prior law); *Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir. 1979) (rule was legislative because it "effect[ed] a change in the method used by [agency] in granting substantive rights"). Further confirming that Treasury was purporting to "implement" the law, not "explain" it, *Chamber*, 636 F.2d at 469, the Government invokes its broad "discretion" over operation of the scheme and its delegated "flexibility" to address "forms of stuffing" *beyond* those covered by the statute. Opp. 9 n.2, 11; *see also Batterton v. Francis*, 432 U.S. 416, 425 (1977) (rule has "legislative effect" if Congress "delegated . . . power to prescribe standards"); *Am. Mining*, 995 F.2d at 1112 (rule is legislative if agency "invoke[s] its general legislative authority").

In short, the Government can hardly invoke Treasury's authority to "adjust the meaning" of Section 7874 in defense of the Rule (Opp. 4), yet then contend that the Rule merely "clarifies" statutory terms. Whether authorized or *ultra vires*, this Rule is anything but interpretive.

## **CONCLUSION**

This Court should enter summary judgment in Plaintiffs' favor and set aside the Rule.

Respectfully submitted,

Dated: November 18, 2016

/s/ Laura Jane Durfee

LILY FU CLAFFEE*
  D.C. Bar No. 450502
  LClaffee@USChamber.com
KATE COMERFORD TODD*
  D.C. Bar No. 477745
  KTodd@USChamber.com
STEVEN P. LEHOTSKY*
  D.C. Bar No. 992725
  SLehotsky@USChamber.com
WARREN POSTMAN*
  D.C. Bar No. 995083
  WPostman@USChamber.com
**U.S. CHAMBER LITIGATION CENTER**
1615 H Street NW
Washington, DC 20062
Telephone: (202) 463-5337
Facsimile: (202) 463-5346

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

MICHAEL A. CARVIN*
  D.C. Bar No. 366784
  macarvin@jonesday.com
RAYMOND J. WIACEK*
  D.C. Bar No. 925966
  rjwiacek@jonesday.com
ANDREW M. EISENBERG*
  D.C. Bar No. 445346
  ameisenberg@jonesday.com
JACOB M. ROTH*
  D.C. Bar No. 995090
  yroth@jonesday.com
BRINTON LUCAS*
  D.C. Bar No. 1015185
  blucas@jonesday.com
**JONES DAY**
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
**JONES DAY**
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Counsel for Plaintiffs*

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2016, I filed the foregoing Reply in Support of Summary Judgment with the Court through the Court's CM/ECF system. I further certify that I served a true and correct copy of the foregoing document on the following attorneys:

Adam D. Strait
Michelle C. Johns
Paul T. Butler
U.S. Department of Justice, Tax Division
P.O. Box 683
Washington, DC  20044-0683
*Counsel for Defendants*

Pierre H. Bergeron
Charles E. Talisman
Rachael Harris
Squire Patton Boggs (US) LLP
2250 M Street Northwest
Washington, DC 20037

Dylan O. Drummond
Squire Patton Boggs (US) LLP
2000 McKinney Avenue, Suite 1700
Dallas, TX 75201

Linda Kelly
National Association of Manufacturers
733 10th Street NW, Suite 700
Washington, DC 20001
*Counsel for Amicus*

Date: November 18, 2016.

/s/ Laura Jane Durfee

LAURA JANE DURFEE
  Texas Bar No. 24069653
  ldurfee@jonesday.com
JONES DAY
2727 North Hardwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

*Attorney for Plaintiffs*