# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; and TEXAS ASSOCIATION OF BUSINESS, <br><br> *Plaintiffs*, <br><br> v. <br><br> INTERNAL REVENUE SERVICE; *et al.*, <br><br> *Defendants*. | Civil Action No. 1:16-cv-00944-LY |

## BRIEF OF *AMICUS CURIAE*
## NATIONAL ASSOCIATION OF MANUFACTURERS

NATIONAL ASSOCIATION OF MANUFACTURERS

Linda Kelly (*pro hac vice* pending)
Senior Vice President & General Counsel
D.C. Bar No 477635
LKelly@NAM.org
733 10th Street NW, Suite 700
Washington, D.C. 20001
Telephone: (202) 637-3000
Facsimile: (202) 637-3182

SQUIRE PATTON BOGGS (US) LLP

Pierre H. Bergeron (*pro hac vice* pending)
D.C. Bar No. 990977
pierre.bergeron@squirepb.com
Charles E. Talisman (*pro hac vice* pending)
D.C. Bar No. 367314
charles.talisman@squirepb.com
Rachael Harris (*pro hac vice* pending)
D.C. Bar No. 983044
rachael.harris@squirepb.com
2550 M Street Northwest
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315)

Dylan O. Drummond
Texas Bar No. 24040830
dylan.drummond@squirepb.com
2000 McKinney Avenue, Suite 1700
Dallas, TX 75201
Telephone: (214) 758-1500
Facsimile: (214) 758-1550

# TABLE OF CONTENTS

Table of Contents ................................................................. ii

Index of Authorities ............................................................ iii

Interest of Amicus Curiae .................................................... 1

Introduction ........................................................................ 2

Argument ............................................................................ 5

    I.    Allowing the AIA to Bar Preenforcement Review of the Rule Fails to Effectuate the Purpose of the AIA and Runs Counter to Predictable, Consistent, and Lawful Tax Policy ........................ 5

        A.    The public policy behind the AIA does not bar the Chamber's challenge to the Rule ........................................ 5

        B.    The Rule runs counter to the predictable, consistent, and lawful tax policy upon which America's manufacturing industry depends ........................................................ 7

    II.    Allowing the AIA to Bar Pre-Enforcement Review of the Rule Eviscerates the Purpose of the APA and Allows the Treasury to Continue its Pattern of Unlawful Rulemaking .......................... 9

        A.    The Treasury and IRS have a history of disregarding the applicable APA rulemaking provisions ................................ 9

        B.    The Court should not read the AIA to allow the Treasury to escape judicial review of all tax regulations in derogation of the APA ........................................................................ 12

Conclusion ........................................................................ 14

# TABLE OF AUTHORITIES

**CASES**

**United States Supreme Court**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ............................................................... 12

*Alexander v. "Americans United" Inc.*,
   416 U.S. 752 (1974) (Blackmun, J., dissenting) ................................. 6

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ............................................................... 10

*Direct Mktg. Ass'n v. Brohl*,
   135 S. Ct. 1124 (2015) .......................................................... 5–6

*Enochs v. Williams Packing & Navigation Co*,
   370 U.S. 1 (1962) ................................................................. 6

*Hibbs v. Winn*,
   542 U.S. 88 (2004) ............................................................... 10

*Mayo Found. for Med. Educ. & Res. v. United States*,
   562 U.S. 44 (2011) ................................................................ 9

**Circuit Courts of Appeals**

*Burks v. United States*,
   633 F.3d 347 (5th Cir. 2011). .................................................... 12

*Cohen v. United States*,
   650 F.3d 717 (D.C. Cir. 2011) (en banc) .................................... 5–6, 10

*United States v. Marshall*,
   771 F.3d 854 (5th Cir. 2014 ) .................................................... 13

**STATUTES**

5 U.S.C. § 553 ...................................................................... 4, 9–10

5 U.S.C. § 701. ........................................................................ 12

26 U.S.C. § 7421 ....................................................................... 4

26 U.S.C. § 7805 ...................................................................... 13

26 U.S.C. § 7874 ....................................................................... 2

**REGULATIONS**

26 C.F.R. § 1.7874-8T ................................................................................ 1

26 C.F.R. § 601.601 .................................................................................. 10

**SECONDARY MATERIALS**

Michael Asimow, *Public Participation in the Adoption of Temporary Tax Regulations*,
    44 TAX LAW. 343 (1991) ................................................................. 11

*CNBC Exclusive: CNBC's Jim Cramer Interviews Treasury Secretary Jack Lew from CNBC Institutional Investor Delivering Alpha Conference in NYC Today*, CNBC (July 16, 2014),
    http://www.cnbc.com/2014/07/16/cnbc-exclusive-cnbcs-jim-cramer-interviews-treasury-secretary-jack-lew-from-cnbc-institutional-investor-delivering-alpha-conference-in-nyc-today.html ........................................................................... 1, 4, 8

Kristen Hallam *et al.*, *Pfizer Confirms Termination of Proposed $160 Billion Allergan Merger*, Bloomberg (Apr. 6, 2016),
    http://www.bloomberg.com/news/articles/2016-04-06/pfizer-allergan-end-160-billion-merger-amid-new-tax-rules .......................... 7

Kristin Hickman, *A Problem of Remedy: Responding to Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*,
    76 GEO. WASH. L. REV. 1153 (2008) ........................................... 11

Kristin E. Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*,
    82 NOTRE DAME L. REV. 1727 (2007) .........................................10

Pamela F. Olson, *And Then Cnut Told Reagan ... Lessons from the Tax Reform Act of 1986*,
    38 OHIO N.U. L. REV. 1 (2011) ..................................................... 11

Irving Salem et al., *ABA Section of Taxation Report of the Task Force on Judicial Deference*,
    57 TAX LAW. 717 (2004) ................................................................ 12

*White House, Office of the Press Secretary, Remarks by the President on the Economy—Los Angeles, Cal. (July 24, 2014)*,
    https://www.whitehouse.gov/the-press-office/2014/07/24/remarkspresident-economy-los-angeles-ca .............. 3, 8

*White House, Office of the Press Secretary, Remarks by the President on the Economy (Apr. 5, 2016)*,
	https://www.whitehouse.gov/the-press-office/2016/04/05/remarks-president-economy-0 ................................ 3, 8

# INTEREST OF *AMICUS CURIAE*

Founded in 1895, the National Association of Manufacturers (the "NAM") is the largest manufacturing association in the United States, representing some 14,000 small and large manufacturers in every industrial sector and every state. Manufacturing employs 12.3 million men and women, contributes more than $2.17 trillion to the U.S. economy annually, and accounts for 12.1% of America's annual gross domestic product ("GDP"). The NAM is the voice of the manufacturing community and the leading advocate for policies that help manufacturers compete in the global economy and create jobs across the United States.

A principal function of the NAM is to represent the interests of its members before Congress, the Executive Branch, and the courts. The NAM regularly files briefs in cases raising issues of concern to America's business community.

The NAM and its members have a substantial interest in the maintenance of a predictable, consistent, and lawful tax system. Here, the Department of the Treasury (the "Treasury") has taken regulatory action by promulgating the "multiple domestic entity acquisition rule" (the "Rule") (26 C.F.R. § 1.7874-8T), which the Treasury Secretary himself has stated is an area beyond the scope of the Treasury's regulatory authority.[1] By making the Rule effective immediately as a temporary regulation, the

---

[1] *See CNBC Exclusive: CNBC's Jim Cramer Interviews Treasury Secretary Jack Lew from CNBC Institutional Investor Delivering Alpha Conference in NYC Today*, CNBC (July 16, 2014), http://www.cnbc.com/2014/07/16/cnbc-exclusive-cnbcs-jim-cramer-interviews-treasury-secretary-jack-lew-from-cnbc-institutional-investor-delivering-alpha-conference-in-nyc-today.html ("we do not believe we have the authority to address this inversion question through administrative action") [hereinafter *Cramer Interviews Secretary Lew*].

Treasury improperly seeks to evade comment by the very industry it affects and the American workers the NAM represents.

Because the Rule exacerbates uncertainty in the U.S. tax environment and undermines the ability of American manufacturers to compete and succeed in the global marketplace, the NAM submits this brief as *amicus curiae* in support of the Chamber of Commerce of the United States of America and the Texas Association of Business's: (collectively, the "Chamber") (1) Opposition to the Internal Revenue Service's ("IRS") Motion to Dismiss for Lack of Subject-Matter Jurisdiction (the "Motion to Dismiss") (ECF No. 31); and (2) the Chamber's Motion for Summary Judgment (the "Summary Judgment Motion") (ECF No. 32-1).

## INTRODUCTION

The United States currently has one of the highest corporate tax rates in the world. These higher rates, together with a worldwide tax system, put multinational corporations headquartered in the United States at a global competitive disadvantage *vis-à-vis* their foreign competitors. In some cases, in order to remain competitive with its international peers, an American company is forced into a cross-border merger sometimes termed an "inversion," where the domestic corporation becomes a subsidiary of a foreign corporation.

Over a decade ago, Congress enacted more stringent requirements to specifically limit such inversions, codified at I.R.C. § 7874 ("Section 7874"). 26 U.S.C. § 7874. Section 7874 sets specific numerical stock-ownership thresholds that determine whether the inverted parent company will be respected as a foreign corporation, or if the inverted

parent will be treated as a domestic corporation for tax purposes and become subject to other punitive tax measures.

Importantly, Congress has explicitly declined to provide the Treasury the authority to eliminate inversions altogether. In promulgating the Rule, the Treasury and the IRS have ignored the clear limits of the Tax Code in an effort to target entirely lawful transactions. Specifically, in order to circumvent the stock-ownership numerical threshold in Section 7874, the Rule—which the Treasury made immediately effective to avoid requisite notice and comment by industry stakeholders like the NAM—artificially ignores *any* stock owned by the foreign shareholders that came from prior acquisitions of an American company within three years before the inversion. As a result, the Rule effectively applies Section 7874 tax penalties to inversions that otherwise plainly satisfy the explicit requirements of Section 7874 for exemption from such penalties.

Both before and after the Rule's promulgation, the Executive Branch has admitted that international corporation inversions are legal.[2] Indeed, the very legitimacy of such inversions was called "exactly the problem."[3] The Treasury Secretary even

---

[2] *Compare* White House, Office of the Press Secretary, *Remarks by the President on the Economy—Los Angeles, Cal. (July 24, 2014)*, https://www.whitehouse.gov/the-press-office/2014/07/24/remarks-president-economy-los-angeles-ca ("I don't care if it's legal—it's wrong.") [hereinafter *July 2014 President's Remarks*], *with* White House, Office of the Press Secretary, *Remarks by the President on the Economy (Apr. 5, 2016)*, https://www.whitehouse.gov/the-press-office/2016/04/05/remarks-president-economy-0 ("It's not that they're breaking the laws, it's that the laws are so poorly designed ....") [hereinafter *April 2016 President's Remarks*].

[3] *See April 2016 President's Remarks*, *supra* n.2.

admitted that the Treasury does not possess the authority to take the administrative action it subsequently engaged in by enacting the Rule.[4]

The Rule, however, was thrust upon American manufacturers in contravention of the Administrative Procedure Act's ("APA") notice and comment requirements.[5] In a pattern that has become alarmingly routine, the Treasury has once again eschewed the requirements of the APA by promulgating a "temporary" rule that is effective immediately—that is ***before*** the public or industry stakeholders have been given the opportunity to comment on the proposed rule. And now, the Treasury seeks to insulate itself from judicial review of the manifestly unlawful Rule by claiming that the Anti-Injunction Act ("AIA") bars the Chamber's preenforcement challenge. The AIA, however, does not bar this suit because the Chamber's challenge does not restrain "the assessment or collection" of a tax.[6] Nor does the policy undergirding the AIA support dismissing the Chamber's challenge here. To the contrary, public policy dictates that the Court should hear a challenge to the Rule now—before it causes any additional damage to the public and the American manufacturing industry. Indeed, as the Rule stands now, it runs counter to the predictable, consistent, and lawful tax policy upon which America's manufacturers depend.

Finally, allowing the AIA to bar preenforcement review of the Rule would eviscerate the purpose of the APA and would allow the Treasury to continue its pattern of unlawful rulemaking. This is simply not what Congress intended to allow by enacting

---

[4] *See Cramer Interviews Secretary Lew*, *supra* n.1.
[5] 5 U.S.C. §§ 553(b)–(c).
[6] 26 U. S. C. § 7421(a).

the AIA. The Treasury is not above the law and should not be permitted to shield itself from judicial review of its promulgation of the unlawful Rule. Accordingly, the Court should deny the IRS's Motion to Dismiss (ECF No. 31) and grant the Chamber's Summary Judgment Motion (ECF No. 32-1).

## ARGUMENT

I. **Allowing the AIA to Bar Preenforcement Review of the Rule Fails to Effectuate the Purpose of the AIA and Runs Counter to Predictable, Consistent, and Lawful Tax Policy.**

The IRS mistakenly relies on the AIA to seek dismissal of the Chamber's challenge to the Rule. Neither the plain text nor the purpose of the AIA supports its application here. Moreover, policy concerns militate in favor of allowing this Court to adjudicate the lawfulness of the Rule presently. Therefore, the Court should decline the IRS's invitation to extend the AIA to preenforcement, noninjunctive suits like the Chamber's here.

    A. **The public policy behind the AIA does not bar the Chamber's challenge to the Rule.**

The AIA does not bar the Chamber's preenforcement suit seeking to invalidate the Rule because the Chamber's challenge does not seek to restrain the "assessment or collection of any tax." As courts have made clear, the AIA does not bar every suit that has a "negative impact on … [government] revenues" (*Direct Mktg. Ass'n v. Brohl*, 135 S. Ct. 1124, 1133 (2015)), that "affect[s] the money Treasury retains" (*Cohen v. United States,* 650 F.3d 717, 726 (D.C. Cir. 2011) (en banc)), or that "might be said to 'hold back'" collection of taxes (*Direct Mktg.*, 135 S. Ct. at 1132).[7] Here, the Chamber's

---

[7] In *Direct Marketing*, the Supreme Court examined both the AIA and the Tax Injunction Act ("TIA"). *Direct Mktg.*, 135 S. Ct. at 1129. Because the TIA "was modeled on the

challenge does not restrain the assessment or collection of a tax because the Chamber's suit is not challenging the determination of a taxpayer's liability or an attempt by the IRS to obtain taxes due. *See Direct Mktg.*, 135 S. Ct. at 1130; *Cohen*, 650 F.3d at 726. Moreover, no such assessment or collection has occurred at all under the Rule. Indeed, the chilling effect of the Rule has prevented the very types of inversions that could have resulted in potential increases in tax assessments and collections to the Treasury.

Because no tax has been assessed or collected here, the public policy behind the AIA of requiring taxpayers to pursue refund suits so as to avoid jeopardizing the free flow of revenue to the Treasury is not furthered by dismissing the Chamber's challenge. The "manifest purpose" of the AIA is to "'permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund.'"[8] *Cohen*, 650 F.3d at 724 (quoting *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962)). The AIA counters the "'danger that a multitude of … suits … would so interrupt the free flow of revenues as to jeopardize the Nation's fiscal stability.'" *Id.* (quoting *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 769 (1974) (Blackmun, J., dissenting)).

But here, there has been no assessment or collection of taxes upon which the Chamber (or anyone else) could sue the IRS for a refund. The operation of the Rule instead scuttles inversions that may have otherwise led to increased assessments and

---

… AIA," the Court "assume[d] that words used in both Acts are generally used in the same way." *Id.*

[8] However, the Supreme Court, the D.C. Circuit, and other circuits have allowed challenges to tax laws outside of refund suits in certain instances. *Cohen*, 650 F.3d at 726 (listing cases).

collection of taxes. *See*, *e.g.*, Kristen Hallam et al., *Pfizer Confirms Termination of Proposed $160 Billion Allergan Merger*, Bloomberg (Apr. 6, 2016), http://www.bloomberg.com/news/articles/2016-04-06/pfizer-allergan-end-160-billion-merger-amid-new-tax-rules (explaining that the promulgation of the Rule caused the proposed inversion between Pfizer Inc. and Allergan plc to be abandoned). No tax court can provide American workers recourse for a business opportunity lost under the Rule. Nor is there an existing stream of revenue to the Treasury that is in danger of being interrupted by the maintenance of the Chamber's suit. Absent either the assessment or collection of taxes under the Rule or the danger of the free flow of Treasury revenues being constricted, the manifest purpose of the AIA is unencumbered. Accordingly, the AIA does not require the dismissal of the Chamber's suit.

> **B.** **The Rule runs counter to the predictable, consistent, and lawful tax policy upon which America's manufacturing industry depends.**

Public policy concerns further dictate that the Court should hear the preenforcement challenge now, before the Rule can do any further damage to the public and specifically to the American manufacturing industry. The NAM is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and every state. Manufacturing has the largest economic impact of any major economic sector, and accounts for two-thirds of private research and development. The NAM and its industry members have a substantial interest in the maintenance of a predictable, consistent, and lawful tax system— something that is being undermined by the Rule.

Here, the Rule's practical impacts threaten domestic economic growth and investment, as well as American manufacturing jobs. This is particularly true in the manufacturing sector in which cross-border mergers—like inversions—have proven beneficial to competitiveness.

Perhaps most detrimental to American manufacturers is that the Rule's unilateral promulgation creates needless inconsistency and instability in the tax policy. After first admitting that the Treasury was without the authority to curb inversions administratively, the Treasury subsequently did just that after Congress declined to legislate the inversion-curbs the Executive Branch sought. *See Cramer Interviews Secretary Lew* ("we do not believe we have the authority to address this inversion question through administrative action"). And the Rule artificially disregards international corporate transactions that even the Executive Branch admits are "legal" and legitimate. *Compare July 2014 President's Remarks* ("I don't care if it's legal—it's wrong."), *with April 2016 President's Remarks* (calling the legitimacy of inversions "exactly the problem"). The Treasury's desire to penalize corporate activity it admits is legal creates an even more uncompetitive and unpredictable tax environment than that previously faced by American manufacturers.

On balance, the Rule makes the tax environment in which American manufacturers must operate less predictable and more inconsistent. As the primary voice for over 12 million men and women who work in the American manufacturing sector that contributes some $2.17 trillion to the United States economy annually, the NAM urges the Court to restore lawful tax policy to American manufacturers. The

Treasury should not be permitted to unilaterally change tax laws with a stroke of its pen. Instead, the Court should adjudicate the lawfulness of the Rule at the preenforcement stage, so as to mitigate any further damage to the public.

## II. Allowing the AIA to Bar Pre-Enforcement Review of the Rule Eviscerates the Purpose of the APA and Allows the Treasury to Continue its Pattern of Unlawful Rulemaking.

The Court should also decline to interpret the AIA in a manner that effectively shields Treasury regulations from any type of judicial review and insulates it from having to comply with the APA. In promulgating tax regulations, the Treasury—like virtually every other federal agency—is subject to the substantive provisions of the APA and to judicial oversight of those regulations through the APA. To that end, the Supreme Court has declined "to carve out an approach to administrative review good for tax law only." *Mayo Found. for Med. Educ. & Res. v. United States*, 562 U.S. 44, 55 (2011). Notwithstanding this clear acknowledgment that the Treasury is not "above the law," here the Treasury advocates for an excessively broad reading of the AIA, which eviscerates the congressional goals of the APA. The Treasury's continued attempt to evade judicial review of its tax regulations, such as the Rule here, is even more egregious in light of the Treasury's long and documented history of non-compliance with the APA's notice and comment rulemaking provisions. To that end, this Court should adopt a narrow reading of the AIA, which can be applied in harmony with the APA's goals of ensuring the legitimacy of the agency rulemaking process.

### A. The Treasury and IRS have a history of disregarding the applicable APA rulemaking provisions.

The APA's notice and comment provision (5 U.S.C. §§ 553(b)–(c)) are not merely academic—they ensure that regulated parties may participate in the

promulgation of rules *before* such rules are enforced against them. "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).

The Treasury purportedly seeks to comply with APA rulemaking requirements in promulgating final tax regulations. *See*, *e.g.*, 26 C.F.R. § 601.601(a)(2) ("Where required by 5 U.S.C. § 553 and in such other instances as may be desirable, the Commissioner publishes in the Federal Register general notice of proposed rules …."); Kristin E. Hickman, *Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 NOTRE DAME L. REV. 1727, 1729–30 n.11 (2007) (citing INTERNAL REVENUE MANUAL § 32.1.2.3 ("[A]lthough most IRS/Treasury regulations are interpretative, the IRS usually publishes its NPRMs in the Federal Register and solicits public comments.")).

This pattern is not surprising because the APA does not exempt the Treasury or the IRS from compliance with its substantive provisions in promulgating final tax regulations, nor does it exempt either from judicial review. *Cohen*, 650 F.3d at 723 ("The IRS is not special in this regard; no exception exists shielding it—unlike the rest of the Federal Government—from suit under the APA."); *Hibbs v. Winn*, 542 U.S. 88, 105 (2004) ("Nowhere does the legislative history announce a sweeping congressional direction to prevent 'federal-court interference with all aspects of … tax administration.'").

This is particularly troubling given how many areas of government are affected by the Treasury's policies. Targeted tax provisions make the IRS responsible "for the administration of policies aimed at the environment, conservation, green energy, manufacturing, innovation, education, saving, retirement, health care, child care, welfare, corporate governance, export promotion, charitable giving, governance of tax exempt organizations, and economic development, to name a few." Pamela F. Olson, *And Then Cnut Told Reagan ... Lessons from the Tax Reform Act of 1986*, 38 Ohio N.U. L. Rev. 1, 12–13 (2011) (footnotes omitted).

The Treasury has a long history of documented noncompliance with APA notice and comment rulemaking requirements. As one noted tax law professor observed: "Treasury often fails to follow APA rulemaking requirements … [and] rarely offers the sort of particularized explanation often demanded by the courts." Kristin Hickman, *A Problem of Remedy: Responding to Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 76 Geo. Wash. L. Rev. 1153, 1159 (2008). Importantly, Professor Hickman found that the most widespread area of noncompliance appears in "Treasury's frequent issuance of binding, temporary regulations with only post-promulgation notice and comment." *Id.* at 1160, n.25; *see also generally* Michael Asimow, *Public Participation in the Adoption of Temporary Tax Regulations*, 44 Tax Law. 343 (1991) (discussing the Treasury's overreliance on temporary regulations and raising concerns about APA noncompliance).

The Treasury often relies on "temporary regulations" because such regulations purport to be effective immediately, without the normal prepromulgation notice and

comment procedures. *See*, *e.g.*, Irving Salem *et al.*, *ABA Section of Taxation Report of the Task Force on Judicial Deference*, 57 Tax Law. 717, 735 (2004). Thus, the Treasury implements regulations that impose a tax burden upon the public ***before*** such regulations are subject to the customary notice and comment process. The Fifth Circuit has recognized this systemic problem, noting concern that promulgation of "[t]emporary Regulations without subjecting them to notice and comment procedures … is a practice that the Treasury apparently employs regularly." *Burks v. United States*, 633 F.3d 347, 360 n.9 (5th Cir. 2011). The Treasury has employed precisely this tactic in promulgating the Rule here. (*See* Summary Judgment Motion, at 10 (ECF No. 32-1)). It enacted the Rule as a temporary one, but one that became effective immediately, and one that the Treasury intends to enforce without ***first*** seeking input from the public or from the industry it affects. The Treasury is not—and should not be allowed to act as if it is—so unaccountable.

### B. The Court should not read the AIA to allow the Treasury to escape judicial review of all tax regulations in derogation of the APA.

The Treasury's continued noncompliance with the APA's substantive provisions makes the APA's judicial review mandate critical to maintain the legitimacy of the rule-making process. Congress provided for judicial review of agency rulemaking under the APA unless a statute specifically precludes such review. 5 U.S.C. § 701(a)(1). As the Supreme Court recognized, "only upon a showing of 'clear and convincing evidence'" of congressional intent to withhold judicial review should courts restrict access to such review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967). Contrary to the Treasury's position, and as discussed above, a regulation that merely touches upon tax

issues is plainly not exempt from judicial review under the AIA. Instead, the AIA bars such actions only related to a purported restraint of the "assessment" and "collection" of taxes.

This Court should interpret the AIA in harmony, not in discord, with the APA provisions calling for judicial review of agency action. *See United States v. Marshall*, 771 F.3d 854, 863 (5th Cir. 2014) ("[S]tatutes dealing with the same subject matter should be read together and harmonized, if possible" (internal quotations omitted)). The purpose of the APA's notice and comment requirements is to aid government rulemaking, and also protect the rights of the taxpayer through notice and comment procedures initiated before agencies adopt binding regulations. Judicial review under the APA ensures that agencies like the Treasury afford such protections to the public. And court oversight is even more critical given the Treasury's promulgation of regulations related to numerous social welfare programs (discussed, *supra*, at 11), which are, at best, only tangentially related to Treasury's traditional revenue-raising functions.

A narrow reading of the AIA fulfills Congress's goal of protecting the inflow of money owed to the IRS through the assessment and collection of taxes, while still staying true to the APA's purpose. Conversely, the broad reading of the AIA advanced by the Treasury here essentially permanently exempts Treasury regulations—some of which are unlawful like the Rule here—from judicial review. This ignores and eviscerates the APA. Such a broad reading effectively creates an immediate prohibition on judicial review of the Rule for at least three years. *See* 26 U.S.C. § 7805(e) (providing that any temporary regulation issued by the Treasury expires within three years of

issuance). Congress certainly did not intend to create such a broad exemption for tax regulations, and this Court should decline to create one.

## CONCLUSION

For the foregoing reasons, the NAM respectfully requests that this Court deny the IRS's Motion to Dismiss (ECF No. 31) and grant the Chamber's Summary Judgment Motion (ECF No. 32-1).

*[Signature page follows]*

Date: November 8, 2016                    **SQUIRE PATTON BOGGS (US) LLP**

*/s/ Dylan O. Drummond*
Pierre H. Bergeron (*pro hac vice* pending)
D.C. Bar No. 990977
pierre.bergeron@squirepb.com
Charles E. Talisman (*pro hac vice* pending)
D.C. Bar No. 367314
charles.talisman@squirepb.com
Rachael Harris (*pro hac vice* pending)
D.C. Bar No. 983044
rachael.harris@squirepb.com
2550 M Street Northwest
Washington, D.C.  20037
Telephone:     (202) 457-6000
Facsimile:     (202) 457-6315

Dylan O. Drummond
Texas Bar No. 24040830
dylan.drummond@squirepb.com
2000 McKinney Avenue, Suite 1700
Dallas, TX  75201
Telephone:     (214) 758-1500
Facsimile:     (214) 758-1550

– and –

Linda Kelly (*pro hac vice* pending)
Senior Vice President & General Counsel
National Association of Manufacturers
D.C. Bar No 477635
LKelly@NAM.org
733 10th Street NW, Suite 700
Washington, D.C.  20001
Telephone:     (202) 637-3000
Facsimile:     (202) 637-3182

*Counsel for Amicus Curiae*
*National Association of Manufacturers*